No. 24-1437

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

CUTBERTO VIRAMONTES, et al.,

*Plaintiffs-Appellants*,

v.

THE COUNTY OF COOK, et al.,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS (No. 21-cv-4595)
HONORABLE REBECCA R. PALLMEYER

---

## BRIEF AND REQUIRED SHORT APPENDIX
## OF PLAINTIFFS-APPELLANTS

---

David H. Thompson
  *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1437</u>

Short Caption: <u>Cutberto Viramontes, et al. v. The County of Cook, at al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Cutberto Viramontes, Christopher Khaya, Second Amendment Foundation, Inc., Firearms Policy Coalition</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Law Firm of David G. Sigale, P.C.</u>

    <u>Cooper & Kirk, PLLC</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>Second Amendment Foundation (None); Firearms Policy Coalition (None)</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>Second Amendment Foundation (None); Firearms Policy Coalition (None)</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ David H. Thompson</u>    Date: <u>June 24, 2024</u>

Attorney's Printed Name: <u>David H. Thompson</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☐ No ☑

Address: <u>1523 New Hampshire Ave. N.W.,</u>

    <u>Washington, D.C. 20036</u>

Phone Number: <u>(202) 220-9600</u>    Fax Number: <u>(202) 220-9601</u>

E-Mail Address: <u>dthompson@cooperkirk.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT .............................................. 6

ISSUE PRESENTED FOR REVIEW ...................................... 6

STATEMENT OF THE CASE .................................................. 6

SUMMARY OF ARGUMENT ................................................. 11

ARGUMENT ............................................................................ 18

I.   This Court Should Reverse Based on *Heller* and *Bruen*. ............. 18

    A. *Bevis* Is Fundamentally Incompatible With *Heller* and *Bruen*. .................................................................... 19

    B. This Case Is Straightforward Under *Heller* and *Bruen*. ...... 34

II.  In the Alternative, the Court Should Reverse the District Court Under *Bevis*. ........................................................... 36

    A. *Bevis* Did Not Hold that *Wilson* and *Friedman* Control This Case. ............................................................ 37

    B. The Ordinance Is Unconstitutional Under *Bevis*. ............... 39

        1.   The Banned Rifles Are "Arms" Under *Bevis*. .................. 40

         i.   The Banned Rifles Are Useful for Self-Defense. ......... 43

         ii.  The Banned Rifles Are Distinct from M16s................. 54

         iii. The Banned Rifles Are Not Commonly Used for Unlawful Purposes........................................................ 59

i

2.  The Banned Rifles Are Protected Under *Bevis*'s Historical Analysis..............................................................................61

CONCLUSION ................................................................................63

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023)........... 3, 4, 5, 9, 13, 14, 19, 20, 24, 28, 29, 30, 31, 32, 33, 34, 37, 38, 39, 40, 41, 42, 43, 49, 54, 56, 59, 62

*Bradley v. Vill. of Univ. Park*,
929 F.3d 875 (7th Cir. 2019) ......................................................... 62

*Dabbs v. State*,
39 Ark. 353 (1882) ......................................................................... 32

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................ 1, 9, 19, 20, 21, 22, 24, 25, 26, 28, 34, 35, 36, 47

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ......................................................... 44

*Free v. Peters*,
12 F.3d 700 (7th Cir. 1993) ........................................................... 44

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ........................................................... 8

*Garland v. Cargill*,
__ U.S. __, 2024 WL 2981505 (U.S. June 14, 2024) .............. 3, 5, 10

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........................................... 2, 49, 60

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ....................................................................... 10

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022) ......... 2, 8, 22, 23, 26, 27, 28, 29, 31, 33, 40, 41, 62

*Staples v. United States*,
511 U.S. 600 (1994) ................................................................. 57, 58

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023)..................................................... 27, 28

*Teter v. Lopez*,
93 F.4th 1150 (9th Cir. 2024)................................................... 27, 28

*United States v. Rahimi,*
   602 U.S. ___, 2024 WL 3074728 (U.S. June 21, 2024)............... 2, 23

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 (2021) ....................................................................... 10

*Wilson v. Cook County,*
   937 F.3d 1028 (7th Cir. 2019) .......................................................... 8

## Constitutional Provisions, Statutes, and Rules

U.S. CONST. amend. II. ................................................................................ 34

7th Cir. R. 40(e) ...................................................................................... 4, 19

720 ILL. COMP. STAT. 5/24-1.9 .................................................................. 9

COOK CNTY., ILL., CODE OF ORDINANCES (Oct. 17, 2023),
   https://bit.ly/2Lcts75

   § 54-211 ........................................................................................... 6, 7

   § 54-211(1) ........................................................................................... 7

   § 54-211, *Assault weapon* ¶ (1)(A) ................................................. 43

   § 54-211, *Assault weapon* ¶ (1)(B) ................................................. 43

   § 54-211, *Assault weapon* ¶ (1)(C) ................................................. 44

   § 54-211, *Assault weapon* ¶ (1)(D) ................................................. 45

   § 54-211, *Assault weapon* ¶ (1)(E) ................................................. 44

   § 54-211, *Assault weapon* ¶ (6) ....................................................... 7

   § 54-211, *Assault weapon* ¶ (7)(A) ................................................... 7

   § 54-211, *Large-capacity magazine* ................................................. 7

   § 54-212(a) ...................................................................................... 6, 7

## Other Authorities

*2019 Firearms Retailer: Survey Report*, NSSF (2019), *available at*
   James Curcuruto's Decl. in Supp. of Pls'. Prelim. Inj. Mot. at 107,
   *Miller v. Becerra*, No. 3:19-cv-1537, Doc. 22-13
   (S.D. Cal. Dec. 6, 2019) .................................................................. 52

*2021 Firearms Retailer: Survey Report*, NSSF (2021),
   https://bit.ly/3gWhI8E .................................................................... 52

A Digest of the Statutes of Arkansas
(W.W. Mansfield ed. 1884) ........................................................ 30, 31

*AFTE Glossary*, Ass'n of Firearm & Tool Mark Exam'rs
(6th ed. 2021) ................................................................................ 44

Ordinances of the City of Cleveland (1890) .................................... 30

*Crime Data Explorer: Expanded Homicide Offense Characteristics
in the United States*, U.S. Dep't of Just., FBI (2023),
https://bit.ly/3IF5A6M .............................................................. 59, 60

Definition of "Frame or Receiver & Identification of Firearms,
2022 WL 1159420 (ATF Apr. 10, 2022) ........................................ 3

Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in
Crimes: Survey of Prison Inmates, 2016*, U.S. Dep't of Just.,
Bureau of Just. Stats. (Jan. 2019), https://bit.ly/31VjRa9 ........ 60

Chris Bird, The Concealed Handgun Manual: How to Choose,
Carry, and Shoot a Gun in Self Defense (1998) .................. 46, 47

Dennis P. Chapman, The AR-15 Controversy: Semiautomatic
Rifles and the Second Amendment (2d ed. 2022)..... 44, 45, 56, 58

William English, *2021 National Firearms Survey: Updated Analysis
Including Types of Firearms Owned* (May 13, 2022),
https://bit.ly/3yPfoHw ............................................................ 50, 51

*Firearm Production in the United States With Firearm Import and
Export Data*, NSSF (2023), https://bit.ly/42qYo7k .................... 53

Gun Trace Report 2017, Chi. Police Dep't, https://bit.ly/2Jl3iM2 ........ 61

Joseph W. Galvin et al., *Rate and time to return to shooting following
arthroscopic and open shoulder surgery*,
6 JSES Int'l 963 (2022) ................................................................ 48

Emily Guskin et al., *Why do Americans own AR-15s?*, Wash. Post
(Mar. 27, 2023), https://wapo.st/3IDZG5I ................................ 49, 50

Stephen P. Halbrook, America's Rifle: The Case for the AR-15
(2022) ........................................................................................ 43, 48

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and
the Abortion Analogue: Stenberg Principles, Assault Weapons,
and the Attitudinalist Critique*, 60 Hastings L.J. 1285 (2009) .... 49

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 ................................................. 61, 62

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994) ............................... 43, 44

David Kopel, *The legal history of bans on firearms and Bowie knives before 1900,* REASON (Nov. 20, 2022), https://bit.ly/3T5Uu17 ................................................. 31, 32

Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence*, NAT'L RSCH. COUNCIL (2013), https://bit.ly/48ZYjcm ....................................................... 51

Frank Main et al., *In Chicago, handguns turned into high-capacity machine guns fuel deadly violence*, NPR (Oct. 28, 2022), https://n.pr/3H6Jeuy ..................................................... 60

Frank Main, *Shorter 'time-to-crime' for guns used in crimes in Chicago than in NY, LA, a sign of illegal trafficking, Justice Department says*, CHI. SUN-TIMES (Feb. 4, 2023), https://bit.ly/3N5wl7N ..................................................... 61

FRANK MINITER, THE FUTURE OF THE GUN (2014) ............................ 53, 54

*Modern Sporting Rifle: Comprehensive Consumer Report*, NSSF (July 14, 2022), https://bit.ly/3GLmErS ......................................... 51

*National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two*, ATF (Feb. 2, 2023), https://bit.ly/3Lj3c7S ..................................................... 61

*Poll of current gun owners*, WASH. POST-IPSOS (Oct. 11, 2022), https://bit.ly/46CqzRa.............................................. 49, 50

*Report and Recommendation on the Importability of Certain Semiautomatic Rifles*, ATF (July 6, 1989), https://bit.ly/4euRLGN .................................................... 47

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. TRAUMA ACUTE CARE SURG. 853 (2016)................................... 48

*Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY (2008), https://bit.ly/3pvS3SW ................................. 56, 58, 59

*Small Arms Weapon System Study, Part One*, U.S. ARMY COMBAT DEVS. COMMAND, EXPERIMENTATION COMMAND (Sept. 12, 1966) ...............................................................55

Clint Smith, *Home Defense*, GUNS MAG. (2005) .....................................46

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, HARV. J.L. & PUB. POL'Y PER CURIAM (Oct. 1, 2022), https://bit.ly/3CMSKjw...................................................................33

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J.L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ.......................................26

*Sport Shooting Participation in the U.S. in 2020*, NSSF (2021), https://bit.ly/3sPuEQl.....................................................................52

E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 TENN. L. REV. 1 (2020).........................................................46, 48

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U.L.J. 193 (2018)............................................45, 46, 56, 57

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq.......................................................35

## INTRODUCTION

The question presented by this case is whether the Second Amendment permits the government to ban the best-selling rifle in America and similar semiautomatic firearms. The answer is no. In *District of Columbia v. Heller*, the Supreme Court held that "[t]he 18th-century meaning" of the word "arms" is "no different from the meaning today"—namely, "weapons of offence, or armour of defence." 554 U.S. 570, 581 (2008) (cleaned up). And because the plain text of the Second Amendment does not distinguish between types of bearable arms, the Amendment's protection "extends, prima facie, to *all* instruments that constitute bearable arms." *Id.* at 582 (emphasis added). To be sure, *Heller* acknowledged that the Second Amendment does not protect a right "to keep and carry any weapon whatsoever." *Id.* at 626. But limitations on the right must come from history. And *Heller* held that "historical tradition" predating ratification of the Second Amendment demonstrates that only "dangerous and unusual weapons" are not protected. *Id.* at 627. Firearms "in common use" by law-abiding citizens, by contrast, are protected, because common arms cannot be unusual. *Id.* And, again, the default is protection; only those weapons that are "*highly* unusual in

1

society at large" are unusual in a constitutionally significant sense. *Id.* (emphasis added).

The Supreme Court clarified two years ago in *New York State Rifle & Pistol Association v. Bruen*, and reaffirmed very recently in *United States v. Rahimi*, that *Heller*'s mode of analysis—a review of the plain text of the Second Amendment followed by analogizing modern restrictions to historically grounded ones—governs all Second Amendment challenges. 597 U.S. 1, 26 (2022); 602 U.S. ___, 2024 WL 3074728, at *6 (June 21, 2024). The Court did not in any way undermine *Heller*, but instead provided a more fulsome elaboration of "*Heller*'s methodology." *Id.* at 22. And the Court repeatedly confirmed *Heller*'s central holding that arms in common use are absolutely protected. *See id.* at 22, 32, 47. In doing so, the Court vindicated then-Judge Kavanaugh's dissent in the D.C. Circuit opining that bans on common semiautomatic rifles like Cook County's are unconstitutional. *See Heller v. District of Columbia*, 670 F.3d 1244, 1285–91 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting).

The principles established by *Heller* and confirmed by *Bruen* should make this a straightforward case. The paradigmatic semiautomatic rifle

banned by Cook County is the modern AR-15, and not only is it "commonly available," *Garland v. Cargill*, __ U.S. __, 2024 WL 2981505, at *11 (U.S. June 14, 2024) (Sotomayor, J., dissenting), but according to the agency charged with administering the Nation's firearms laws it is "one of the most popular firearms in the United States," Definition of "Frame or Receiver & Identification of Firearms, 2022 WL 1159420, at *2 (ATF Apr. 10, 2022). And Cook County has offered nothing to distinguish the AR-15 from other types of semiautomatic rifles it bans. Under *Heller* and *Bruen*, therefore, Cook County's ban is unconstitutional. This Court's inquiry should end there.

Of course, this Court's decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), complicates matters. *Bevis* purported to apply *Heller* and *Bruen* to an Illinois law similar to Cook County's, but in reality, it crafted a rule that is contrary to both of those decisions and the text and history of the Second Amendment, purporting to draw a line between "civilian" firearms, which are protected, and "military" firearms, which are not—a line that the Supreme Court does not itself draw.

If this Court disagrees that it should overrule Bevis consistent with the rules of this Circuit, then it can still rule for Plaintiffs under the

flawed Bevis test. *See* 7th Cir. R. 40(e). Contrary to *Bevis*, *Heller* and *Bruen* do not call for courts and legislatures to make a "distinction between military and civilian weaponry." *Bevis*, 85 F.4th at 1201. Rather, *Heller* and *Bruen* establish that all firearms are protected unless the government can prove they are dangerous and unusual weapons.

Even under *Bevis*'s flawed understanding of the Second Amendment, however, Cook County's ban on common semiautomatic rifles cannot be sustained. In analyzing whether civilian, semiautomatic AR-15s can be distinguished from military, fully automatic M16s, *Bevis* incorrectly focused on the relative firing rates of the two types of firearms,[1] while acknowledging that "[b]etter data" may "change the

---

[1] Of note, however, is that firing rate is an inherently irrelevant inquiry under the Supreme Court's test, and, arguably, is nothing more than a new form of the means-end scrutiny prohibited by the Supreme Court in Second Amendment cases. All that is relevant in distinguishing a semiautomatic firearm from a fully automatic M16, is that a semiautomatic firearm only fires a single round per function of the trigger, while a fully automatic M16 can and will fire multiple rounds with a single function of the trigger, until the firearm malfunctions or the magazine is exhausted. All semiautomatic arms—whether the rifles at issue here, or common semiautomatic handguns—have that same basic function. As demonstrated below, there can be no question that semiautomatic firearms, and specifically the semiautomatic rifles at issue here, are in common use, and they thus cannot be banned under existing Supreme Court precedent, regardless of rate of fire.

analysis." *Id*. at 1197. Justice Sotomayor provided better data in *Cargill*: "with an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute," while "[a] regular person with an AR-15 can achieve a fire rate of around 60 rounds per minute." *Cargill*, 2024 WL 2981505, at *12–13 (Sotomayor, J., dissenting). That, in addition to basic mechanical function, further demonstrates that "the AR-15 is materially different from the M16." *Bevis*, 85 F.4th at 1197. More, if this Court continues to look to factual differences between semiautomatic and fully automatic arms, then it is a truth that along with a machinegun's increased rate of fire comes an increased difficulty in controlling that fire and directing it with precision. Accuracy is key to safe and effective defensive firearm use. AR-15s and similar semiautomatic rifles, through their semiautomatic function, are simply easier to fire accurately. For these reasons, even if this Court engages in this inappropriate analysis, this Court can rule for Plaintiffs without overruling *Bevis*.

Whether properly analyzed under *Heller* and *Bruen*, or under *Bevis*, this Court should rule Cook County's ban unconstitutional and reverse.

## JURISDICTIONAL STATEMENT

This case is an action brought under 42 U.S.C. § 1983, challenging the constitutionality of a Cook County Ordinance under the Second and Fourteenth Amendments to the United States Constitution. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343. The district court entered its final judgment and order granting Cook County's motion for summary judgment and deny Plaintiffs' motion for summary judgment on March 1, 2024. Plaintiffs timely filed a notice of appeal on March 15, 2024. This Court has jurisdiction under 28 U.S.C. § 1291. *See* Order, Doc. 12 (May 15, 2024).

## ISSUE PRESENTED FOR REVIEW

Whether Cook County's ban on semiautomatic rifles that are among the most popular firearms in the country, including the most popular rifle in American history, infringes the "right to keep and bear arms" protected by the Second Amendment to the United States Constitution.

## STATEMENT OF THE CASE

Cook County makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" common semiautomatic rifles, which it has tendentiously labeled "assault weapons." *See* COOK CNTY., ILL., CODE OF ORDINANCES §§ 54-211,

54-212(a) (Oct. 17, 2023), https://bit.ly/2Lcts75 (hereinafter "C.C. Ord.").

Cook County identifies semiautomatic rifles as so-called "assault weapons" both by feature and by name. The lengthy list of over 100 specific rifles banned by name (as well as "copies or duplicates thereof") includes the modern AR-15 and AK-47 rifle platforms. *Id.* § 54-211, *Assault weapon* ¶ (7)(A). And the features-based ban covers those same rifles in their standard configurations, banning any semiautomatic rifle with the ability to accept a magazine holding more than ten rounds of ammunition if it has one or more of the following features:

> (A)    Only a pistol grip without a stock attached;
> (B)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
> (C)    A folding, telescoping or thumbhole stock;
> (D)    A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or
> (E)    A muzzle break or muzzle compensator.

*Id.* § 54-211(1); *see also id.* § 54-211, *Large-capacity magazine*. The Ordinance also bans any "[c]onversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person." *Id.* § 54-211, *Assault weapon* ¶ (6).

Plaintiffs Cutberto Viramontes and Christopher Khaya are law-abiding residents of Cook County who wish to own banned semiautomatic rifles for lawful purposes. App.4. Viramontes and Khaya are both members of Plaintiffs Firearms Policy Coalition and Second Amendment Foundation, nonprofit membership organizations dedicated to promoting and protecting the rights enshrined in the Second Amendment to the United States Constitution. *Id*.

Plaintiffs filed this action on August 27, 2021, alleging that the Ordinance violates the Second Amendment and seeking declaratory and injunctive relief. Slip op. 3. Recognizing that their claims were foreclosed, at the time, by this Court's prior decision in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) and *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and hoping to have this Court overrule those decisions, Plaintiffs filed a motion for judgment on the pleadings. App.5. Cook County opposed that motion, stating that it desired to build a record that the banned firearms are "dangerous and unusual," an issue left undecided by *Wilson* and *Friedman*, and the Court denied the motion. App.5–6. While discovery was ongoing, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022),

8

abrogating most circuit court precedent in Second Amendment cases and clarifying the methodology the Supreme Court had applied in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

On January 10, 2023, Illinois passed a statewide ban on so-called "assault weapons" that largely overlaps with the Ordinance, including with respect to the types of firearms that Plaintiffs Viramontes and Khaya wish to acquire. *See* 720 ILL. COMP. STAT. 5/24-1.9. Following the close of discovery, Cook County and Plaintiffs cross-moved for summary judgment in early 2023. App.7. While those motions were pending before the district court, this Court issued its opinion in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), affirming two district court decisions that had declined to preliminarily enjoin the statewide ban and reversing a parallel decision that had granted a preliminary injunction. In light of *Bevis* and the continuing applicability of the overlapping statewide ban, the district requested briefing on the question of whether this case was moot because the State ban independently prohibited Plaintiffs from acquiring the firearms they wish to own. App.12. The parties agreed the case is not moot, though for different reasons. App.12–13.

9

On March 1, 2024, the district court granted summary judgment to Cook County and denied Plaintiffs' cross-motion. Beginning with the issue of mootness, the Court accepted Plaintiffs' arguments that the case remains a live controversy for two independent reasons. First, Plaintiffs have sought nominal damages against Cook County, which are not barred by sovereign immunity and which ensure that this case can provide Plaintiffs with redress for their injuries. App.12; *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) (nominal damages); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (no sovereign immunity). Second, the Defendants in this case include the same officials who are charged with enforcing the statewide ban against the Plaintiffs, and "the two bans are similar enough that the unconstitutionality of one would likely fall with the other," such that if Plaintiffs win this case, they likely would not need to fear enforcement of the state ban by the Defendants. App.13. On the merits, the district court held that *Wilson* and *Friedman* remained good law following this Court's decision in *Bevis* so Plaintiffs' claims were foreclosed by those cases and, in any event, Plaintiffs had not presented evidence that convinced the district court that this case was distinguishable from *Bevis*. App.14–15.

## SUMMARY OF ARGUMENT

1. This Court could can and should resolve this case by applying *Bruen* and *Heller* directly. A straightforward application of those cases requires reversing the decision below.

A. Doing so would entail overruling *Bevis*, which this Court has authority to do under Circuit Rule 40(e), and *Bevis* is inconsistent with *Bruen* and *Heller*. Beginning with the text of the Amendment, *Bevis*'s reading of "bearable arms" as limited to certain sufficiently useful non-military firearms, as determined by judges, is untenable under *Heller*, which makes perfectly clear that *any* firearm that is capable of being carried (i.e., is "bearable") presumptively triggers the Second Amendment's protections. *Bevis*'s reasons for holding otherwise are unconvincing and based on a misreading of a section of *Heller* that (1) was concerned with *history* not the Amendment's plain text and (2) does not establish that arms can be banned if they are sufficiently useful in military service, but rather seeks to explain how certain arms can be banned *despite* their use by the military if they are both "dangerous" and "unusual."

Similarly, the *Bevis* Court's rejection of "common use" as dispositive of the historical analysis called for in *Bruen* cannot be squared with either *Bruen* or *Heller*. In *Heller*, which itself dealt with an arms ban (there, handguns), the Court surveyed the relevant history and concluded that the only historical tradition that could support banning a type of firearm was the historical prohibition on "dangerous and unusual weapons." But in acknowledging that tradition, the Court noted that it had a positive corollary: arms in common use are *per se* protected and cannot be banned. *Bruen* did nothing to call this conclusion into question—indeed *Bruen* itself used the tradition of restricting "dangerous and unusual weapons" as an example of the sort of rules that can be appropriately derived from history when explaining its analytical framework.

Finally, even if "dangerous and unusual" was just one possible tradition supporting banning types of firearms (and it is not, under *Heller*), the *Bevis* panel's analysis of history would still not pass muster under *Bruen*. As *Bruen* explained in great detail, to support a modern law, historical restrictions must be part of a broader "tradition" of regulation that impacted the right to keep and bear arms in similar ways

and for similar reasons. The handful of laws collected by the *Bevis* panel entirely fail this test: they are disconnected laws which do not form a "tradition," and they neither burdened the right in the same way, nor for the same reasons, as Cook County's ban.

B. If *Bevis* is overruled as inconsistent with *Heller* and *Bruen*, resolution of this case is straightforward. *Heller* held that *all* firearms are "arms" within the scope of the Second Amendment, and it also held that an arm "in common use" cannot be banned consistent with history. So, while in other cases applying *Bruen* will involve original historical work and analysis of the foundations of a modern restriction, here, because there can be no doubt that the banned arms are "in common use," Cook County's ban is an historical outlier repugnant to the Second Amendment and should be held unconstitutional.

2. In the alternative, if this Court applies *Bevis* to this case, Plaintiffs should still win. The district court preformed little original analysis of Plaintiffs' or the County's arguments in favor of their respective motions, instead treating as essentially dispositive the statement from *Bevis* that "*Friedman* [is] basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on

13

history, not on a free-form balancing test." 85 F.4th at 1189. But *Bevis* did not hold that *Friedman* or *Wilson* remain the law in this Circuit—after all, if they *were* still controlling, then *Bevis* would not have had to do all the original work it did to decide that case—and it was error for the district court to resolve this case as though they were.

If the district court had properly analyzed Plaintiffs' claims under *Bevis*, it would have ruled in Plaintiffs' favor. In this respect, it is important to note that while the district court was bound to follow *Bevis*'s analytical framework, its conclusions—couched as they were in the preliminary injunction posture of "likelihood of success on the merits"—are not binding. *Id*. at 1197. Indeed, the *Bevis* panel went out of its way to stress that a future case, on final judgment, might offer evidence that undercut its ultimate conclusions as to the constitutionality of a so-called "assault weapons" ban. *Id*. This is such a case.

A. Beginning with the text, *Bevis* tentatively concluded that modern AR-15s and similar banned semiautomatic rifles are not "bearable arms" within the meaning of the plain text because it held that "bearable arms" were limited only to "civilian" arms while "military" weapons are not protected. To decide on which side of the line a given firearm falls, *Bevis*

14

instructed courts to consider (1) whether the banned arms are useful for self-defense, (2) whether they can be meaningfully distinguished from the weapons used by the military, and (3) whether they are commonly possessed for *unlawful* means.

Asking those questions here, it is apparent that the rifles banned by Cook County—which, like those at issue in *Bevis*, are typified by the modern AR-15 rifle—are properly classed as "civilian" weapons. As to the first issue, they are overwhelmingly popular among civilians who choose them in large numbers for self-defense. Indeed, semiautomatic rifles, such as the AR-15, are the most popular rifles among American civilians in history, and their popularity is only growing, as consumer surveys, retailer surveys, and hard manufacturing data all show. The low end of estimates of their prevalence *still* places the number of AR-15s alone in civilian hands in the tens of millions. And no matter who is asking the question, an overwhelming majority of owners report that they own them for self-defense. In addition, an analysis of the very features Cook County singles out as impermissible on a rifle (again, features that are common on AR-15s and other semiautomatic rifles) demonstrates that each

feature itself performs a function that contributes to the firearm's reliability, accuracy, and all-around suitability for self-defense.

Furthermore, the rifles banned by Cook County are unlike those used by the military. As the *Bevis* majority pointed out, the modern, civilian AR-15 is a semiautomatic version of an M16: they (often) fire the same ammunition, with similar velocity and other ballistic characteristics, and they are visually similar because they are built on the same general configuration of parts. But there is a world of difference between a "semiautomatic version" of automatic weapon, and an automatic weapon, which the fuller record in this case amply demonstrates. First, the *Bevis* Court was wrong that a semiautomatic rifle and an automatic rifle offer relatively similar rates of fire. The difference is much starker than *Bevis* appreciated. Second, and more importantly, the *Bevis* court failed to address that the relevant distinction between semiautomatic and automatic fire transcends firing rate, as the Supreme Court recently confirmed in *Cargill*. A firearm is not more dangerous merely because it can fire faster; indeed, faster and more accurate fire presumably would aid a law-abiding citizen engaging in self-defense. Rather, it is the fact that automatic fire means that a

firearm will continue to fire *without* requiring the shooter to pull the trigger again and will reduce accuracy that distinguishes semiautomatic rifles from fully automatic ones, such as the M16. Because the firearms banned by Cook County are not automatic, they are categorically not "military weapons" under the *Bevis* test.

Finally, the banned rifles, like rifles more generally, are not commonly possessed or used for unlawful purposes. This is even clearer than the data on common ownership and use for self-defense. Unlike a law-abiding citizen who will be predominantly concerned with reliability, for criminals, the critical aspect of a crime gun is concealability, and an AR-15 is not a concealable firearm. As a result, they are almost never used in crime, while run-of-the-mill handguns are overwhelmingly the weapon of choice for criminals.

B. The banned firearms are useful for self-defense, are not exclusively military weapons, and are not commonly used for unlawful purposes, so under *Bevis* that means that the Second Amendment's protections are presumptively triggered, and the Cook County ban is unconstitutional unless the County can justify it historically. Here again, *Bevis* provides guidance, but no binding holding because its historical

analysis was both preliminary and dictum. That guidance again points in favor of finding the Cook County ban unconstitutional, because *Bevis* considered the same central factor as dispositive of the historical issue as it had at the plain text: namely, whether the banned firearms were "military" or "civilian," reasoning that its review of history showed that "military" firearms could be banned. Applying that rule here, because the semiautomatic rifles banned by Cook County are not "military" firearms, then nothing in *Bevis* supports upholding the ban.

## ARGUMENT

### I. This Court Should Reverse Based on *Heller* and *Bruen*.

The district court below resolved this case by applying *Bevis*, holding that that case had reaffirmed *Friedman* and *Wilson* and that *Friedman* and *Wilson* were controlling precedent. As will be discussed in detail below, that was incorrect, and under *Bevis*, properly applied, Plaintiffs should still have won this case. But there is another way to reach that same result, and that is through the straightforward application of *Heller* and *Bruen* to the facts of this case. Doing so would entail overruling *Bevis* because *Bevis* is fundamentally incompatible with

the decisions of the Supreme Court. *See* 7th Cir. R. 40(e) (providing a mechanism for a panel of this Court to overrule prior panel decisions).

## A. *Bevis* Is Fundamentally Incompatible With *Heller* and *Bruen*.

*Bevis* purported to apply the analytical framework *Bruen* laid out, and to follow *Heller*'s lead in analyzing the scope of the Second Amendment. In truth, however, both its textual analysis and its unnecessary foray into history deviated significantly from the framework the Supreme Court has prescribed and were directly contrary to *Heller*'s dispositive analysis. As such, *Bevis* should be overruled.

1. Beginning with *Bevis*'s "textual" analysis, *Bevis* read into the term "bearable arms" an implicit carve out for any "weapons that may be reserved for military use." *Bevis*, 85 F.4th at 1194–95. Nothing in *Heller* or *Bruen* supports such a rule. Rather, *Heller* interpreted the term broadly to encompass "all instruments that constitute bearable arms" and *at no point* in its textual analysis did the Court ask whether those arms were useful in military service. 554 U.S. at 582; *see also Bevis*, 85 F.4th at 1225 (Brennan, J., dissenting) ("[T]he military has historically commissioned pistols, a firearm that is an 'Arm' under *Heller*. Pistols

have always been standard-issue military firearms. Under the majority opinion's approach, *Heller* would have been mistaken.").

The panel's justification for this limitation was to claim that *Heller* said that machineguns were not bearable arms "because they can be dedicated exclusively to military use." *Bevis*, 85 F.4th at 1193. But this is a non sequitur. *Heller*'s suggestion that machineguns might be unprotected does not establish that they fall outside the *plain text* of the Second Amendment. Coverage by the plain text only establishes presumptive protection. That presumption can be rebutted with historical evidence.

The passage in *Heller* seized on by the panel majority in *Bevis* for its military weapon carveout from the plain text states that "weapons that are most useful in military service—M16 rifles and the like"— "may be banned." *Id.* (quoting *Heller*, 554 U.S. at 627). But analysis of this passage in context shows that *Heller* neither exempted M16 rifles from the scope of the Second Amendment's protections as a matter of "plain text" nor suggested that *any* firearm could be excluded from protection *because* it is useful to the military.

20

First, *Heller* was, in this passage, not analyzing the Second Amendment's text (which it had done much earlier in its opinion) but consulting history to elucidate any relevant limitations on that right. In the process it identified one "important limitation on the right to keep and carry arms" that would permit the government to ban a firearm even though it fell within the plain text meaning of "arms." *Heller*, 554 U.S. at 627. Specifically, *Heller* explained that the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" permitted certain arms to be banned. *Id.* But, the Court made clear, arms "in common use" are "protected" and therefore cannot be banned. *Id.* This was a rule developed from "*the historical understanding* of the scope of the right,*" id.* at 625 (emphasis added), and it was consistent with another historical tradition: as the prefatory clause of the Second Amendment notes, the explicit purpose for which the right to keep and bear arms was included in the Constitution was to ensure the preservation of the militia, and "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624. So, for the *Bevis* panel to treat this

statement as relevant to the text of the Second Amendment at all is contrary to *Heller*.

Second, *Heller* was not, as a result of this history, singling out M16s to be banned *because* they were useful for military service. Quite the opposite. It was addressing M16s directly because it viewed them as possibly outside the Amendment's protective scope *despite* their utility to the military. Because the prefatory clause at the beginning of the Second Amendment states that its purpose is to protect the militia, and because the arms that were originally protected were those that ordinary people brought with them to serve in the militia—literally military weapons—*Heller* was concerned that it would be seen as contradictory to the text to permit a military weapon that would undoubtedly be useful for militia purposes to be banned. *Heller* was anticipating a counterargument and going out of its way to explain its method of interpreting the Amendment in light of its relevant history was the correct one, even if "modern developments [could] limit[] the degree of fit between the prefatory clause and the protected right." 554 U.S. at 627–28.

The *Bevis* panel's textual analysis conflicts with *Bruen* as well. This is true for the obvious reasons that *Bruen* did not disturb *Heller*'s analysis

and stressed repeatedly that the focus at the threshold of a Second Amendment case is exclusively on the Amendment's "plain text," 597 U.S. at 17, 24, 32–33, or "bare text," *id*. at 44 n.11, and the *Bevis* panel went well beyond that. But more fundamentally, *Bruen*'s central teaching is that, in the context of claims invoking the Second Amendment, courts are not at liberty to balance the interests of the government against the rights of the people, the contours of which are determined solely with reference to the constitutional text and to our nation's history. *See id.* at 26. And the Supreme Court's recent decision in *Rahimi* reaffirmed *Bruen*'s rejection of "tiers of scrutiny," further undermining the panel analysis in *Bevis* by reiterating that any restriction on the right to keep and bear arms must be justified historically, if at all. 2024 WL 3074728, at *6. By turning "bearable arms" into shorthand for only those weapons that can be shown not to be at least "predominantly" useful to the military, the *Bevis* panel smuggled interest balancing back into the analysis. There is *nothing* in the text to help a court divine between what is a "military" arm and what is useful in a "civilian" context, precisely because the text does not address the issue. And in the absence of any textual guidance to assist a court in drawing this distinction, *Bevis*

23

invites future panels in this Circuit to draw those lines for themselves and pose the sort of questions that *Bruen* prohibited: Do individuals really need this sort of weapon? Would other firearms do the trick in a self-defense situation if we decided the government could ban this one? As Judge Brennan pointed out in dissent, the majority opinion's proposed line between military and civilian weapons effectively committed discretion for answering these questions to the government, since "[t]he only 'characteristic' that matters" in defining a firearm as "military" "is that the government decided to ban it." *Bevis*, 85 F.4th at 1224 (Brennan, J., dissenting). Such a result is incompatible with the text-and-history standard laid out in *Bruen*.

2. The panel was also wrong to conclude that "bearable arms" was code or shorthand for only those arms that are "in common use" for lawful purposes. *Id.* at 1193. This, too, is a criterion that appears nowhere in the "plain text," and *Heller* and *Bruen* both appropriately treat it as an element of the *historical* inquiry, not of the plain text. *See id.* at 1209 (Brennan, J., dissenting). In Part III of *Heller*, after conducting its plain text analysis, the Court turned to historical limitations on the textual scope of the right. *See* 554 U.S. at 626–28; *see also id.* at 595 ("Before

turning to limitations upon the individual right, however, we must determine whether the prefatory clause of the Second Amendment comports with our interpretation of the operative clause."). It was through examining this history that the Court concluded that, despite its expansive textual scope, ultimately the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id.* at 626. Rather, the type of arms that are protected is limited by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627. And because *Heller* was itself an arms ban case, *Heller*'s elucidation of this historical tradition is binding and dispositive.

Because only dangerous and unusual weapons can be banned, it follows that arms "in common use" are "protected." *Id.* After all, an arm that is in common use cannot be both dangerous and unusual. This conclusion was supported by history as well, because normally "when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets in original). Although this particular quotation from *Heller* precedes its historical analysis, that is because this is the point of

25

the opinion in which the Court was explaining that its textual interpretation of the Second Amendment was consistent with *Miller*. As part of that discussion, the Court stated that, "[w]e may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits." *Id*. (emphasis in original). Based in part on the quotation above about the use of common arms in militia service, the Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. "That accords," the Court explained, "with *the historical understanding of the scope of the right*, see Part III, *infra*." *Id*. (emphasis added). Thus, even though this discussion took place outside of the Court's analysis of historical limits on the right, the Court made clear that those historical limits were what was being addressed.

*Bruen* confirms that the exception for "dangerous and unusual weapons" (and correlative *protection* for arms "in common use") is a rule derived from history. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J.L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ. When *Bruen* explained its framework, "common

26

use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21. Once it was established that the arms at issue (handguns) were " 'in common use' today for self-defense," there was no need for any further analysis of the type of arm at issue, textual or historical. *Id.* at 32. In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. That was significant because "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,' " and *in Heller*, "[d]rawing from this *historical tradition*, [the Court] explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' " *Id.* at 47. If there was any doubt that *Heller*'s statements about "common use" were derived from history, *Bruen* put them to rest.

A panel of the Ninth Circuit recently correctly applied *Bruen* and *Heller* in a challenge to Hawaii's ban on butterfly knives. In *Teter v. Lopez*, Hawaii pressed but the court rejected the argument that the

allegedly "dangerous and unusual" nature of butterfly knives "means that they are not 'arms' as that term is used in the Second Amendment." 76 F.4th 938, 949 (9th Cir. 2023), *reh'g en banc granted, op. vacated*, 93 F.4th 1150 (9th Cir. 2024) (Mem.). Instead, citing the same portions of *Heller* discussed above, the panel noted that "the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting [such] weapons.' " *Id.* at 949–50 (quoting *Heller*, 554 U.S. at 627); *see also Bevis*, 85 F.4th at 1209–10 (Brennan, J., dissenting) (citing *Teter*, 76 F.4th at 949–50). Therefore, "whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis," and since whether an arm is "dangerous and unusual" depends in part on "whether the weapon is commonly possessed by law-abiding citizens for lawful purposes," it was up to Hawaii to prove the arms were not in common use. *Teter*, 76 F.4th at 950 (internal quotation marks omitted).

3. Finally, even leaving aside the critically important fact that *common use* should have been the end of the matter historically, the historical analysis *Bevis* did undertake was also critically flawed. *Bruen* instructs courts analogizing to historical restrictions that they must only

accept a modern law if it restricts the right in the same way, and for the same reasons as the proffered historical analogues. 597 U.S. at 28–29. Explaining the analysis as comparing both "how" and "why" the modern and historical laws restricted the right, *Bruen* underscored that it was critical to look closely at these laws because the alternative "risk[s] endorsing outliers that our ancestors would never have accepted." *Id*. at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

The *Bevis* majority's analysis of history did just that. It pointed to just seven examples of historical laws which it asserted "suffice to make the point[]" that historically, military firearms could be banned. *Bevis*, 85 F.4th at 1201. But those examples prove no such thing. In fact, the first example, a law from 1746 restricting the "discharging of any cannon, gun, or pistol within city limits" of Boston but permitting soldiers to fire them "on their training days," demonstrates the opposite: it is apparent from the restriction that civilians were permitted to own such weapons and keep them personally when not using them in the context of the militia, they just were restricted from engaging in target practice in an urban environment. *Id.* Such a law is not "relevantly similar" to a law banning civilians from owning certain firearms at all because they are assertedly

similar to firearms used by the military. The same is equally true of the panel's second law, a much later 1890 Cleveland, Ohio ordinance that similarly outlawed firing weapons within the city limits, though it specifically exempted "the use of firearms in the lawful defense of the person, family, or property of any person." Ch. 33—Fire Arms, §§ 417, 423, in ORDINANCES OF THE CITY OF CLEVELAND (1890); *see also Bevis*, 85 F.4th at 1201. Plainly such a law is less restrictive than the County's ban on possessing common semiautomatic rifles, since it does not preclude the possession and use of any weapon in self-defense. *See Bevis*, 85 F.4th at 1227 (Brennan, J., dissenting).

The majority next claims that its rule is supported by:

> dozens of examples of Bowie knife regulations, forbidding or limiting the use of these dangerous weapons. Several of those featured military exceptions. In 1884, for example, Arkansas outlawed the sale of all dirks, Bowie knives, cane-swords, metal knuckles, and pistols, except as for use in the army or navy of the United States.

*Id.* at 1201 (citing Ch. 53—Carrying Weapons, §§ 1907–09, *in* A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield ed. 1884)). But this claim too lacks merit. First of all, there are not "dozens of examples" of laws similar to the Arkansas law cited by the *Bevis* panel. The Arkansas law was one of just three in American history (alongside laws from Texas

and West Virginia) to actually "ban" Bowie knives in some relevant way (either by making trade in them illegal or banning all forms of carry). *See* David Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, REASON (Nov. 20, 2022), https://bit.ly/3T5Uu17. Second, it is not true that the Arkansas law permitted sale of the banned weapons for use "in the army or navy of the United States." *Bevis*, 85 F.4th at 1201. This appears to stem from a misreading of the statutory text, which banned "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, *except such pistols as are used in the army or navy of the United States*." Ch. 53—Carrying Weapons, § 1909, in A DIGEST OF THE STATUTES OF ARKANSAS 490 (W.W. Mansfield, ed., 1884) (emphasis added). Far from stating that only the army could buy brass knuckles and sword canes, this was specifically exempting from prohibition larger and less concealable pistols of the sort that were used in the military. *See Bruen*, 597 U.S. at 69 n.31 ("Arkansas exempted 'pistols as are used in the army or navy of the United States,' " from its carry prohibition "so long as they were carried 'uncovered, and in [the] hand.' " (citation omitted)); *see also* Kopel, *Legal history*, *supra* (clarifying that "army or navy pistols" was a term for

"large handguns of the sort carried by military officers, artillerymen, etc."). Thus, far from showing that certain weapons could be reserved for the military, the *Bevis* panel's example demonstrates the opposite: The only weapons listed in the statute that were actually used in the military were those that it explicitly did not prohibit to civilians. And in fact, the law's constitutionality was challenged shortly after it was enacted and it was held not to "abridge the constitutional right of citizens to keep and bear arms for the common defense; *for it in no wise restrains the use or sale of such arms as are useful in warfare." Dabbs v. State*, 39 Ark. 353, 357 (1882) (emphasis added). Thus, far from supporting the *Bevis* panel's asserted historical tradition of restricting military arms, this Arkansas law undercuts any claim to legitimacy such a tradition might plausibly have. And the same is true for the assertedly similar "city ordinances in the late 1800s" that targeted the same non-military weapons as the Arkansas ban. *Bevis*, 85 F.4th at 1201. It is difficult to understand how such laws could be read to support banning arms for being sufficiently "military" in nature.

The final three laws the majority relies on are all federal restrictions on machine guns, bombs, missiles, and grenades, dating to

1934, 1968 and 1986, respectively. *Id.* at 1202. The critical period for historical restrictions that shed light on the scope of the Second Amendment is the period immediately following its ratification in 1791. *See generally* Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, Harv. J.L. & Pub. Pol'y Per Curiam (Oct. 1, 2022), https://bit.ly/3VOIeCZ. But even under the most expansive understanding of the historical inquiry, a law from 1986 is out of bounds. *Bruen* explicitly declined to consider any laws from after 1900 as irrelevantly late. *Bruen*, 597 U.S. at 66 n.28. It was error for *Bevis* to do otherwise. *See Bevis*, 85 F.4th at 1227 (Brennan, J., dissenting).

Finally, it must be noted that the majority's historical analysis is directly contrary to *Heller* in another way which has already been discussed. As mentioned above, when *Heller* stated that the M16 rifle may be unprotected consistent with the historical tradition of banning "dangerous and unusual arms," it explained the fact that this was possible notwithstanding the stated purpose of the amendment, because "modern developments have limited the degree of fit" between the

operative language of the Amendment and its stated goal. *Heller*, 554 U.S. at 627–28. If it truly were the case that there is "a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use," *Bevis*, 85 F.4th at 1202, then the claim that the disconnect was a "modern" development would be incorrect and *Heller* would have had a much easier way to explain it away—by showing it had always been so. That *Heller* did not suggest any such thing demonstrates that the *Bevis* panel's reading of the Amendment is at odds with Supreme Court precedent and should be overruled.

### B. This Case Is Straightforward Under *Heller* and *Bruen*.

If this Court overrules *Bevis*, then this case is easily resolved in Plaintiffs' favor. The first question under *Bruen* is whether the "plain text" of the Second Amendment protects owning semiautomatic rifles that Cook County has misleadingly labeled "assault weapons." The plain text of the Second Amendment states that it protects the right "keep and bear [a]rms." U.S. CONST. amend. II. The question here, then, is what was understood by the term "arms" at the Founding. Unlike the Court in

*Bevis*, *Heller* offers a simple answer to that question: "The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence.'" *Id*. And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id*. The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "[w]eapons of offense, or armor for defense and protection of the body," and said that "in law, *arms* are any thing which a man takes in his hand in anger, to strike or assault another." *Arms*, NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq. Firearms plainly are encompassed within "arms." Indeed, while the Court noted one anomalous Founding-era source that "limited 'arms' (as opposed to 'weapons') to 'instruments of offence *generally* made use of in war,'" it emphasized that "even that source stated that all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581 (citation omitted). In sum, "the Second Amendment extends, prima facie, to all instruments that constitute

bearable arms." *Id.* at 582. Because the Ordinance bans firearms, the plain text is necessarily implicated, and the burden is on the County to justify its Ordinance by reference to history.

That it cannot do because, as already discussed in great detail, the historical work here has been done by *Heller*, and it yielded the rule that only "dangerous and unusual" arms can be banned, while arms "in common use at the time" are protected. *Id.* at 627. After all, an arm that is in common use cannot be both dangerous and unusual. The County bears the burden of showing the arms it bans are both "dangerous and unusual" (and hence, proving they are *not* in common use), but the burden point is irrelevant. As discussed below, Cook County bans some of the most popular firearms in the nation, including the bestselling rifle in America. *See infra* Section II.B.1.i. It would be impossible to show that such rifles are not in common use, and it follows that the County's ban violates the Second Amendment.

## II.    In the Alternative, the Court Should Reverse the District Court Under *Bevis*.

Even if this Court continues to adhere to Bevis's unsound approach, this Court should still reverse the district court because modern semiautomatic rifles, such as the AR-15, are utterly district from fully

automatic M16s in their function, and they are particularly well-suited to lawful purposes, including self-defense.

### A. *Bevis* Did Not Hold that *Wilson* and *Friedman* Control This Case.

The district court's decision rested almost entirely on its conclusion that *Wilson* and *Friedman* remained binding—indeed, it conducted little additional analysis of the parties' arguments or of *Bevis*'s reasoning beyond that point, believing the validity of those prior cases to be dispositive. *See* App.13–15. However, the district court misread *Bevis*, which did not confirm that *Wilson* and *Friedman* remain dispositive of cases like this one. While *Bevis* did positively reference *Friedman*'s reasoning as "basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on history, not on a free-form balancing test," 85 F.4th at 1189, it was clear that this limited endorsement was not confirmation that *Friedman* remains binding caselaw in this Circuit that controls the outcome of cases involving so-called "assault weapons" bans. If it were still controlling, much of the *Bevis* opinion need never have been written after all, rehashing as it did the constitutionality of a type of restriction that *Friedman* already decided, and the *Bevis* panel need not have couched its conclusions about

the constitutionality of the Illinois ban in preliminary language, reserving final judgment for when the cases proceed to final judgment.

Rather, *Bevis*'s discussion of *Friedman* is best read as only establishing two things: (1) that *Friedman* had avoided the chief error that plagued the opinions of the courts of appeals prior to *Bruen* by not applying an interest-balancing test to determine the constitutionality of the "assault weapon" ban at issue in that case and (2) *Friedman*'s rejection of the argument that an arm "in common use" for lawful purposes necessarily could not be banned consistent with history remains good law in the Seventh Circuit (this being the only point for which the majority in *Bevis* specifically relied on *Friedman*). *Id.* at 1190–91, 1198. As for *Wilson*, rather than reaffirming that decision, the *Bevis* panel distanced itself from it, arguing *Wilson* had mischaracterized *Friedman* as applying a balancing-test rationale.

Indeed, it should be stressed that *Bevis* undertook an entirely original analysis of the question of the constitutionality of an "assault weapons" ban without relying on either the reasoning or the holding of these supposedly "controlling" decisions. In the dispositive portion of the *Bevis* opinion, when the Court addressed the scope of the Second

Amendment's text, its analysis did not depend on, or even mention, *Friedman* or *Wilson* at all. *See id.* at 1192–97 ("A. Are the Covered Weapons 'Arms'?"). The only point for which the *Bevis* opinion relied on *Friedman* at all came in the Court's unnecessary discussion of history, which it offered only "for the sake of completeness." *Id.* at 1197. There, reiterating what it had said in its overview of relevant precedent, as Plaintiffs have already acknowledged, the Court reaffirmed that *Friedman*'s dismissal of the argument that firearms "in common use" for lawful purposes cannot be banned remains the law in this Circuit and that it did not believe that "relevant portion [of *Friedman*] was undermined by *Bruen*." *Id.* at 1198.

Following *Bevis*, which addressed the same topic as *Friedman* in a different way, the question is not what other, if any, statements from *Friedman* continue to be good law, but how the analysis from *Bevis* applies in this case. That is what the district court should have done.

## B. The Ordinance Is Unconstitutional Under *Bevis*.

Had the district court properly applied *Bevis* in this case, it would have granted summary judgment in Plaintiffs' favor, because the Cook County ban unconstitutionally infringes their Second Amendment rights.

As an initial matter, and given the overlapping nature of the firearms covered by both the Ordinance and by PICA, it is important to note that while *Bevis*'s interpretation of the Second Amendment and its application of *Bruen* are binding, its conclusion that, under that standard, AR-15s and similar rifles banned by both Illinois and Cook County are unprotected was merely the result of a "preliminary look at the subject," and *Bevis* cautioned that it did not have a full or adequate record on which to base a final determination of that issue. 85 F.4th at 1197. The path is open, therefore, to apply that standard to the full record available in this case and reach a different conclusion, which is exactly what the Court should do here.

### 1.   The Banned Rifles Are "Arms" Under *Bevis*.

*Bevis* purported to apply the analysis outlined in *Bruen*. That analysis begins with an examination of the "plain text" or "bare text" of the Second Amendment. *Bruen*, 597 U.S. at 19, 44 n.11. When the conduct Plaintiffs wish to engage in falls within the scope of the plain text, *Bruen* presumes the law is unconstitutional, and the burden falls on the government to "justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

*Bevis* held, preliminarily, that semiautomatic rifles like the AR-15 or AK-47 are not "arms" within the scope of the Second Amendment. In doing so, and diverging from *Heller* and *Bruen* as demonstrated above, *Bevis* argued that the phrase "arms" in the Second Amendment must be read to implicitly draw a dividing line between "[a]rms that ordinary people would keep at home for purposes of self-defense," which are protected, and "weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1194. In reaching the conclusion that the firearms banned by PICA likely fall into the latter category, *Bevis* primarily found it important that the panel was "not persuaded that the AR-15 is materially different from the M16," and since *Bevis* reasoned, "the latter weapon is not protected by the Second Amendment, and therefore may be regulated or banned," it concluded that "[b]ecause it is indistinguishable from that machinegun, the AR-15 may be treated in the same manner without offending the Second Amendment." *Id.* at 1197.

41

Again, it must be remembered that although the AR-15 was the subject of *Bevis*'s discussion and that same rifle is banned by the Cook County ordinance at issue here (and is typical of the other rifles similarly banned), *Bevis*'s ultimate conclusion that the AR-15 and similar rifles are not arms was "just a preliminary look at the subject" and "[t]here thus will be more to come, and [the panel did] not rule out the possibility that … other evidence [could] show[] a sharper distinction between AR-15s and M16s (and each one's relatives) than" the record before it did. *Id*. Thus, it remains an open question in this Circuit whether the firearms banned by Cook County are "arms" triggering the Second Amendment's presumptive protection. Answering that question here turns, under *Bevis*, on whether the common semiautomatic rifles banned by Cook County (1) are useful for self-defense and would be used for that purpose by ordinary people, (2) can be distinguished from M16s in some relevant way (so they are not "exclusively or predominantly useful in military service"), and (3) are not the sort of arms commonly possessed for unlawful purposes. *Id*. at 1194. Given *Bevis*'s construction that an arm may only be banned if it is "exclusively or predominantly" military in nature, so long as Plaintiffs can demonstrate that the banned rifles have

some substantial utility to civilians trying to defend themselves, then they are "arms" under the text of the Second Amendment. *Id.*

### i.    The Banned Rifles Are Useful for Self-Defense.

The specific features and rifles Cook County bans are among the best suited for the purpose of self- and home-defense of any currently available. Indeed, *every one* of the features banned by the Ordinance are accuracy and reliability enhancing or ergonomic features that make rifles with which they are equipped (including many if not all of the rifles banned by name like the AR-15, which has many of them by design and can be equipped with all of them) better suited for lawful self-defense. *See* STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 9 (2022) (reproducing portions of the Colt patent for the AR-15). For instance, a pistol grip and other features, such as those "capable of functioning as a protruding grip that can be held by the non-trigger hand," C.C. Ord. § 54-211, *Assault weapon* ¶¶ (1)(A), (B), help to stabilize a firearm and permit its operator to maintain accuracy. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 396-97 (1994) (Doc. 98-1, Ex. 8). The pistol grip is positioned "in such a manner as to provide a more natural, comfortable, and effective

grasp of the rifle. It is this purpose, and no other, for which the modern pistol grip is intended." DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE SECOND AMENDMENT 38 (2d ed. 2022) (Doc. 98-9, Ex. 82).

A muzzle brake or compensator, C.C. Ord. § 54-211, *Assault weapon* ¶ (1)(E), reduces recoil by redirecting energy and so permits the operator to aim the firearm more effectively. Kopel, *Rational Basis*, *supra*, at 396–97. Folding, telescoping, or thumbhole stocks, C.C. Ord. § 54-211, *Assault weapon* ¶ (1)(C), are also ergonomic and accuracy enhancing features. Taking the latter first, a "thumbhole stock" is simply a stock with a hole through it in which the user can place his or her thumb to allow a more secure grip on the firearm. *See AFTE Glossary* at 116, ASS'N OF FIREARM & TOOL MARK EXAM'RS (6th ed. 2021).[2] Folding and telescoping stocks (broadly termed "adjustable stocks") are "designed to allow adjustments

---

[2] While many of the sources cited in this brief were included as exhibits to Plaintiffs' response to Cook County's statement of material facts below and hence are part of the "record" on appeal (and where that is true, Plaintiffs have included a citation to the docket below and exhibit number), not all are. However, that is of no importance here where *all* of the facts relevant to the constitutionality of the Cook County ban are "legislative facts" of which this Court's review is unrestricted. *See Free v. Peters*, 12 F.3d 700, 706 (7th Cir. 1993); *see also Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011).

in the rifle's length of pull, making the firearm more comfortable to shoot in both military and civilian applications." E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U.L.J. 193, 232 (2018) (Doc. 98-2, Ex. 13); *see also* HALBROOK, *supra*, at 383 ("[L]ike finding the right size shoe," adjusting the length of a stock "simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably." (quoting *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 368 (W.D.N.Y. 2013)) (Doc. 98-1, Ex. 3). As another commentator has explained:

> adjustable buttstocks reflect the American shooting tradition, wherein hunting, target shooting, and arms for self-defense have always been the province of ordinary working people of modest means, as opposed to the European tradition wherein the shooting sports were the domain of the wealthy and privileged classes who could afford to indulge in fine, handcrafted, and extremely expensive custom sporting arms.

CHAPMAN, *supra*, at 83–84.

As for the "shroud attached to the barrel, or that partially or completely encircles the barrel," the Ordinance *itself* explains that it is used to "allow[] the bearer to hold the firearm with the non-trigger hand without being burned." C.C. Ord. § 54-211, *Assault weapon* ¶ (1)(D). Generally known as the "handguard," this part of the Ordinance forbids "the metal or plastic enclosure that covers typically all but a few inches

45

of the barrel," Wallace, *Myths*, *supra*, at 231, and, on an AR-15 or similarly styled rifle,

> has multiple functions: (1) it provides the shooter with a forward grip on the rifle using the non-trigger hand; (2) it protects the shooter's hand from a hot barrel; (3) it protects the barrel and gas tube or piston from damage; (4) it helps ventilate and cool the barrel; and (5) it provides a base for attaching accessories to the rifle such as sights, slings, flashlights, forward vertical grips, and bipods. None of these functions make the AR-15 exceptionally lethal, especially when compared to non-banned rifles.

*Id.* "[S]uch features…do not render the AR-15 more deadly by making it fire faster . . . or impact with far more power. They mostly serve the same ergonomic functions as similar features on non-banned firearms, making the AR-15 easier and safer to use." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 TENN. L. REV. 1, 13–14 (2020) (Doc. 98-2, Ex. 12).

Rifles with these features are among the *most* useful of all firearms. Indeed, many experts have endorsed the use of rifles over handguns for self-defense in the home, *see, e.g.*, Clint Smith, *Home Defense* at 50, GUNS MAG. (2005) (cited approvingly, Br. for Pet'rs, *District of Columbia v. Heller*, No. 07-290, 2008 WL 102223, *54–55 (U.S. Jan. 4, 2008)), noting, among other things, that they are easier to shoot accurately than handguns, especially in situations where an individual is in danger with adrenaline surging, *see, e.g.*, CHRIS BIRD, THE CONCEALED HANDGUN

MANUAL: HOW TO CHOOSE, CARRY, AND SHOOT A GUN IN SELF DEFENSE 40 (1998) (cited approvingly, Br. of Violence Pol'y Ctr. & the Police Chiefs for Several Cities as Amici Curiae in Supp. of Pet'rs, *District of Columbia v. Heller*, No. 07-290, 2008 WL 136348, at *30 (U.S. Jan. 11, 2008)). And these are not isolated opinions. Even 35 years ago, an ATF evaluation of firearms technical writers found that "the majority recommended" semiautomatic "assault-type" rifles "for activities such as . . . home and self-defense." *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* at 11, ATF (July 6, 1989), https://bit.ly/4euRLGN. So although, as the Supreme Court noted in *Heller*, handguns are "the quintessential self-defense weapon" and "[t]here are many reasons that a citizen may prefer a handgun for home defense," there are equally many reasons why an individual would prefer to use one of the banned rifles, like an AR-15, for that purpose. 554 U.S. at 629.

In addition to their ergonomic advantages, which are not shared by many hunting rifles, AR-15s are somewhat surprisingly (given the way they are often talked about) relatively *underpowered* compared to most rifles. Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [like

the AR-15 in its standard configuration], . . . is relatively light in both force and velocity compared to many other shoulder-fired weapons used for hunting and recreation." Joseph W. Galvin et al., *Rate and time to return to shooting following arthroscopic and open shoulder surgery*, 6 JSES INT'L 963, 968 (2022) (Doc. 98-12, Ex. 99); *see also* Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. TRAUMA ACUTE CARE SURG. 853, 861 (2016). So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." Galvin, *supra*, at 968. While being "underpowered" compared to a .30-06 caliber rifle may not sound like a selling point, in the context of home defense it undoubtedly is. The lower overall velocity (and lighter weight ammunition compared to most hunting rifles) of rounds fired from an AR-15 reduces the risk that an individual engaged in self-defense in the home would harm someone in another room with an errant shot. *See* Wallace, *Lethality*, *supra*, at 37–38; HALBROOK, *supra*, at 398 (noting degree of penetration "would depend on the caliber" of the round).

It should come as no surprise then, that law-abiding citizens *do* choose AR-15s and similar rifles for self-defense, and in large numbers.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1296 (2009) (Doc. 98-5, Ex. 48). That civilians really do use AR-15s and similarly styled banned rifles for protection is apparent from consumer surveys, manufacturing data, and industry sales data, all of which demonstrate that the AR-15 "and its many cousins covered by the [Ordinance]," *Bevis*, 85 F.4th at 1196, are some of the best-selling rifles of all time and are overwhelmingly purchased for their utility in self-defense and other lawful purposes.

**Consumer surveys.** Several consumer surveys demonstrate the commonality of AR-15 and similar types of rifles. In 2022, Washington Post-Ipsos conducted a survey of a random sample of 2,104 gun owners. *Poll of current gun owners* at 1, WASH. POST-IPSOS (Oct. 11, 2022), https://bit.ly/46CqzRa ("WashPost Poll"). The survey asked whether individuals owned AR-15-style rifles. Twenty percent answered yes, *id.*, which suggests that "about 16 million Americans own an AR-15." Emily

Guskin et al., *Why do Americans own AR-15s?*, WASH. POST (Mar. 27, 2023), https://wapo.st/3IDZG5I. The survey also asked *why* individuals owned AR-15s. Reasons given included to protect themselves, their family, and property (91%, with 65% stating this was a major reason), target shooting (90%), in case law and order breaks down (74%), and hunting (48%). WashPost Poll at 1–2. Sixty-two percent of AR-15 owners reported firing their AR-15 rifles at least a few times a year. *Id.* at 2.

In 2021, Georgetown Professor William English conducted a survey of 16,708 gun owners. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. The English survey asked whether gun owners had "ever owned an AR-15 or similarly styled rifle?" and "30.2% of gun owners, about 24.6 million people," indicated that they had owned such a rifle. *Id.* at 33. Of those who had owned such rifles, the average person had owned 1.8 and the median 1. *Id.* The English survey also asked why gun owners had owned such a rifle. Answers included recreational target shooting (66%), home defense (61.9%), hunting (50.5%), and defense outside the home (34.6%). *Id.* English also asked about defensive use of firearms. The survey responses indicated that gun

owners engage in 1.67 million defensive gun uses a year. *Id.* at 9. This is consistent with other survey data; "[a]lmost all national survey estimates indicate[d] that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million[.]" Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence* at 15, Nat'l Rsch. Council (2013), https://bit.ly/48ZYjcm. English found that 13.1% of defensive gun users used a rifle, English, *supra*, at 1415, which amounts to over 200,000 defensive uses of rifles a year.

Also in 2021, the National Shooting Sports Foundation (NSSF), the Firearm Industry Trade Association, conducted a survey of 2,185 owners of AR- and AK-platform rifles. *Modern Sporting Rifle: Comprehensive Consumer Report* at 10, NSSF (July 14, 2022), https://bit.ly/3GLmErS. Owners were asked to rate on a scale of 1 to 10 (with 1 being not at all important and 10 very important) how important various reasons were for owning the rifles. Responses included recreational target shooting (8.7), home/self-defense (8.3), and varmint hunting (5.8). *Id.* at 18. Sixty-seven percent of respondents indicated that they had used their rifle at least five times in the previous twelve months. *Id.* at 41. Another NSSF

51

survey from that year estimated that over 21 million Americans had trained with these types of rifles in 2020. *Sport Shooting Participation in the U.S. in 2020* at *iii*, NSSF (2021), https://bit.ly/3sPuEQl.

**Firearm dealer surveys.** In addition to surveying consumers, NSSF also surveys firearm dealers. *See 2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E. NSSF asked retailers what percentage of firearms they sold were of various types. For 2020, at the top-selling type was semiautomatic pistols, at 44.2%. *Id*. at 9. AR-15 and similarly styled semiautomatic rifles were second, at 20.3%, followed by shotguns (12.4%), traditional rifles (11.3%), and revolvers (7.2%). *Id*. And 2020 was not an outlier. NSSF's 2019 retailer survey indicated that ARs and other similar rifles constituted between 17.7% and 20.3% of firearm sales in every year from 2011 to 2018 (excepting 2017, when no results were reported). *2019 Firearms Retailer: Survey Report* at 6, NSSF (2019), *available at* James Curcuruto's Decl. in Supp. of Pls'. Prelim. Inj. Mot. at 107, *Miller v. Becerra*, No. 3:19-cv-1537, Doc. 22-13 (S.D. Cal. Dec. 6, 2019).

**Firearm production data.** NSSF also has analyzed firearm production data to determine how many AR- and AK-style rifles have

been produced for the American market. *Firearm Production in the United States With Firearm Import and Export Data* at 7, NSSF (2023), https://bit.ly/42qYo7k. From 1990 to 2021, it estimates that number to be 28,144,000, with totals exceeding one million every year from 2012 to 2021 and an average of over two million per year over that time period. *See id.* Domestic production of AR-style and similar rifles accounted for approximately 20% of all domestic firearms produced for the American market for the decade of 2012 to 2021. *See id.* at 2, 7.

In sum, AR-style and similar rifles unquestionably are useful, and, indeed, commonly used for lawful purposes, especially self-defense: millions of Americans own tens of millions; they account for approximately 20% of all firearm sales in the past decade; and leading reasons for owning them include self-defense, target shooting, and hunting. As one author put it:

> AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves.

FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014) (Doc. 98-13, Ex. 105).

### ii.     The Banned Rifles Are Distinct from M16s.

That the banned arms are in fact used, and used in large numbers, for self-defense and other lawful purposes means that, even under the *Bevis* test, they are not "exclusively" military weapons. Nevertheless, in concluding preliminarily that they may still be "predominantly" useful in the military, the Seventh Circuit focused much of its discussion on the AR-15, which it held was "almost the same gun as the M16 machinegun" with only one "meaningful distinction . . . that the AR-15 has only semiautomatic capability . . . while the M16 operates" in both semiautomatic and fully automatic modes. *Bevis*, 85 F.4th at 1195. As a result of this difference, the M16 is capable of firing more quickly than an AR-15 but they "use the same ammunition, deliver the same kinetic energy (1220–1350 foot-pounds), the same muzzle velocity (2800–3100 feet per second) and the same effective range (602–875 yards)." *Id.* at 1196. Those similarities, the *Bevis* panel asserted, were enough to overcome the semiautomatic/automatic distinction, at least on a preliminary basis.

Fundamentally however, by focusing solely on the rates of fire, the district court and *Bevis* did not appreciate the true importance of the distinction between semiautomatic and automatic fire. As the Supreme Court recently explained in detail, *regardless* of how quickly semiautomatic firearms can fire in comparison to automatic firearms, the real distinction between them is their mechanism: an automatic firearm will continue to fire as long as the trigger is depressed and there is ammunition left in the magazine, but a semiautomatic firearm, once it has fired, will not fire again until the person controlling it pulls the trigger. *See Cargill*, 2024 WL 2981505, at *10 ("Congress could have linked the definition of 'machinegun' to a weapon's rate of fire. . . . But, it instead enacted a statute that turns on whether a weapon can fire more than one shot 'automatically … by a single function of the trigger.' " (citation omitted)). Along with that mechanical difference comes a difference in accuracy: semiautomatic fire is inherently more accurate than automatic fire. *See Small Arms Weapon System Study, Part One* at 9-2, ¶ 19, U.S. ARMY COMBAT DEVS. COMMAND, EXPERIMENTATION COMMAND (Sept. 12, 1966) ("For aimed fire on visible point targets during daylight, semiautomatic fire is superior to automatic fire. This is true for

all rifles, both low and high muzzle impulse."). "Automatic or burst fire is inherently less accurate than semiautomatic fire. The first fully automatic shot fired may be on target, but recoil and a high cyclic rate of fire often combine to place subsequent rounds far from the desired point of impact." *Rifle Marksmanship: M16-/M4-Series Weapons* at 7–12, DEP'T OF THE ARMY (2008), https://bit.ly/3pvS3SW (Doc. 98-1, Ex. 7). Subsequent rounds landing far from the desired point of impact can be detrimental in self-defense scenarios, especially with loved ones and other innocent bystanders nearby.

That is not to say that automatic fire has *no* uses. Indeed, it is critically important to military tactics. For this reason, Dennis Chapman, a former Lieutenant Colonel in the U.S. Army, has referred to automatic fire as "the one uniquely military firearms technology." CHAPMAN, *supra*, at 110; *see also Bevis*, 85 F.4th at 1222 (Brennan, J., dissenting) ("No army in the world uses a service rifle that is only semiautomatic."). As Chapman details, automatic fire is a key component of establishing "fire superiority" through use of "suppressive fire" keeping the enemy hiding from fire to disguise troop movements and render them unable to counterattack. *Id.* at 112–15. In such contexts, the lessened accuracy of

automatic fire is compensated for by its speed. *See* Wallace, *Myths*, *supra*, at 208 ("Sometimes the military's need to fire many rounds downrange quickly is more important than precisely-aimed fire."). But for lawful self-defense uses, accuracy of a firearm is a critical feature (for which the AR-15 is optimized), and none of the features that promote its accuracy render it a so-called "military firearm."

Therefore, although the *Bevis* majority was right to note that there are many similarities between the modern AR-15 and the M16, the significant distinction between them—that the AR-15 is merely semiautomatic whereas the M16 is automatic—is critical for constitutional purposes. And this insight is not a novel one—the Supreme Court has long recognized it as the line separating firearms that "traditionally have been widely accepted as lawful possessions" from those that have not. *Staples v. United States*, 511 U.S. 600, 612 (1994).

The record in this case further demonstrates that *Bevis*'s preliminary conclusion cannot be sustained, and any doubt on this score is removed by the Supreme Court's recent decision in *Garland v. Cargill*, which undermines any attempt to equate the two rifles based on rate of fire. *Bevis* was simply wrong as a factual matter about the magnitude of

57

the difference between the AR-15 and the M16 in terms of actual rate of fire. *Bevis* said that an M16 could fire 700 rounds per minute while the AR-15 could fire 300. *Id.* In reality, *Bevis* significantly understates the vast gulf separating the AR-15 from fully automatic fire: "Semiautomatic rifles such as the AR-15 cannot even approximate—much less replicate— the effective rates of fire of machineguns or selective fire weapons, and they cannot even remotely approach the extreme capabilities that some poorly informed commentators attribute to them." CHAPMAN, *supra*, at 34. As Justice Sotomayor explained in dissent in *Cargill*, when firing "an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute" while "[a] regular person with an AR-15 can achieve a fire rate of around 60 rounds per minute." 2024 WL 2981505, at *12-13 (Sotomayor, J., dissenting). The military agrees that the M16, operating in semiautomatic mode (and so the AR-15 operating in the only mode it has), has an effective rate of fire of 45-65 rounds per minute, *see Rifle Marksmanship*, *supra*, at 2-1, tbl. 2-1.

The only feature of the M16, to use the *Bevis* panel's flawed terminology, that is "exclusively or predominantly useful in military service," 85 F.4th at 1194, is the ability to fire more than one round per

pull of the trigger. And contrary to the panel's reasoning in this Court's "preliminary look" at the subject, *id.* at 1197, that difference does not come down merely to a distinction in the rate of fire but to a fundamental difference in function which makes clear that while the M16 may be more obviously appropriate for the battlefield, the AR-15's accuracy enhancing features are at least as useful to civilians as they are to soldiers.

### iii.    The Banned Rifles Are Not Commonly Used for Unlawful Purposes.

While AR-15s and similar rifles are in common use for lawful purposes, there is one thing they very rarely are used for: violent crime. From 2013 to 2022, rifles *of any kind* were used in an average of 356 homicides per year. *Crime Data Explorer: Expanded Homicide Offense Characteristics in the United States*, U.S. DEP'T OF JUST., FBI (2023), https://bit.ly/3IF5A6M (select year "2022" and include previous years "past 10 years"). Assuming *every one* of these rifles was a different AR-15 or similar semiautomatic rifle, that would mean that less than 0.01% of these rifles are used to commit homicide every year. Other weapons are used much more frequently in homicide, including: handguns (an average of 6,743 handgun murders from 2013 through 2022); knives (an average of 1,544), and hands and feet (an average of 671). *Id.* With handguns used

nearly *twenty times* more often in murder than rifles, "if we are constrained to use [Cook County]'s rhetoric, we would have to say that *handguns* are the quintessential 'assault weapons' in today's society[.]" *Heller II*, 670 F.3d at 1290 (Kavanaugh, J., dissenting) (emphasis in original). The strong preference for handguns among criminals holds true for crimes other than murder as well. As of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016* at 5 tbl. 3, U.S. DEP'T OF JUST., BUREAU OF JUST. STATS. (Jan. 2019), https://bit.ly/31VjRa9 (Doc. 98-8, Ex. 77). The reason for this preference is straightforward enough: criminals rely on the ability conceal their weapons prior to their crimes, and handguns are "easily concealable in a waistband or coat, unlike a rifle." Frank Main et al., *In Chicago, handguns turned into high-capacity machine guns fuel deadly violence*, NPR (Oct. 28, 2022), https://n.pr/3H6Jeuy (Doc. 98-12, Ex. 96).

Cook County is no outlier in this respect. From 2013–16, more than 90% of crime guns recovered in Chicago were handguns while rifles, by contrast, made up just 4.8% of recovered crime guns. Gun Trace Report

2017 at 9, CHI. POLICE DEP'T, https://bit.ly/2Jl3iM2 (Doc 98-11, Ex. 92).

Rifles similarly made up just 4.5% of all recovered crime guns traced by the ATF in Chicago from 2017–21. *See National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two* at 5, ATF (Feb. 2, 2023), https://bit.ly/3Lj3c7S (Doc. 98-11, Ex. 94); *see also* Frank Main, *Shorter 'time-to-crime' for guns used in crimes in Chicago than in NY, LA, a sign of illegal trafficking, Justice Department says*, CHI. SUN-TIMES (Feb. 4, 2023), https://bit.ly/3N5wl7N (Doc. 98-11, Ex. 95). Of the top 20 firearms seized by Chicago police in 2014, *not one* was a rifle (unsurprisingly, given that they dominated the trace data, all 20 were handguns). *See* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 (Doc. 98-8, Ex. 76). That same year, "Chicago police recovered only three assault weapons associated with criminal incidents" of *any* kind. *Id.*

## 2. The Banned Rifles Are Protected Under *Bevis*'s Historical Analysis.

As the foregoing demonstrates, even if applying *Bevis*'s reasoning to this suit, *Bevis*'s preliminary conclusion that AR-15s are not "arms" within the meaning of the Second Amendment's "plain text" ought to be

rejected. AR-15s are well-suited (and commonly chosen) for self-defense, are rarely used in crimes of any sort, and have features that make them at least as attractive to civilians as they are to the military. As such, the question in this case becomes: can Cook County show that the ban is nevertheless constitutional based on historical laws that restricted the right in similar ways and for similar reasons? *See Bruen*, 597 U.S. at 17. It cannot do so.

Here again, *Bevis*'s ultimate conclusion is not binding on this panel. *Bevis* conducted the historical analysis only "for the sake of completeness" after already resolving the case against the plaintiffs as a textual matter. 85 F.4th at 1197. As such, it is nonbinding dicta. *See Bradley v. Vill. of Univ. Park*, 929 F.3d 875, 908 (7th Cir. 2019). Furthermore, even if the historical analysis is treated as more than dicta, it overlapped almost entirely with *Bevis*'s textual analysis, hinging again on the panel's conclusions that the banned firearms are more like "military" weapons than they are "civilian" arms that are more "military" than "civilian" could be banned. *Bevis*, 85 F.4th at 1198–99, 1201. As discussed above, these conclusions were admittedly merely a preliminary look at the issue, and they do not have controlling effect. *Id.* at 1197. And

for the reasons already laid out, *Bevis*'s conclusions on that score were in fact flawed and based on an insufficient record. Given that the *only* historical tradition *Bevis* recognized was that "military and law enforcement may have access to especially dangerous weapons, and that civilian ownership of those weapons may be restricted," *id.* at 1201, and because Plaintiffs have demonstrated the arms banned by the County are *not* "military" weapons, if Plaintiffs succeed in overcoming the textual hurdle erected by *Bevis*, then they clear its historical analysis as well.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court and remand with instructions to enter judgment in Plaintiffs' favor.

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
  *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 13,284 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: June 24, 2024

/s/ David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# REQUIRED SHORT APPENDIX

## TABLE OF CONTENTS

**Page**

Judgment, *Viramontes v. County of Cook*, No. 21-cv-04595
     (N.D. Ill. Mar. 1, 2024), Doc. 130....................................................App. 1
Opinion & Order, *Viramontes v. County of Cook*, No. 21-cv-04595
     (N.D. Ill. Mar. 1, 2024), Doc. 129..................................................App. 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

CUTBERTO VIRAMONTES, an individual
and resident of Cook County, Illinois, Rubi Joyal,
an individual and resident of Cook County,
Illinois, Christopher Khaya, an individual and
resident of Cook County, Illinois, SECOND
AMENDMENT FOUNDATION, and
FIREARMS POLICY COALITION, INC. ,

Plaintiff(s),

v.

THE COUNTY OF COOK, a body politic
and corporate,  TONI PRECKWINKLE,
in her official capacity as County Board
President and Chief Executive Officer of
Cook County; KIMBERLY M. FOXX,
in her official capacity as State's Attorney,
and THOMAS DART, in his official capacity
as Sheriff,

Defendant(s).

Case No.  21-cv-04595
Judge Rebecca R. Pallmeyer

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which  ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☒      in favor of defendant(s) The County of Cook, Toni Preckwinkle, Kimberly M. Foxx, and
Thomas Dart.
and against plaintiff(s) Cuberto Viramontes, Christopher Khaya, Second
Amendment Foundation, and Firearms Policy Coalition, Inc.
.
Defendant(s) shall recover costs from plaintiff(s).

**App.1**

☐   other:

_____

This action was *(check one)*:

☐  tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐  tried by Judge          without a jury and the above decision was reached.
☒  decided by Judge Rebecca R. Pallmeyer. The court granted Defendants' motion for summary
judgment [80] and denied Plaintiffs' [100]; it also denied Defendants' motion to strike [104] as moot.
Plaintiff Rubi Joyal was previously dismissed on 4/25/2022 [34].


Date:   3/1/2024                    Thomas G. Bruton, Clerk of Court

                                   Christina Presslak , Deputy Clerk


**App.2**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois; Christopher Khaya, an individual and resident of Cook County, Illinois; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC.,** ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | No. 21 C 4595 |
| **THE COUNTY OF COOK, a body politic and corporate; TONI PRECKWINKLE, in her official capacity as County Board President and Chief Executive Officer of Cook County; KIMBERLY M. FOXX, in her official capacity as State's Attorney; and THOMAS DART, in his official capacity as Sheriff,** ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| **Defendants.** ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In several recent cases, gun-rights advocates have challenged Illinois state and local regulations on certain semiautomatic rifles defined by law as "assault weapons." This is one of those cases. Plaintiffs Cutberto Viramontes, Christopher Khaya, the Second Amendment Foundation, and Firearms Policy Coalition, Inc.[1] challenge the constitutionality of Cook County's assault-weapons ban, naming as Defendants Cook County and county officials Toni Preckwinkle, Kimberly M. Foxx, and Thomas Dart. Before the court are the parties' competing motions for summary judgment [80, 100], as well as Defendants' motion to strike Plaintiffs' responses to Defendants' Rule 56.1 statements [104]. During the pendency of this case, and while the parties engaged in discovery on the merits, the Seventh Circuit decided *Bevis v. City of Naperville*, 85

---

[1]    Rubi Joyal, a former Plaintiff in the case, was removed in April 2022. (*See* Minute Entry [34].)

F.4th 1175 (7th Cir. 2023), rejecting a preliminary injunction against enforcement of the State of Illinois's assault-weapons ban.  Although this case presents a different procedural posture, the Seventh Circuit's *Bevis* opinion has greatly simplified the question presented for this court.

For the reasons discussed below, the court grants Defendants' summary judgment motion, denies Plaintiffs', and denies Defendants' motion to strike as moot.

## <u>BACKGROUND</u>

Cutberto Viramontes and Christopher Khaya both live in Cook County.  (Pls.' Rule 56.1 Statement of Material Facts in Supp. of Summ. J. (hereinafter "PSOF") [101] ¶¶ 1, 4.)[2]  They are members of Firearms Policy Coalition, Inc., a nonprofit dedicated to using "legislative advocacy, grassroots advocacy, litigation and legal efforts" to, in its view, "defend and promote the People's rights—including the right to keep and bear arms—advance individual liberty, and restore freedom." (*Id.* ¶¶ 7–8, 10.)  Viramontes and Khaya are also members of the Second Amendment Foundation, a nonprofit devoted to similar educational and legal advocacy concerning gun rights. (*Id.* ¶¶ 12–13, 15.)  Viramontes stated in his deposition that he hopes "to own a Smith & Wesson M&P 15 rifle," which is an "AR-15 style rifle" that he intends to use for self-defense.  (*Id.* ¶¶ 2–3.)  Khaya wants an "IMI [Israeli Military Industries] Galil semiautomatic rifle"[3] (*id.* at ¶ 5), which, he testified, he is "most likely to use at the range, to be honest." (Tr. of the Dep. of Christopher Khaya, Ex. 2 to PSOF [101-2] at 82:7–10.)  He went on to say that if the other two guns he owns—a handgun and different (permitted) semi-automatic rifle—"are out of commission, then [he] would have to use" the Galil for self-defense.  (*Id.* at 82:11–15.)

---

[2]      The court broadly relies on the parties' Rule 56.1 statements for its factual recounting.  Where a fact or characterization of part of the record is disputed, the court cites directly to the record.

[3]      In their response to Defendant's Rule 56.1 statements, Plaintiffs agreed with Defendants' description of this weapon as an "Israel Military Industries Galil AR-15 style semiautomatic rifle".  (Pl.'s Responses & Objections to Def.'s Rule 56.1 Statement of Material Facts [98] at 8.)    Plaintiffs then amended their response in a footnote to their own Rule 56.1 statement, clarifying that "[t]he firearm in question is not an AR-15 style rifle but is largely based on the AK-47 design . . . ."  (PSOF ¶ 6 n.1.)

**App.4**

Cook County's Blair Holt Assault Weapons Ban (the "Ordinance"), enacted in November of 2006 and revised in July 2013, makes it "unlawful for any person to manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess any assault weapon or large capacity magazine in Cook County."  (Cook County, Ill. Code §§ 54-212(a); Defs.' Local Rule 56.1 Statement of Undisputed Material Facts in Supp. of their Mot. for Summ. J. (hereinafter "DSOF") [81] ¶¶ 130–31.)  The weapons Viramontes and Khaya would like to own are among those banned by the Ordinance.  (DSOF ¶¶ 12, 15.)

Plaintiffs filed this lawsuit on August 27, 2021 arguing that the Ordinance violated the Second Amendment and seeking declaratory and injunctive relief.  (Compl. [1] ¶ 71.)  In their Complaint, Plaintiffs acknowledged the hurdle they faced: their claims were, in Plaintiffs' own words, "contrary to" Seventh Circuit precedent.  (*Id.* ¶ 5.)  Specifically, in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit held that Highland Park, Illinois's assault-weapons ban did not violate the Second Amendment.  More recently, in *Wilson v. Cook County*, 937 F.3d 1028, 1029, 1034 (7th Cir. 2019), the Seventh Circuit rejected a Second Amendment challenge to the very same Cook County Ordinance at issue in this case, which the court and parties agreed was "materially indistinguishable" from the Highland Park ban at issue in *Friedman*.  Plaintiffs "institute[d] this litigation to . . . seek to have *Wilson* and *Friedman* overruled."  (Compl. ¶ 5.)

Eager to achieve that goal, Plaintiffs in early December 2021 moved for judgment on the pleadings in favor of *Defendants*.  (Pls.' Mot. for J. on the Pleadings [20].)  Recognizing that their claims "are foreclosed by *Wilson* . . . and *Friedman*," which themselves relied on general national evidence in upholding the weapons ban, Plaintiffs saw no need to "'develop a factual record on which to distinguish *Friedman* . . . .'"  (Pls.' Brief in Supp. of J. on the Pleadings [21] at 1, 4, (quoting *Wilson*, 937 F.3d at 1036).)  Plaintiffs noted that if the Seventh Circuit were to reverse *Friedman* and *Wilson,* Defendants could always ask to remand for "further factual development under correct legal standards."  (*Id.* at 6.)

3

**App.5**

For their part, Defendants declined the offer of an easy victory. In a hearing on December 8, 2021, Defendants asked the court to deny Plaintiffs' request for a judgment in Defendants' favor. Instead, Defendants asked that discovery proceed on the issue of whether assault weapons (as defined by the Ordinance) were "dangerous and unusual"—and thus outside the Second Amendment's ambit. (Tr. of Proceedings held on Dec. 8, 2021 (hereinafter "Hearing Tr.") [24] at 4–5; *see also Friedman*, 784 F.3d at 407–08 (noting the longstanding practice of banning dangerous and unusual weapons).) They pointed out that *Friedman* declined to answer that threshold question, instead assuming that the Second Amendment was implicated, but nevertheless upholding the ban. (Hearing Tr. at 4–5; *see also Friedman*, 784 F.3d at 411 ("Since the banned weapons can be used for self-defense, we must consider whether the ordinance leaves residents of Highland Park ample means to exercise the inherent right of self-defense that the Second Amendment protects." (quotation omitted)).) In other words, in the case before this court, Defendants hoped to develop a record on assault weapons' dangerousness and use this record as "an additional basis pursuant to which we could potentially win on the merits." (Hearing Tr. at 5.) Plaintiffs countered that the relevant evidence bearing on that question amounted to "legislative facts"—in other words, universal facts about the weapons having nothing to do specifically with Cook County—and that to engage in discovery would be "a waste of judicial resources." (*Id.* at 7–8.) Ultimately, recognizing "powerful arguments in both directions," the court granted Defendants' request to develop a record in this respect, and discovery commenced. (*Id.* at 15.)

The subsequent two years saw numerous twists and turns. First, as discovery was ongoing, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, which announced a new standard applicable to Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

**App.6**

597 U.S. 1, 24 (2022). Importantly, this new test explicitly rejected subjecting such laws to means-end scrutiny, holding instead that to justify a restriction, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

On January 10, 2023, Illinois passed its own statewide assault-weapons ban. (Mem. of Law in Supp. of Pls.' Mot. to Stay (hereinafter "Stay Motion") [70] at 1; *see also* 720 Ill. Comp. Stat. 5/24-1.9.) That state law spawned challenges in several district courts across the Seventh Circuit. Plaintiffs asked the court to stay this case pending resolution of the Illinois ban's constitutionality, recognizing that the new law's scope, "while not identical" to that of the Cook County ordinance, "would equally bar Plaintiffs from acquiring their chosen firearms." (Stay Motion at 1.) The court set a hearing date in March of 2023 to decide whether to grant Plaintiffs' request (*see* Ord. [77]), but in the intervening months Judge Virginia M. Kendall issued an order denying a preliminary injunction that would have prevented enforcement of both the Illinois ban and a similar ban employed by the City of Naperville, finding that both the state law and the local ordinance would likely survive constitutional scrutiny, *see Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023). On March 3, 2023, Defendants filed their motion for summary judgment. (*See* Def.'s Mot. for Summ. J. [80].) Five days later, after a hearing, the court declined to stay this case, noting the possibility that the Seventh Circuit's ruling in the appeal from *Bevis* (and other cases addressing assault weapons bans) might not resolve this one. (Ord. [88] at 1.) The court also observed that this case is the only one where the parties were developing a factual record. (*Id.*)

Briefing on Defendants' motion for summary judgment and on Plaintiffs' own motion for summary judgment (*see* Pl.'s Mot. for Summ. J. [100]) continued and was complete by mid-June. In September 2023, declining a motion for reassignment of a yet another assault-weapons-ban challenge case pending before Judge Harry D. Leinenweber, the court observed that the Seventh

Circuit had by then heard oral argument in *Bevis*, and its decision there "may well have substantial influence on, or control, this one."  (Ord. [120] at 1–2.)

Then on November 3, 2023, the Seventh Circuit issued a single opinion addressing *Bevis* and the other consolidated cases challenging Illinois' statewide and local assault-weapons bans on appeal.  The Court of Appeals refused to enjoin enforcement of any of these laws.  *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1182, 1203 (7th Cir. 2023) (addressing the Illinois state law, a City of Chicago ordinance, a City of Naperville ordinance, and the Cook County Ordinance).  In doing so, the court affirmed the "continuing vitality" of *Friedman*.  *Id.* at 1184.  The court noted that *Friedman* was "basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on history, not on a free-form balancing test."  *Id.* at 1189.  In defending this conclusion, the court noted that *Wilson* included a "gloss" on *Friedman*; that is, *Wilson* suggested that *Friedman* had done some sort of means-end scrutiny when upholding Highland Park's assault-weapons ban.  That suggestion, the *Bevis* court said, was *dicta*; *Wilson* never explicitly characterized *Friedman* as having applied means-end scrutiny.  *Id.* at 1191.  That *Friedman* included a "fleeting reference to the city's reasons for adopting [its] ordinance" was not enough to "undermine the central analysis in the case," which focused on history.  *Id.*

On the merits*, Bevis* considered whether challenges to these state and local assault-weapons bans were likely to succeed—a showing necessary for entry of a preliminary injunction against their enforcement.  The court's Second Amendment analysis involved two successive inquiries:  first, whether the weapons regulated by these laws are "Arms" within the meaning of the Second Amendment; and second, if so, whether the regulation comported with the history and tradition of firearms regulation.

At the first step, the court noted that the Amendment only applies to "bearable arms," which the court defined as "weapons in common use for a lawful purpose . . . [which] is at its core the right to individual self-defense."  *Id.* at 1193 (relying on *District of Columbia v. Heller*, 554 U.S. 570, 624–25 (2008)).  Plaintiffs therefore must show "that the weapons addressed in the pertinent

6

**App.8**

legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Id.* at 1194.  Plaintiffs were not likely to meet that burden, the court concluded, pointing out that *Heller* "stated that M16s [military machineguns] are not among the Arms covered by the Second Amendment," and that the AR-15 (and similar weapons) were more like military weapons than those useful for self-defense. *Id.* at 1195 (citing *Heller*, 554 U.S. at 624, 627).  Comparing the AR-15 and the M16, the court stressed that "[b]oth models use the same ammunition, deliver the same kinetic energy . . . the same muzzle velocity . . . and the same effective range . . . ." *Id.* at 1196.  The "only meaningful distinction" the court found between the two weapons "is that the AR-15 has only semiautomatic capability (unless the user takes advantage of some simple modifications that essentially make it fully automatic), while the M16 operates both ways." *Id.* at 1195.  The court also found irrelevant the fact that the "M16 has an automatic firing rate of 700 rounds per minute, while the [unmodified] AR-15 has a semiautomatic rate of 'only' 300 rounds per minute . . . ." *Id.*  at 1196.  This distinction made no difference for numerous reasons.  For one, AR-15s could easily be modified with a bump stock to "mak[e] it, in essence, a fully automatic weapon." *Id.*   And there was "a serious question" whether it would make sense to consider the AR-15 an Arm "as sold" if it could easily be modified to a military-like weapon; calling the AR-15 an Arm protected by the Amendment would, thus, "be a road map for assembling machineguns and avoiding legitimate regulations of their private use and carry." *Id.*

Importantly, the court concluded this threshold inquiry with a caveat:

Better data on firing rates might change the analysis of whether the AR-15 and comparable weapons fall on the military or civilian side of the line.  We note in this connection that it is one thing to say that the AR-15 is capable of firing at a rate of 300 rounds per minute and the comparable rate for the M16 is 700 rounds per minute, but quite another to address actual firing capacity, which accounts for the need to change magazines.  No one here has suggested that the M16 comes with a 700-round magazine, or for that matter that the AR-15 comes with a 300-round magazine.  Either one must be reloaded multiple times to fire so many rounds. Factoring in the reloading time, the record may show that the two weapons differ more—or less—than it appears here.

*Id.* at 1197. The court also found that "large-capacity magazines . . . can lawfully be reserved for military use," and that "[a]nyone who wants greater firepower" could buy "three 10-round magazines" instead of one 30-round magazine. *Id.* The court concluded by stating that "there thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.*

For the sake of completeness, the court also considered the second step "of the *Bruen* framework"—namely, whether "these laws [are] consistent with the history and tradition of firearms regulation . . . ." *Id.* at 1197–98. Here, too, the court concluded that plaintiffs were unlikely to succeed on the merits. The court began by tackling the question of whether assault weapons were in "common use" for self-defense—an inquiry it chose to conduct at the second step as opposed to the first. *Id.* at 1198. On that question, the court found "the analysis in *Friedman* to be particularly useful," in recognizing that "common use" was not tied to "numbers alone" concerning how many people owned the weapons, as this would make a ban constitutional at one time and unconstitutional at another. *Id.* at 1198–99. Instead, *Bevis* decided that "the relevant question is what are the modern analogues to the weapons people used for individual self-defense in 1791, and perhaps as late as 1868," and concluded those modern analogues include the non-military weapons that cases like *Heller* had in mind, "not a militaristic weapon such as the AR-15, which is capable of inflicting the grisly damage described in some of the briefs." *Id.* at 1199.

The *Bevis* court also addressed the history of regulation of dangerous weapons to protect the public. *Id.* at 1200. There is, the court held, a "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices." *Id.* at 1199, 1201. The slate of assault-weapons bans at issue in *Bevis* thus "respect[ed] and rel[ied] on" what the court deemed "a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction

8

between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use." *Id.* at 1202.

After the *Bevis* decision issued, Defendants in this case filed a notice of supplemental authority, noting that *Bevis* "relied upon the analysis in *Friedman*" in reaching its conclusion as to *Bruen*'s second (history-minded) step. (*See* Notice of Supp. Authority [122] at 2.) Plaintiffs responded, admitting that "the legal conclusions in *Bevis* are binding here," but arguing that *Bevis* leaves open the possibility that further evidence, especially concerning the differences between AR-15s and M16s, could change its analysis. (Pls.' Resp. to Defs.' Supp. Authority (hereinafter "Pls.' *Bevis* Resp.") [123] at 1.) They contend that "[b]etter data" is available here, noting certain of their responses to Defendants' Rule 56.1 statements. (*Id.* at 2.) Specifically, they challenge *Bevis*' assumption that AR-15s shoot at a maximum rate of 300 rounds per minute (as compared with M16s' supposed rate of 700 per minute):

> The effective rate of fire of the M-16 rifle is 45–65 rounds per minute in semiautomatic mode and 150–200 rounds per minute in automatic mode. Unlike the M-16, the AR-15 is solely semiautomatic. It thus has an effective rate of fire that is one-third of the rate of the M-16 in automatic mode, and one-fifth of the rate posited by the Seventh Circuit.

> (*Id.* at 2 (citations omitted).) This data, Plaintiffs argue, effectively distinguishes their case

from *Bevis* on both prongs of the test identified by the Seventh Circuit, as both prongs rely to some extent on the distinction between military and civilian weapons. In other words, "[b]ecause the record in this case distinguishes AR-15s from M-16s, this tradition cannot support banning the AR-15 and other semiautomatic firearms." (*Id.*) Finally, *Bevis*' having left Illinois' assault-weapons ban intact left the court with questions about this case's justiciability. Accordingly, the court asked the parties to brief the issue of how Plaintiffs still have standing to challenge Cook County's ban. (Minute Ord. [125].)

## DISCUSSION

This case presents an awkward procedural puzzle with a simple solution. On the one hand, *Bevis* made clear that *Friedman* and *Wilson* remain good law, all but foreclosing Plaintiffs'

claim.  On the other hand, *Bevis* also suggested that on remand, its merits analysis on the bans at issue (including Cook County's) might change based on a more fully developed factual record. In theory, this case—which has proceeded through discovery—might present just such a record to pick up where *Bevis* left off.  But because Plaintiffs surface nothing from this record that might justify departing from binding precedent, the court grants summary judgment for Defendants.

The standards governing this case are familiar.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court views the facts "in the light most favorable" to the nonmoving party when making this determination.  *Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020).  And the "substantive law will identify which facts are material." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## I.      Whether Plaintiffs Have Standing

Illinois' assault-weapons ban, which is unchallenged here, prohibits Plaintiffs from owning the same weapons that the challenged Cook County Ordinance does.  The court thus asked the parties to explain how Plaintiffs' injuries are redressable by a ruling in their favor.  Both parties urged that Plaintiffs do retain standing.  Plaintiffs argue (1) that they have asked for nominal damages, which entitle them to *some* relief; and (2) that Defendant Foxx (the Cook County State's Attorney) is tasked with enforcing both state and county law.  Thus, Plaintiffs assert, a ruling in their favor concerning the county's ban would strongly imply that the state ban is also unconstitutional, and would likely dissuade Foxx from enforcing the state law while independent challenges to its constitutionality proceed elsewhere.  (*See* Pl.'s Resp. to Ord. to Show Cause [128].)

Defendants also argue that standing exists, for different reasons.  First, Defendants contend that the Ordinance fully prohibits ownership of assault weapons, while Illinois' ban "allows gun owners to retain possession of assault weapons purchased prior to October 1, 2023, if registered."  (Def.'s Mem. in Resp. to ECF No. 125 [127] at 4.)  Defendants tacitly admit that

**App.12**

neither side has shown that any Plaintiff in fact owned covered weapons before October of 2023, but they make the common-sense assumption that the organizational "Plaintiffs here likely represent" such people. (*Id.* at 5.) Secondly, Defendants note that the Ordinance allows for larger penalties than Illinois' ban does, such that a ruling in Plaintiffs' favor would insulate them from harsher forms of punishment. (*Id.* at 6–7.)

The fact that the Plaintiffs seek nominal damages, and that the two bans are similar enough that the unconstitutionality of one would likely fall with the other, persuade the court that the case remains justiciable. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1536 (2020) (Alito, J., dissenting) ("[I]t is widely recognized that a claim for nominal damages precludes mootness."). Accordingly, the court proceeds to the merits.

## II.    Whether *Friedman* and *Wilson* control this case

It is undisputed that this court is bound by Seventh Circuit precedent "unless 'powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity.'" *Brenner v. Brown*, 814 F. Supp. 717, 718 (N.D. Ill. 1993) (quoting *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987)). The court follows Seventh Circuit precedent even if it believes those decisions are wrong or mistaken. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

*Friedman* affirmed a grant of summary judgment in favor of Highland Park and held that its assault-weapons ban did not violate the Second Amendment. 784 F.3d at 406. And in 2019, *Wilson* affirmed dismissal of a complaint challenging the same Cook County Ordinance at issue in this case,[4] holding that *Friedman* was controlling because the two ordinances were "materially indistinguishable" and "the plaintiffs ha[d] not come forward with a compelling reason to revisit" that earlier decision. 937 F.3d at 1029. If this were not enough, the parties have expressly agreed that, if they are still good law, *Friedman* and *Wilson* control the case. Plaintiffs themselves made this point in their December 2021 motion for judgment on the pleadings (in favor of Defendants),

---

[4]    The Ordinance has not been amended in the interim; it has remained the same since July 2013. *See* Cook County, Ill. Code §§ 54-210 *et seq.*

admitting that "the claims at issue in this case are foreclosed by *Wilson* . . . and *Friedman*," and that "[a]ll parties agree that the Court is bound by these decisions . . . ." (Pls.' Brief in Supp. of J. on the Pleadings at 1.) Defendants see it in the same way. In their March 2023 motion for summary judgment, Defendants argue that Plaintiffs' "claims are foreclosed by the Seventh Circuit's decisions in *Wilson* . . . and *Friedman* . . . ." (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. [82] at 46.)

The only hope for Plaintiffs' claim was that the Seventh Circuit would hold that *Friedman* and *Wilson* are inconsistent with *Bruen* and thus call them into serious doubt or overrule them. But crucially, the court in *Bevins* went well beyond simply refusing to overrule *Friedman* (and *Wilson* by extension); *Bevis* made a point of stressing *Friedman*'s "continuing vitality . . . ." 85 F.4th at 1184, 1190–91. And Plaintiffs conceded after *Bevins* came down that its legal conclusions are binding on this court. (Pls.' *Bevis* Resp. at 1.) Plaintiffs' claims are thus squarely foreclosed by binding precedent.

### III. Whether Any Evidence Distinguishes this Case from *Bevis*, *Friedman*, or *Wilson*

Nor, to the extent dicta in *Bevis* suggests that firing-rate differentials between M16s and AR-15s could change the calculus, have Plaintiffs offered evidence meaningfully doing so. First, it is not at all clear that the papers, surveys, and other online sources to which Plaintiffs cite are even admissible in this case. (*See* Defs.' Reply Filed in Supp. of Defs.' Mot. to Strike [117] at 5 (noting that Plaintiffs rely largely on "opinions set forth by alleged experts" without disclosing them in discovery and thus "circumvent[ing] th[e] court's discovery orders").)

But even considering the sources the Plaintiffs *do* cite, their evidence falls far short of meaningfully distinguishing AR-15s from M16s. Plaintiffs claim that the M16 and AR-15 both have a lower "effective" rate of fire than the rates contemplated by the Seventh Circuit in *Bevis*. Recall that *Bevis* appeared to assume that the M16 as an automatic weapon was capable of firing a maximum of 700 rounds per minute while the semiautomatic AR-15's comparable maximum rate was 300 rounds per minute. 85 F.4th at 1196. Plaintiffs note, contrarily, that the *effective* rate of

fire of the M16 rifle is 'only' 150–200 (not 700) rounds per minute in automatic mode and 45–65 (not 300) rounds per minute in semiautomatic mode, which would be the same for the AR-15, as it is semiautomatic.  (Pls.' *Bevis* Resp. at 2.)  This leads Plaintiffs to claim that the AR-15 "has an effective rate of fire that is one-third of the rate of the M-16 in automatic mode, and one-fifth of the rate posited by the Seventh Circuit."  (*Id.*)

This is truly a distinction without a difference.  *Bevis* made clear that the relevant distinction is not how fast the AR-15 shot in isolation, but how its firing rate compares with that of an M16, which (as recognized in *Heller*) was appropriately subject to regulation.  *Id.* at 1197 ("[W]e do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s . . . than the present record reveals.")  By the court's math, pre-modification with bump stocks or other devices, the AR-15 shot about 40% as many rounds in a minute as did the M16 (300 versus 700).   The difference is similar, though, using Plaintiffs' numbers: if the M16 can "effective[ly]" shoot at 150–200 rounds a minute and the AR-15 can, pre-modification, shoot at 45–65 rounds a minute, then the AR-15 can shoot about 33% as many rounds in a minute as the M16 does.  There is no indication in *Bevis* that this percentage difference in minute-to-minute firing capacity would render AR-15s different enough from M16s (which the court assumed were military weapons) to render them subject to Second Amendment protection.  Moreover, the court in *Bevis* made a point of stressing that AR-15s can easily be modified with bump stocks or other devices to at least "double the rate at which" they can fire, further demonstrating the practical similarity between the two weapons.  *See id.* at 1196.   Nothing Plaintiffs have presented casts this into doubt.  Additionally, *Bevis* appeared more concerned with whether the firing-rate differentials between AR-15s and M16s were exacerbated by things like "[f]actoring in reloading time" and the size of the typical magazines used with each weapon, and

**App.15**

Plaintiffs point to no evidence suggesting any such difference.  *See id.* at 1197; *see also generally* Pls.' Resps. & Objections to Defs.' Rule 56.1 Statement of Material Facts [98].[5]

More importantly, it appears that the Seventh Circuit had this evidence before it in some form when deciding *Bevis.*  In his dissent, Judge Manion points to a report from one of the compiled cases "listing the M16's maximum semiautomatic effective rate at 45 rounds per minute" to argue that the AR-15, which would have that same semiautomatic firing rate, was significantly lower than the M16 firing in automatic mode.  *Bevis*, 85 F.4th at 1224 (Manion, J., dissenting). The *Bevis* majority was evidently unmoved by this distinction.

## CONCLUSION

For the foregoing reasons, the court grants Defendants' motion for summary judgment [80] and denies Plaintiffs' [100]; it also denies Defendants' motion to strike [104] as moot.  The Clerk is directed to enter judgment in favor of Defendants.  This ruling is final and appealable.


ENTER:


Dated: March 1, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

---

[5]    Indeed, Plaintiffs' evidence in this case appears to have been broadly similar to that addressed in *Bevis*, as Plaintiffs seem to have relied on publicly available studies and information as opposed to producing expert reports during discovery.  (*See* Motion to Strike at 6–7 (pointing out that Plaintiffs did not disclose exhibits they use to challenge Defendants' Rule 56.1 statements during discovery).)  For example, in addition to the firing-rate evidence discussed above, *Bevis* was not troubled by statistics about the apparent popularity of the weapons at issue including "[o]ne brief['s] assert[ion] that at least 20 million AR-15s and similar rifles are owned by some 16 million citizens," and Plaintiffs stress similar figures here.  (*Bevis*, 85 F.4th at 1198; Pls.' Mem. of Law in Supp. of Summ. J. [102] at 8.)

**App.16**

**STATEMENT PURSUANT TO CIRCUIT RULE 30(d)**

I certify that all of the materials required by Circuit Rule 30(a) are included in the Required Short Appendix and that there are no materials within the scope of Circuit Rule 30(b).

June 24, 2024                          /s/ David H. Thompson
                                       David H. Thompson
                                       *Attorney for Plaintiffs-Appellants*