No. 24-1437

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

CUTBERTO VIRAMONTES, et al.

Plaintiffs-Appellants,

v.

COUNTY OF COOK, et al.

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 21-cv-4595
The Honorable Rebecca R. Pallmeyer, presiding
————

**BRIEF OF DEFENDANTS-APPELLEES**
————

KIMBERLY M. FOXX
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-6934
Jessica.Scheller@cookcountyil.gov

CATHY MCNEIL STEIN
Chief, Civil Actions Bureau
JESSICA M. SCHELLER
Deputy Chief, Civil Actions Bureau
JONATHON D. BYRER
PRATHIMA YEDDANAPUDI
Assistant State's Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

POINTS AND AUTHORITIES ..................................................................iii

JURISDICTIONAL STATEMENT ............................................. 1

ISSUES PRESENTED ............................................................... 1

STATEMENT OF THE CASE ..................................................... 1

SUMMARY OF ARGUMENT ..................................................... 13

ARGUMENT ............................................................................. 15

I.     *Friedman* and *Wilson* Foreclose Viramontes' Second Amendment Claim ..... 15

II.    Various Procedural Defects Impair Viramontes' Arguments Concerning *Bevis* ................................................................................... 17

    A.  *Bevis* Resolved the Challenge to the Ordinance under *Bruen* ................... 18

    B.  Viramontes' Appeal is Replete With Waiver and Forfeiture .....................19

III.   There Is No Compelling Reason To Overrule *Bevis* ................................ 22

    A.  Viramontes' Rehashing Of Arguments Raised And Rejected In *Bevis* Cannot Provide Compelling Reason To Overrule *Bevis* ..................................... 23

    B.  *Rahimi* Reinforces *Bevis*' Conclusion That Assault Weapons Regulations Are Constitutional ................................................................. 23

        1.  Assault Weapons Are Not "Arms" Within The Second Amendment's Text Because They Are "Unusual" ................................................24

        2.  Assault Weapons Are Not "Arms" Within The Scope Of The Second Amendment Because They Are "Dangerous" ............................... 33

        3.  The County's Assault Weapons Ban Is Consistent With The Legal Principles Underpinning This Nation's Traditions ....................... 46

CONCLUSION.......................................................................... 54

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)............................ 55

CERTIFICATE OF SERVICE ...................................................................... 55

# POINTS AND AUTHORITIES

## Cases

*Alden v. Maine,*
    527 U.S. 706 (1999) ................................................................26

*Anonymous,*
    12 Mod. 342 (King's Bench) ................................................ 49

*Bailey v. United States,*
    516 U.S. 137 (1995) ................................................ 27, 32

*Belom v. Nat'l Futures Assoc.,*
    284 F.3d 795 (7th Cir. 2002) ............................................19

*Benjamin v. Bailey,*
    662 A.2d 1226 (Conn. 1995) ............................................ 41

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) .................................... 11, passim

*Bianchi v. Brown,*
    No. 21-1255, 2024 U.S. App. LEXIS 19624 (4th Cir. Aug. 6, 2024) ............ 34, 45

*Brooks v. Walls,*
    279 F.3d 518 (7th Cir. 2002) .......................................... 16

*Calvillo-Silva v. Home Grocery,*
    19 Cal. 4th 714 (1998) ................................................ 43

*Cheatham v. Shearon,*
    31 Tenn. 213 (1851) ................................................ 50

*Cockcroft v. Smith,*
    11 Mod. 43 (King's Bench 1705) ...................................... 39

*Day v. State,*
    37 Tenn. 496 (1858) ................................................ 41

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ................................................................23, passim

*English v. State*,
　35 Tex. 473 (1872) ................................................................ 33

*Flanagan v. Office of Chief Judge*,
　893 F.3d 372 (7th Cir. 2018) ................................................. 31

*Flint v. City of Belvidere*,
　791 F.3d 764 (7th Cir. 2015) ................................................. 20

*Friedman v. City of Highland Park*,
　784 F.3d 406 (7th Cir. 2015) ...........................................9, 10, 15, 33

*Grant v. Trustees of Indiana Univ.*,
　870 F.3d 562 (7th Cir. 2017) ................................................. 19

*Harrel v. Raoul*,
　144 S. Ct. 2491 (2024) ......................................................... 34

*Herrera v. Raoul*,
　No. 23-cv-00532 (N.D. Ill.) ....................................................22

*Jackson v. City of Peoria*,
　825 F.3d 328 (7th Cir. 2016) ................................................. 31

*Katko v. Briney*,
　183 N.W.2d 657 (Iowa 1971) ................................................ 42, 43, 44

*McDonald v. City of Chicago*,
　561 U.S. 742 (2010) ............................................................. 36

*New York State Rifle & Pistol Ass'n v. Bruen*,
　597 U.S. 1 (2022) ...................................................... 10, 18, 24, 25

*Ocean State Tactical, LLC v. Rhode Island*,
　95 F.4th 38 (1st Cir. 2024) ................................................. 29, 53

*Packer v. Trustees of Ind. Univ. Sch. of Med.*,
　800 F.3d 843 (7th Cir. 2015) ................................................. 20

*People v. Brown,*
     235 N.W. 245 (Mich. 1931) .......................................................... 41

*People v. Persce,*
     97 N.E. 877 (N.Y. 1912) ............................................................. 41

*People v. Murillo,*
     587 N.E. 2d 1199 (1st Dist. 1992) ......................................... 45

*Reg. v. Nailor,*
     Foster Crown Cases 278 (Old Bailey 1704) ........................ 39

*Rex v. Dewhurst,*
     (King's Bench 1820) .................................................................... 37

*Rex v. Taylor,*
     2 Str. 1167 (King's Bench) ....................................................... 49

*Staples v. United States,*
     511 U.S. 600 (1994) .................................................................. 28

*State v. Duke,*
     42 Tex. 455 (Tex. 1874) ........................................................... 41

*State v. Huntly,*
     25 N.C. 418 (1843) ................................................... 25, 26, 27, 30

*State v. Reid,*
     1 Ala. 612 (1840) ....................................................................... 41

*State v. Wells,*
     1 N.J.L. 486 (N.J. 1790) ......................................................... 39

*Teter v. Lopez,*
     76 F.4th 938 (9th Cir. 2023) ..........................................22, fn.2

*Teter v. Lopez,*
     93 F.4th 1150 (9th Cir. 2024) ...................................... 22, fn.2

*United States v. Carpenter,*
     104 F.4th 655 (7th Cir. 2024) ................................................. 22

*United States v. Foster,*
   652 F.3d 776 (7th Cir. 2011) ........................................................... 15, 24

*United States v. Freed,*
   401 U.S. 601 (1971) ........................................................................... 28

*United States v. Miller,*
   307 U.S. 174 (1939) ........................................................................... 28

*United States v. Rahimi,*
   144 S. Ct. 1889 (2024) ................................................................14, passim

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) .............................................................. 31

*United States v. White,*
   879 F.2d 1509 (7th Cir. 1989) ........................................................ 21, 46

*Vermont Fed. of Sportsmen's Clubs v. Birmingham,*
   No. 2:23-cv-710, 2024 U.S. Dist. LEXIS 126857 (D. Vt. July 2, 2024) .............. 25

*Wilson v. Cook County,*
   937 F.3d 1028 (7th Cir. 2019) .....................................................9, 12, 15, 22

*Woods v. Interstate Realty Co.,*
   337 U.S. 535 (1949) ........................................................................... 17

## Statutes and Ordinances

720 ILCS 5/24-1(a)(5) ........................................................................ 42

720 ILCS 5/24-1.5 ............................................................................. 45

720 ILCS 5/24-1.2 ............................................................................. 45

720 ILCS 5/47-5(7) ............................................................................ 50

*An Act to Incorporate the City of Key West*, ch. 58, § 8, 1838 Fla. Laws 70 ............ 50

*English Declaration of Rights of 1689*, 1 W. & M., ch. 2, § 7 ............................ 36

Mich. Comp. Laws § 750.236 ............................................................ 42

*Offenses Against the Person Act 1861*, 24 & 25 Vict. .......................... 42

*Repeal of Obsolete Statutes Act 1856*, act 19 & 20 Vict. c. 64 .............. 36

*Spring Gun Act 1827*, 7 & 8 Geo. 4, ch. 18 ....................................... 42

*Statute Made at Westminster in the Seventh Year 1383* ..................... 35

*Statute of the Twentieth Year 1396-97* ............................................ 35

Fed. R. Evid. 201 .......................................................................... 21

N.D. Ill. Local Rule 56.1.................................................................. 20

Cook County Ordinance No. 54-210 – 54-215 ............................... 9, 18

Cook County Ordinance No. 93-O-37 .................................................9

## Other Sources

1 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW
(Boston 1823) .................................................................... 40

1 William Blackstone, *Commentaries On The Laws Of England*
(Oxford 2016) .................................................................... 37

3 William Blackstone, *Commentaries On The Laws Of England*
(Oxford 2016) .................................................................... 38

4 William Blackstone, *Commentaries On The Laws Of England*
(Oxford 2016) ...........................................................24, passim

7 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW
(Boston 1823) .................................................................... 40

Alan Haynes, THE GUNPOWDER PLOT (History Press 1994) .................48

BLACK'S LAW DICTIONARY 1228 (8th ed. 2008) .................................24

Chris Bishop, THE ENCYCLOPEDIA OF WEAPONS OF WORLD WAR II
    218 (Sterling 2002) ......................................................................... 2

CORPUS JURIS CIVILIS, Dig. 48, 49 ............................................... 34, 35

David Lockmiller, SIR WILLIAM BLACKSTONE 8 (U.N.C. Press 1938) ....................... 26

Deborah Azrael, *A Critique of Findings on Gun Ownership, Use, and Imagined Use
    from the 2021 National Firearms Survey: Response to William English* ....... 32

Ed Tangen, *Spring Guns*, 1 AM. J. POLICE SCI. 307 (1930) ...................................41

Eric Ruben, *An Unstable Core: Self-Defense & the Second Amendment*,
    108 CALIF. L. REV. 63 (2020) ................................................................ 39

George Cameron Stone, A GLOSSARY OF THE CONSTRUCTION, DECORATION, &
    USE OF ARMS & ARMOR IN ALL COUNTRIES & IN ALL TIMES, 410 (1934) ....... 36

Henry A. Chaney, *Nathan Dane*, THE GREEN BAG, Vol. III 548 (1891) ...................40

H.G. Wood, A PRACTICAL TREATISE ON THE LAW OF NUISANCES 142 (1875) .......... 50

House of Commons Debates, March 23, 1827, vol. 17, cc19-34 .............................43

John Ayliffe, A NEW PANDECT OF ROMAN LAW 195 (1734) ................................ 34

John MacDonnell, REPORTS OF STATE TRIALS, NEW SERIES 601-02
    (London 1888) (Bayley, J.) ...................................................................... 37

Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier
    Performance of their Duty* 147 (1689)............................................................ 26

Joyce Lee Malcolm, TO KEEP & BEAR AMS 162 (Cambridge 1994) .................. 36, 42

*Merriam-Webster*, www.merriam-webster.com............................................................ 26

Mike McIntire, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*,
    NEW YORK TIMES (June 18, 2024) ........................................................... 32

Miller Christy, *Man Traps & Spring-Guns*,
    OUTING, vol. XLI, issue 6 (1903) .................................................... 41, 42

Nick Penzenstadler, *Gun Used in Trump Shooting: New Details about Rifle Emerge*,
    USA TODAY (July 16, 2024) .................................................................. 51

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ....... 35

Saul Cornell & Nathaniel DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004)................................ 50

Stephen Halbrook, *To Bear Arms for Self-Defense*, 21 FEDERALIST SOC'Y REV. 46 (2020) ....................................................... 37

Rev. Sydney Smith, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW, Vol. 35, Issue 70 (1821) ................................... 43

Thomas A. Green, *The Jury & The English Law Of Homicide, 1200-1600*, 74 MICH. L. REV. 413 (1976) ................................................................ 38

U.S. Department of Justice, CRITICAL INCIDENT REVIEW: ACTIVE SHOOTER AT ROBB ELEMENTARY SCHOOL (2024) .................................................1, 2, 8, 29

V.F. Nourse, *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235 (2001) .............. .37

William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 87 (8th ed. London 1824) ....................................................................38, fn 5

William Lambarde, EIRENARCHA 134 (1579) ..................................................... 26

William J. Novak, THE PEOPLE'S WELFARE 63 (U.N.C. Press 2000) ......................50

## JURISDICTIONAL STATEMENT

—————

The jurisdictional statement of plaintiffs-appellants Cutberto Viramontes, Christopher Khaya, Second Amendment Foundation, and Firearms Policy Coalition (collectively, "Viramontes") is complete and correct.

## ISSUES PRESENTED

—————

1.     Whether the County's ordinance prohibiting ownership of assault weapons both implicates and contravenes the text of the Second Amendment, where those weapons are not commonly used for lawful purposes and are dangerous militaristic weapons incompatible with legal guardrails governing self-defense.

2.     Whether the County's ordinance is consistent with this nation's historical regulatory traditions, where the undisputed historical record reveals a longstanding American legal tradition recognizing a moderation principle as it applies to the doctrine of self-defense as well as a historical tradition of regulating weapons capable of inflicting rapid mass death.

## STATEMENT OF THE CASE

————

### I.     Assault Weapons.

On May 24, 2022, a gunman armed with an assault weapon murdered nineteen children – none older than 11 years– and two teachers at Robb Elementary School in Uvalde, Texas. *See generally* U.S. Department of Justice, CRITICAL INCIDENT REVIEW: ACTIVE SHOOTER AT ROBB ELEMENTARY SCHOOL (2024). Afterward, a pediatrician observed that the children "had been pulverized by bullets

1

fired at them, decapitated," their "flesh had been ripped apart" to such an extent "that the only clue as to their identities was blood-spattered cartoon clothes still clinging to them." R. 81 ¶4. While these children were dying, the law enforcement officers who swore an oath to protect them waited outside and "focused on calls for additional SWAT equipment," paralyzed by the sheer destructive capacity of the war weapon they faced. CRITICAL INCIDENT REVIEW, *supra*, at xvii. None of this was new, nor was it unforeseen – the Uvalde massacre was at least the seventeenth assault-weapon massacre in the United States since 1984.

To understand how a single weapon could be utilized to such devastating effect in the Uvalde massacre, and those which preceded it, one must understand its origins as a weapon of war. In 1944, Germany's government began arming its troops with the *Sturmgewehr 44*. Chris Bishop, THE ENCYCLOPEDIA OF WEAPONS OF WORLD WAR II 218 (Sterling 2002). This weapon "was the first of what are today termed assault rifles. It could fire single shots for selective fire in defence, and yet was capable of producing automatic fire for shock effect in the attack or for close quarter combat." *Id.* Following the war, in 1957, the United States Army invited Armalite, a firearms manufacturer, to produce a lightweight, high-velocity rifle that could operate in both semiautomatic and fully automatic modes with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. R. 81 ¶298. Armalite devised the AR-15 to meet these specifications. *Id.* ¶299. In December 1963, the Army adopted the AR-15, rebranding it the "M-16." *Id.* ¶302.

The AR-15 has the same performance characteristics, in terms of muzzle velocity, range, and ammunition, as the M-16. R. 81 ¶304, 325. The AR-15 also has the same destructive capacity as weapons developed for use in war-time offensives by the military. *Id.* ¶325. Its performance characteristics all contribute to its uncommon lethality as compared to handguns. *Id.* ¶¶56-57, 59-70. Military-style assault rifle rounds travel between two and three times as fast as rounds from a handgun. *Id.* ¶60. The physical impact of assault-weapon fire on human tissue is vastly different than the impact from a handgun and leads to greater fatality and injury. *Id.* ¶56-57. Bullets from assault weapons are more likely to fracture bones due to their higher energy release. *Id.* ¶73. Assault rifle impacts to extremities frequently result in amputations, even where a handgun injury would be treatable. *Id.* ¶74. Similarly, if a handgun injury requires surgery, typically only one is needed, but assault weapon injuries frequently require multiple operations and massive blood transfusions because major blood vessels and multiple organs are damaged. *Id.* ¶71. These injuries are even more deadly for children. *Id.* ¶75. In the words of one trauma surgeon, "A handgun [wound] is simply stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can." R. 81-4 ¶¶101-03.

As this table illustrates, R. 82 ¶7, there is no meaningful difference between the performance capacity of the M-16 and the AR-15:

| Weapon | Ammunition | Muzzle Velocity[4] | Effective Range[5] | Maximum Range[6] |
|--------|-----------|--------------------|--------------------|--------------------|
| M 16 | 5.56 mm/.223 caliber | 3,200 ft/sec | 550 M individual targets/800 M area targets | 3,000 M |
| AR 15 | 5.56 mm/.223 caliber | 3,200 ft/sec | 550 M individual targets/800 M area targets | 3,000 M |

These performance characteristics allow assault weapons to deliver more gruesome injuries and, with them, nearly certain death. A weapon's killing capacity is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. R. 81 ¶59. The ammunition often used in AR-15s, the 5.56mm/.223 caliber cartridge, was adopted by the military for use in assault weapons specifically because of its light weight and ability to deliver reliable lethality. *Id.* ¶¶298, 270. The lethality of this type of weapon and ammunition were immediately evident in Vietnam, where an AR-15 left a back wound that "caused the thoracic cavity to explode," and a "heel wound" where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip," both of which resulted in "instantaneous" death. R. 81-4 ¶98. In another instance, three shots fired from an AR-15 decapitated the enemy combatant and severed his right arm. *Id.* ¶97.

The extraordinary lethality of assault weapons is a function of the velocity with which they expel ammunition, the yaw effect experienced by the bullets they fire, and their range. Assault-weapon rounds have a muzzle velocity of

approximately 3200 feet per second, compared to approximately 1200 feet per second for a 9mm pistol. R. 81 ¶60. The kinetic energy of an AR-15 round is approximately 1303 foot-pounds, as compared to 400 foot-pounds from a 9mm round. *Id*. ¶60. This increased kinetic energy alone increases the likelihood of serious injury and death*, id*. ¶¶58-61, particularly in children with smaller body mass*, id*. ¶75. In addition, unlike rounds fired from a handgun, assault-weapon rounds have a tendency to yaw, or rotate on their axis, *id*. ¶¶66-67, and on impact send out a radial wave of kinetic energy, *id*. ¶62. As a result, the temporary injury cavity created by an assault-weapon round is over three times the size of the temporary cavity created by a round from the Thompson Machine gun. *Id*. ¶61. Finally, the effective range of an assault weapon is up to 500 yards, compared to 50 yards for a typical handgun. *Id*. ¶60.

While these characteristics make assault weapons more lethal, they also make them less useful for ordinary self-defense. Because of their overpowered performance characteristics, assault weapons may over-penetrate common household materials, increasing the risk of harm to innocent bystanders. R. 81 ¶23. Also, self-defense rarely involves lengthy shootouts*, id*. ¶28, and most confrontations involving armed self-defense occur at close range, at distances between 3-7 yards. R. 81-11 ¶25.

## II.    Assault Weapon Massacres.

The record is bereft of evidence that assault weapons are *ever* used in lawful self-defense. Conversely, it is common knowledge that assault weapons have become

the weapon of choice for criminals and terrorists hoping to massacre innocent citizens. Since 1984, assault weapons have been used at:

- 2022 Robb Elementary School, 21 dead, mostly small children;

- 2022 Highland Park parade, 7 dead;

- 2022 Buffalo supermarket, 10 dead;

- 2019 El Paso Wal-Mart, 23 dead;

- 2019 Dayton Historic District, 9 dead;

- 2018 Marjory Stoneman Douglas High School, 17 dead;

- 2018 Pittsburgh Tree of Life Synagogue, 11 dead;

- 2017 Las Vegas Route 91 Harvest music festival, 58 dead;

- 2017 Sutherland Springs Church, 26 dead;

- 2016 Pulse Nightclub, 49 dead;

- 2014 San Bernadino Regional Building, 14 dead;

- 2012 Sandy Hook Elementary, 27 dead, mostly small children;

- 2012 Aurora, Colorado, 12 dead;

- 2009 Geneva County, Alabama, 10 dead;

- 1989 Standard Gravure, 8 dead;

- 1989 Cleveland Elementary School, 5 dead, all small children; and

- 1984 San Ysidro McDonald's, 22 dead, including a baby and unborn child.

And even more recently, an assault weapon was used in the attempted assassination of former President Trump at a Pennsylvania campaign rally, resulting in the death of an innocent bystander.

There are many reasons for assault weapons' popularity in mass shootings. Their inherent lethality makes them an alluring choice for mass murder, compared to less lethal weapons like knives or handguns. In combat, the ability to fire continuously without reloading translates to combat effectiveness. R. 81 ¶281. When used against noncombatant civilians, these features translate to mass, indiscriminate harm. *Id.* ¶8. More troubling, the mere presence of a firearm tends to encourage violence; the use of assault weapons in previous massacres increases the likelihood that aspiring mass shooters will use them as a form of mimicry. *Id.* ¶¶123-124. This natural psychological effect is only compounded by the fact that assault-weapons manufacturers market them as cool and intimidating military weapons. *Id.* ¶¶189-190.

Assault weapons also encourage mass shootings by deterring effective, prompt law enforcement intervention. Effective responses to assault-weapon shootings require specialized protective equipment, R. 81 ¶¶198-199, 204, 222-223 – during the Pulse Nightclub massacre officers needed an armed personnel carrier to breach the wall*, id.* ¶199. This is because assault weapons discharge ammunition at a velocity that will pierce standard issue body armor. *Id.* ¶221. Indeed, 20% of all active-duty law enforcement officers slain in 2016 and 2017 were killed by assault weapons, *id.* ¶204, six of whom were killed when an assault-weapon round

penetrated body armor, R. 81-11 ¶18. Even if an officer is wearing body armor capable of stopping an assault-weapon round, the impact can still cause significant trauma. R. 81 ¶224. As a result, law enforcement will feel "outgunned" in a mass shooting situation, *id.* ¶¶219-220, and thus more likely to delay any intervention in a mass shooting, R. 81-4 ¶132. Such delays give shooters more time to kill, as demonstrated by the number of children slaughtered in Uvalde while law enforcement waited outside. *See* CRITICAL INCIDENT REVIEW, *supra*, at xvi.

The trauma that assault-weapon massacres have inflicted on the public at large has been staggering. Three out of four young Americans "report mass shootings being a primary source of stress" and around one in five report that the possibility of a school shooting causes them daily stress. R. 81 ¶177. In fact, at least 5% to 10% of people in a community who experience but are *not* the primary victims of a mass shooting develop Post-Traumatic Stress Disorder. *Id.* ¶172. Survivors of mass shootings are at a greater risk of mental health problems, and the people associated with schools and organizations impacted by mass shootings are psychologically impacted even if they are not physically injured. R. 81-16 at 14. Even those not directly victimized are affected – research has shown that active shooter drills to prepare students for such massacres "are associated with increases in depression (39 percent), stress and anxiety (42 percent), and physiological health problems (23 percent) overall, including children from as young as 5 years old." CRITICAL INCIDENT REVIEW, *supra*, at 392.

### III.   The County's Ordinance & This Litigation.

In 1993, in the wake of the Cleveland Park Elementary assault-weapon massacre, Cook County prohibited the sale, transfer, acquisition, ownership, or possession of "assault weapons," specifically listing 60 rifles and pistols designated by model name or type. Cook County Ordinance No. 93-O-37. In 2006, after the federal assault weapon ban, the County enacted the Blair Holt Assault Weapon Ordinance, No. 54-210 – 54-215 (the "Ordinance"). R. 81 ¶130. The Ordinance makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" assault weapons and large-capacity magazines in Cook County. *Id.* ¶131. An "assault weapon" is defined as a semi-automatic firearm that can accept a detachable magazine and has one or more military-style features, such as a folding or telescoping stock, a pistol grip without a stock, a barrel shroud, or a muzzle brake. *Id.* ¶¶132-136. The Ordinance also lists specific, but nonexclusive, examples of banned assault weapons. *Id.* ¶152.

Decades later, Viramontes filed this suit against Cook County, Cook County Board President Toni Preckwinkle, State's Attorney Kimberly Foxx, and Sheriff Thomas Dart (collectively, "the County"), claiming that he desires assault weapons banned by the Ordinance and that it thus infringes on his Second Amendment rights. R. 1. Shortly thereafter, Viramontes moved for judgment on the pleadings in the County's favor, R. 20, arguing that *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), foreclosed his claims, R. 21 at 1. According to Viramontes, a factual record would

9

"be wholly irrelevant," *id.* at 5, as he hoped to ask this court to overrule *Wilson* and *Friedman*, *id.* at 3-4. The County opposed that motion, asking to proceed with discovery and develop a record establishing that assault weapons are dangerous and unusual and therefore fall wholly outside of Second Amendment protection, an issue not resolved by *Wilson* or *Friedman*. R. 24 at 4-5. In response, Viramontes claimed that only "social science evidence" was necessary, and that such evidence constituted "legislative facts." R. 24 at 7. The district court denied Viramontes' motion. R. 23.

Shortly thereafter, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), holding that Second Amendment challenges proceed in two steps – the first, where the plaintiff must prove that the defendant's actions are contrary to the Second Amendment's text, and if that showing is made, a second step where the defendant must show its actions are consistent with this nation's traditions and history, *id.* at 19. The district court then extended discovery regarding this country's historical traditions, R. 38, 39, and the County disclosed eleven experts, R. 81 ¶¶36-54. Viramontes disclosed no experts of his own. R. 37, 104 at 11.

The parties then filed cross-motions for summary judgment. In its motion, the County explained that assault weapons are not "arms" as the Second Amendment uses that term because they are both "dangerous and unusual," given their regular use in mass shootings and their inherent unsuitability for lawful self-defense, R. 82 at 10-12, and the lack of evidence that they are commonly used for

lawful purposes, *id.* at 12. Furthermore, the County explained, regulations of assault weapons are consistent with the longstanding historical tradition of regulating militaristic weapons, dating all the way back to ancient Athens, and of regulating weapons capable of causing rapid mass death, as demonstrated by strict historical regulations on gunpowder, *id.* at 37-39. The County also moved to strike Viramontes' responses to the County's statements of undisputed material facts, explaining that his response failed to comply with N.D. Ill. Local Rule 56.1 and rested on inadmissible evidence. R. 104.

While the County's motions were pending, this court held in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), that a preliminary injunction of the County's ordinance, and several materially identical state and local laws, was inappropriate because (1) the evidence in that case failed to show that assault weapons are "arms" within the Second Amendment's meaning; and (2) bans on assault weapons are consistent with this nation's history and traditions. *Id.* at 1192-1203. The County then filed a notice of supplemental authority explaining that *Bevis* supported its motion for summary judgment. R. 122. In response, Viramontes noted *Bevis'* statement that "[b]etter data on firing rates might change the analysis," 85 F.4th at 1197, but, having offered no evidence on that subject in his Rule 56.1 statements, identified only the County's evidence as providing that "[b]etter data," R. 123 at 1. Specifically, Viramontes noted the M-16 fires "45-65 rounds per minute in semiautomatic mode and 150-200 rounds per minute in automatic mode." *Id.* at 2 (citing R. 98, ¶¶326-27). By contrast, Viramontes claimed,

the AR-15 has an "effective rate of fire that is one third the rate of the M-16 in automatic mode," but cited no record evidence for this proposition. *Id.* Viramontes did not argue that *Bevis* could be otherwise distinguished.

The district court granted the County's motion for summary judgment. App. 3-16. As the court noted, "the parties have expressly agreed that, if they are still good law, *Friedman* and *Wilson* control the case," App. 13, and "*Bevis* made a point of stressing *Friedman*'s continuing vitality," App. 14 (cleaned up). The court also noted that Viramontes failed to distinguish *Bevis* by offering any evidence "meaningfully" differentiating the "firing-rate differentials between M16s and AR-15s." *Id.* The court observed, "it is not at all clear that the papers, surveys, and other online sources to which Plaintiffs cite are even admissible in this case," because they were not properly disclosed in discovery. *Id.* But even considering that evidence, nothing in *Bevis* indicated that Viramontes' argument regarding effective firing rates would have changed the analysis. App. 15. In fact, "the evidence in this case appears to have been broadly similar to that addressed in *Bevis*," App. 16 n.5, and "the Seventh Circuit had this [effective-firing-rate] evidence before it in some form when deciding *Bevis*," as indicated by Judge Brennan's discussion of it in his dissent, App.16. Accordingly, the Ordinance survived Second Amendment scrutiny. *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

_____

Viramontes' arguments suggesting *Bevis* serves as a legal precedent upon which this court could find the Ordinance to be unconstitutional are the stunning equivalent of legal misinformation based upon alternative facts. Viramontes asserts that *Bevis* supports finding that the Ordinance is unconstitutional. But *Bevis* involved a consolidated appeal of the Ordinance (among other regulations) in which the constitutionality of the Ordinance was upheld. *Bevis,* 85 F.4th at 1182. There exists no logical analytical framework pursuant to which Viramontes may ask this court to rely upon *Bevis* to overturn the very Ordinance upheld by *Bevis* – particularly absent new evidence suggesting a different result may be warranted. But rather than offer a factual means to distinguish this record from *Bevis*, Viramontes' arguments pretend that the *Bevis* court did not review the Ordinance at all – and that if it had – it would have certainly reached a contrary result. It is difficult to know where to begin when combatting arguments based upon such a faulty premise, but the County suggests this court: i) look to the precedent supporting the validity of the Ordinance; ii) take note of the mountain of waiver under which many of Viramontes' new arguments should be buried; and iii) review the traditional legal principles underpinning the Second Amendment and which support upholding the constitutionality of the Ordinance.

Viramontes invites this court to revisit an issue thrice resolved: whether the Ordinance passes constitutional muster. *Friedman, Wilson,* and *Bevis* each upheld the Ordinance (or in the case of *Friedman*, its legal twin). Critically, this court in

*Bevis* reaffirmed *Wilson* and *Friedman* as consistent with the Second Amendment standards subsequently announced by *Bruen*. *Bevis*, 85 F.4th at 1189-91. Adding further support to the County's position in this litigation resolved several times over, the Supreme Court's subsequent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024) supports a conclusion that assault weapons fall outside the text of the Second Amendment because they are not commonly used for lawful purposes.

*Rahimi* further instructs this court that it need not find a direct analogous regulation to the Ordinance, but rather determine whether the regulation is consistent with the understanding of the contours of the right as it was at the time of our Nation's founding. *Rahimi*, 144 S. Ct. at 1897-98. Armament was always understood to serve as a right at which the core was self-defense. A right which has been understood in historical American jurisprudence as a moderate and proportional ability to protect oneself from threats of imminent harm. There is simply no historical support for Viramontes' claim that offensive militaristic weapons are compatible with the legal moderation principles applied to self-defense at the time of the founding up to and through the present.  For this additional reason, assault weapons fall outside the Second Amendment's text.

Finally, historical analogous regulations support a tradition of regulatory principles in which the government may ban or significantly restrict ownership of dangerous weapons capable of inflicting rapid or mass death.

## ARGUMENT

---

Viramontes' claims are foreclosed by this court's decisions in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), cert. denied, 577 U.S. 1039 (2015), *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) (per curiam), cert. denied, 141 S. Ct. 110 (2020), and *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023); *Harrel v. Raoul*, 144 S. Ct. 2491 (2024) (cert denied).

## I. *Friedman* and *Wilson* Foreclose Viramontes' Second Amendment Claim.

In *Friedman*, this court held that an assault-weapon ban identical to the Ordinance did not violate the Second Amendment. 784 F. 3d 406. This court subsequently held in *Wilson* that the Ordinance is constitutional, applying *Friedman*. 937 F.3d 1028. That is significant here, as the district court observed, because Viramontes agreed below that, "if they are still good law, *Friedman* and *Wilson* control the case." App. 13. And they are still good law – *Bevis* specifically "address[ed] *Friedman*'s continuing vitality," 85 F.4th at 1184, explaining that it was "basically compatible with *Bruen*" because it "anticipated the need to rest the analysis on history, not a free-form balancing test," *id.* at 1189, and rejecting the dissent's arguments to the contrary as relying on "pure dicta," *id.* at 1191.

Notably, Viramontes does not claim that either *Friedman* or *Wilson* was wrongly decided on the merits, and does not ask that either be overruled, thus forfeiting any argument to that effect. *See United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) (noting that rules of forfeiture apply with particular force to requests

to overrule precedent). Rather, he claims that *Friedman* and *Wilson* are no longer controlling because *Bevis* "did not hold that [they] remain the law." Viramontes Br. 14; *accord id.* at 37. This gets things exactly backwards – decisions of this court "remain the law of the circuit" until there has been "recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e)." *Brooks v. Walls*, 279 F.3d 518, 523 (7th Cir. 2002). A decision need not even be mentioned, let alone expressly confirmed, in later precedent to retain its vitality; indeed, failure to mention prior contrary precedent only undermines the *subsequent* decision to the extent it conflicts with existing precedent. *See id.* (explaining that panel's failure to "mention" previous contrary decisions meant they "remain the law of the circuit"). *Bevis* neither purported to overrule *Friedman* or *Wilson*, nor was it circulated to the full court under Rule 40(e), so both decisions remain the law of this circuit, foreclosing Viramontes' claim here.

Viramontes' remaining arguments regarding *Friedman* and *Wilson* are easily dismissed. While Viramontes insists that *Bevis* would not have analyzed *Bruen* at all, merely to "rehas[h]" *Friedman*, Viramontes Br. 37-38, this is nonsense. After all, *Bevis* could not have confirmed *Friedman* and *Wilson*'s ongoing vitality under *Bruen* without analyzing *Bruen*. Viramontes also deems it significant that *Bevis* relied on *Friedman* only for what he considers an "unnecessary discussion of history," *id.* at 39, constituting "nonbinding dicta," *id.* at 62. This is not how precedent works. The historical discussion in *Bevis* was an alternative ground for decision applying *Bruen*'s second, historical step, and an alternative ground for decision cannot "be

relegated to the category of *obiter dictum*." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949). Practically speaking, the fact that *Bevis* relied on *Friedman* at all only confirms that it had no intent to set *Friedman* aside.

## II.     Various Procedural Defects Impair Viramontes' Arguments Concerning *Bevis*.

Even setting *Friedman* and *Wilson* aside, the Ordinance survives Second Amendment scrutiny under *Bevis*. Viramontes asserts two equally suspect and procedurally defective categories of arguments as to why *Bevis* purportedly supports his claim. These arguments are premised upon a misunderstanding of the scope of *Bevis* and failure to appreciate the fatal blow to his claim struck by the waivers of his own hand.

In *Bevis*, this court addressed a Second Amendment challenge to the Ordinance and held that a preliminary injunction was inappropriate because the plaintiffs in that case failed to show a likelihood of success at either step of the *Bruen* analysis.

Despite *Bevis*' repeated caution that its analysis of the facts was purely preliminary and could be revisited if further development of evidence so warranted, Viramontes declined this invitation. From the very outset, he opposed conducting discovery on his own claims. And when the County moved for summary judgment, he offered only a handful of facts in his Local Rule 56.1 statements. None of which involved the merits of his Second Amendment claims, and most of which concerned associational standing – and only a cursory argument why *Bevis* should not foreclose his Second Amendment claim altogether. All this was done in service of a

singular goal, made apparent from the very outset when Viramontes took the extraordinary step of moving for an adverse judgment on his own complaint: get the proceedings in the district court and this court over with as quickly as possible so he can file a petition for certiorari with the Supreme Court. Like the proverbial dog that caught the car, Viramontes should have been more careful of what he wished for, because his haste interred his constitutional claims under a mountain of forfeiture.

### A. *Bevis* Resolved the Challenge to the Ordinance under *Bruen.*

First, Viramontes curiously claims that *Bevis* is distinguishable, because *Bevis* did not involve the Ordinance at issue here. *E.g.*, Viramontes Br. 3 (claiming that "*Bevis* purported to apply *Heller* and *Bruen* to an Illinois law similar to Cook County's); *id.* at 9 (*Bevis* only "affirm[ed] two district court decisions that had declined to preliminarily enjoin the statewide ban"); *id.* at 41 (*Bevis* only "conclu[ded] that the firearms banned by [the Illinois statute]" were not "arms"); *accord* R. 123 at 1 (same). This argument is as frivolous as it is misleading, as *Bevis* specifically affirmed the denial of a preliminary injunction of the Ordinance in a consolidated appeal. 85 F.4th at 1182 (noting that case involved challenges to "Cook County Ordinances No. 54-210 to 54-215").

As the Supreme Court explained in *Bruen*, and later clarified in *Rahimi*, the Second Amendment analysis proceeds in two steps. First, plaintiff must show that the regulated conduct falls within the plain language of the constitutional text. *Bruen*, 597 U.S. at 24. Second, if the plaintiff makes that showing, the burden then

shifts to the government to demonstrate that its regulation is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. In upholding the denial of a preliminary injunction against the Ordinance in a consolidated appeal also involving challenges to materially identical assault weapons regulations enacted by Illinois, the City of Chicago and the City of Naperville, *Bevis* explained that the plaintiffs in that case had not shown a likelihood of success on the merits at either step.

### B. Viramontes' Appeal is Replete With Waiver and Forfeiture.

For reasons that are entirely unclear – and despite repeated invitations to do so – Viramontes declined to share his "legislative facts" during the course of discovery. Nor did he include these purportedly outcome determinative facts and arguments during briefing on dispositive motions. Instead, Viramontes raises various arguments framed to distinguish the facts of this case from *Bevis* which were never asserted in the lower court and should thus be deemed forfeited. *See Belom v. Nat'l Futures Assoc.*, 284 F.3d 795, 799 (7th Cir. 2002) ("[A]rguments not raised in the district court are waived on appeal.").

As Viramontes admits, a significant amount of the evidence on which he rests his arguments was not presented to the district court, or was presented only in his response to the County's statement of material facts. Viramontes Br. 44 n.2. This dilatory tactic adds three forfeitures to the mix.

First, it is well settled that this court will not consider on appeal from a grant of summary judgment any opposing evidence that was not offered below, *Grant v.*

*Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017), because summary judgment is the moment for parties to come forward with all legal and factual support for their position, *Packer v. Trustees of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849 (7th Cir. 2015).

Second, it is equally well settled that a "failure to follow the local rules circumscribes [this court's] review of the facts" on summary judgment, *Flint v. City of Belvidere*, 791 F.3d 764, 766 (7th Cir. 2015); *accord id.* at 767 (considering "*only* the facts (and inferences drawn from them) presented in accordance with Local Rule 56.1"). That is significant because the local rules of the Northern District of Illinois are clear that a response to a statement of material facts "may not set forth any new facts" and "may not assert legal arguments except to make an objection," N.D. Ill. Local R. 56.1(e), which is precisely what Viramontes attempted to do here. For example, in response to evidence regarding a first-responder's personal observations of the horrific injuries inflicted on two children murdered at Uvalde, Viramontes "decline[d] to dispute" that evidence, R. 98 at 2 – a response he later conceded meant to admit the fact offered, R. 111 at 9-10 – only to then offer a page of nonresponsive argument he claimed would somehow put those injuries in "context," R. 98 at 2-3.

Third, while Viramontes summarily declares that his failure to disclose evidence below is not problematic because "*all*" of that evidence is supposedly evidence of "legislative facts," Viramontes Br. 44 n.2, such cursory, undeveloped

arguments are forfeited on appeal, *e.g.*, *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989).

Assuming arguendo that any or all of Viramontes' evidence can be considered evidence of a legislative fact, that still would not help him escape the consequences of his forfeitures here. Whether evidence involves legislative facts is relevant only to the application of the federal rules of evidence, which exempt such facts from the rules governing judicial notice. Fed. R. Evid. 201. But Rule 201's commentary makes clear that the presentation of those facts is still subject to the ordinary rules of party presentation "affording opportunity to hear and be heard and exchang[e] briefs." *Id.*, Notes of Advisory Committee.

Reflecting this principle, Local Rule 56.1 contains no exception for legislative facts, but makes clear that it governs *all* evidence a party hopes to offer in support or opposition to a motion for summary judgment. Indeed, the problems of judicial administrability that require presentation of adjudicative facts in a Local Rule 56.1 statement are even more acute when legislative facts are involved – while the judicial search for improperly identified adjudicative facts can at least be confined to the record materials before the district court, the search for legislative facts is bounded by only the limits of human knowledge itself.

Due to his pervasive forfeitures,[1] Viramontes has preserved only the lone argument he raised in the district court below, that *Bevis* can be distinguished on

---

[1] For avoidance of doubt, the forfeited arguments are also meritless. For example, Viramontes' claim that muzzle shrouds serve only "ergonomic functions" by ventilating the gun barrel and preventing the shooter from being burned,

the basis of evidence regarding firing rates. R. 123 at 1-2; Viramontes Br. 57-58. But that argument fails for the simple reason that the evidence on which Viramontes relies was the exact same evidence that Cook County put forward in *Bevis*. *Compare* R. 81-5 at 30, *with Herrera v. Raoul*, No. 23-cv-00532, Doc. 60-5 at 30 (N.D. Ill. March 7, 2023). Indeed, as the district court noted below, App. 16, that evidence was discussed by Judge Brennan in his *Bevis* dissent, 85 F.4th at 1223. Obviously, Viramontes cannot distinguish *Bevis* by regurgitating evidence already considered in that case. Having eschewed the opportunity to build a record in the district court in the manner required by local rule, Viramontes cannot deny that *Bevis* controls on this record.

## III.   There Is No Compelling Reason To Overrule *Bevis.*

Unable to distinguish *Bevis*, Viramontes is left only to ask that it be overruled. Viramontes Br. 18-36. But this court requires a compelling reason to overrule its precedent, *Wilson*, 937 F.3d at 1035, because "[m]ere disagreement with the law or a desire to see the law change is not enough," *United States v. Carpenter*, 104 F.4th 655, 658 (7th Cir. 2024). Viramontes offers no compelling reason to overrule *Bevis*, focusing instead on rehashing arguments already made and rejected in *Bevis*.[2] Even setting that problem aside, Viramontes' request to overrule *Bevis* faces an insurmountable obstacle in the Supreme Court's recent decision in *Rahimi*,

---

Viramontes Br. 45-46, simply blinks reality. A muzzle shroud is necessitated only by the extreme heat created by rapid fire, which explains why ordinary handguns not capable of such rapid fire are not equipped with similar "ergonomic" features.
[2] Viramontes also relies on the Ninth Circuit's decision in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), but that decision has been vacated for en banc reconsideration, 93 F.4th 1150 (9th Cir. 2024), and thus serves as no authority here.

which only reinforces that this court correctly applied both steps of the *Bruen* analysis.

### A. Viramontes' Rehashing Of Arguments Raised And Rejected In *Bevis* Cannot Provide Compelling Reason To Overrule *Bevis*.

Viramontes simply rehashes all the arguments already presented by the parties in *Bevis*. For example, Viramontes argues that common ownership of assault weapons is sufficient to show that they are commonly used for lawful purposes, Viramontes Br. 19-20, 52-53, but that exact argument was made by the *Bevis* plaintiffs. Viramontes also claims assault weapons bans contradict *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Bruen,* Viramontes Br. at 18-34, and that the historical examples offered by the County and its codefendants were not sufficiently analogous, *id.* at 29-32, but those argument, too, were obviously central in *Bevis*. The same of Viramontes' argument that only "dangerous and unusual" weapons may be prohibited, *id.* at 1, 25-27, which was also raised by the plaintiffs in *Bevis*. Merely rehashing arguments already considered when rendering a decision only shows disagreement with that decision; it does not show compelling reason to overrule that case.

### B. *Rahimi* Reinforces *Bevis*' Conclusion That Assault Weapons Regulations Are Constitutional.

Viramontes' failure to offer a compelling reason to overrule *Bevis* likely reflects his recognition that the Supreme Court's recent decision in *Rahimi*, clarifying the *Bruen* standards, only reinforced *Bevis*' conclusion that the County's assault weapons ban survives at both steps of the *Bruen* analysis. Indeed, Viramontes effectively concedes as much by largely ignoring *Rahimi*, forfeiting any

contrary argument. *Foster*, 652 F.3d at 793. Despite that forfeiture, we address each step, in turn.

### 1. Assault Weapons Are Not "Arms" Within The Second Amendment's Text Because They Are "Unusual."

Under *Bruen*, the plaintiff bears the burden of demonstrating that his challenge falls within that Amendment's plain text. 597 U.S. at 24. For present purposes, the determinative question is whether the assault weapons prohibited by the County's Ordinance constitute "arms." *Heller* instructed "arms" "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. As indicated by the Court's inclusion of the term "prima facie" – a term used when a legal standard is only *presumptively* satisfied, absent more evidence, *e.g.*, BLACK'S LAW DICTIONARY 1228 (8th ed. 2008) – the fact that a weapon is *literally* a bearable arm does not conclusively establish that it is *legally* an arm for purposes of the Second Amendment.

To the contrary, *Heller* recognized, and *Bevis* specifically adopted, the historical tradition of prohibiting "dangerous and unusual weapons" and that "weapons that are most useful in military service—M-16 rifles and the like" may be banned. *Heller* at 627, *Bruen*, 597 U.S. at 21; *Bevis*, 85 F.4th at 1195, 1197. It was well settled by the time of Blackstone that possession of "dangerous or unusual weapons" could be strictly regulated. 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND, 148-49 (Oxford 2016). And as made clear by *Bruen*'s discussion of common-use in its analysis of the Second Amendment's text, a court considering

24

whether a weapon is presumptively protected by the Second Amendment's text must consider whether that weapon is "'in common use' today for self-defense." 597 U.S. at 32; *accord Vermont Fed. of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710, 2024 U.S. Dist. LEXIS 126857, at \*14 (D. Vt. July 2, 2024) (noting that *Bruen* "discussed the 'common use' issue as part of its consideration of whether handguns were presumptively protected by the Second Amendment").

Because the parties in *Bruen* did not dispute that the ordinary handguns at issue in that case were commonly used for self-defense, 597 U.S. at 32, *Bruen* refrained from addressing what constitutes "common use." But both *Bruen* and the Court's subsequent decision in *Rahimi* specifically endorsed as representative of American legal traditions an early decision of the North Carolina Supreme Court in *State v. Huntly*, 25 N.C. 418 (1843) (per curiam). *Rahimi*, 144 S. Ct. at 1901; *Bruen* at 51 (describing *Huntly* as "more telling" of early American law of affray than other sources).

Significantly, *Huntly* directly addressed the legal standards governing common use. After quoting Blackstone's statement that the Statute of Northampton codifying the English law of affray applied to "dangerous or unusual weapons," *Huntly* noted that the ancient definition of affray reached only "armor or weapons not usually worn." 25 N.C. at 420-21. As a result, the court rejected the notion that the particular firearm at issue in that case, "or any other gun, cannot in this country come under the description of 'unusual weapons'" merely because "there is scarcely a man in the community who does not own and occasionally use a gun of

some sort." *Huntly*, 25 N.C. at 422. This, the court explained, is because the question was not whether the weapon was unusual to *own*, but whether it was unusual "wherewith to be *armed and clad*." *Id.* (emphasis added). As a result, the gun at issue in that case was "unusual" because "[n]o man amongst us carries it about with him, as one of his every day accoutrements--as a part of his dress." *Id.*

*Huntly* did not stand alone in its understanding of what constituted an "unusual" weapon for purposes of the law of affray. Multiple eminent legal scholars recognized that the question whether a weapon could be considered unusual for purposes of the law of affray was governed by its public use. *E.g.*, Joseph Keble, AN ASSISTANCE TO THE JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147 (2d ed. 1689) ("[I]f a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed"); *accord* William Lambarde, EIRENARCHA 134 (1579). It is also in accord with how Blackstone – and thus the framers for whom he was their primary source on English law, *Alden v. Maine*, 527 U.S. 706, 715 (1999) – would have understood that term. Blackstone was an award-winning student of Latin, David A. Lockmiller, SIR WILLIAM BLACKSTONE 8 (U.N.C. Press 1938), which features prominently throughout his writings. As a result, he would have known that "usual" is a direct lineal descendent of the Latin term *usus*, which meant "make use of, profit by, take advantage of." Reflecting that lineage, the original definition of "usual" was "accordant with *usage*." *Merriam-Webster*, *Usual*, https://www.merriam-webster.com/dictionary/ usual (last visited August 28, 2024) (emphasis added).

This understanding finds further support in the Supreme Court's firearms precedent. Interpreting federal law prohibiting the "use" of a firearm during a drug trafficking offense, the Court unanimously agreed that use "must connote more than mere possession of a firearm," *Bailey v. United States*, 516 U.S. 137, 143 (1995), noting that all of the ordinary definitions of use "imply action and implementation," *id.* at 145. But use does not reach mere "intended use, as when [one] places a firearm with the intent to use it later if necessary," *id.* at 146, and the Court specifically rejected the notion that use encompassed "placement of a firearm to provide a sense of security or to embolden," or "mere possession" of a weapon to "embolden or comfort" its owner, *id.* at 149. While *Bailey* did not purport to interpret the Second Amendment, the fact that the Court itself recognized that the ordinary meaning of the term "use" implies action, not passive possession, in the context of a firearm is strong indication that *Heller* did not employ the term "use" in accordance with an uncommon meaning it had already unanimously rejected.

Focus on the commonness of actual open, public use of a firearm, rather than on mere ownership, best respects the common-use principle's origins in the law of affray. As noted in *Rahimi*, the purpose of criminalizing affray was to prevent activity that would naturally bring terror to the general populace and, by so doing, increase the chance that said terror would escalate into actual violence. 144 S. Ct. at 1901 (quoting *Huntly*, 25 N. C. at 421-22). But the mere fact that something is commonly *owned*, standing alone, says next to nothing about whether the general populace would naturally respond with terror to seeing that same item *borne* in

public. For example, it is beyond dispute that chainsaws can be used "in wrath to cast at or strike another," Viramontes Br. 35, and are commonly owned by millions of Americans. But members of the general public would still naturally respond with terror at the sight of an individual openly wielding a chainsaw while strolling down Michigan Avenue in Chicago, because such public use is exceedingly uncommon. By contrast, the common public uses to which a particular weapon is put directly informs whether terror at the sight of that weapon is a natural, inherent reaction of the populace, as well as whether it is fair to presume that the act of carrying that arm conveys with it the evil intent necessary to show an affray.

An illustrative example of this principle is the Thompson machine gun: no matter how commonly that weapon might have been *owned*, the common public *use* of that arm was to commit heinous, high-profile crimes like the 1929 St. Valentine's Day Massacre. Given that common use, the sight of such a firearm being wielded in public would naturally evoke feelings of terror in the general populace. Thus, the Supreme Court had no trouble determining in *Heller* that such weapons "may be banned." 554 U.S. at 627.

Similarly, grenades are not commonly used in public for any lawful purposes, and the Court has repeatedly concluded that their mere possession is not an "innocent act." *Staples v. United States*, 511 U.S. 600, 610 (1994) (quoting *United States v. Freed*, 401 U.S. 601, 609 (1971)); *accord Bevis,* 85 F.4th at 1195. The Court reached the same conclusion for short-barrel shotguns, *United States v. Miller*, 307 U.S. 174, 182 (1939), most commonly used by criminals. And so too with the Bowie

knife – though it has lawful uses, as a machete or hunting knife, those uses took place largely in isolated frontier or rural areas; the known *public* uses of the Bowie knife were overwhelmingly criminal. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46 (1st Cir. 2024) (noting Bowie knife's "popularity in the hands of murderers").

Today, assault weapons have become indelibly linked to mass shootings in the popular consciousness the weapon of choice for mass shooters. R. 81 ¶¶187-89, 193-94. As with Tommy guns or Bowie knives in the past, possession of an assault weapon in public causes fear and constitutes an affray because the American public knows all too well the grim purposes for which they are commonly employed. The psychological impact of mass shootings, overwhelmingly perpetrated with assault weapons, cannot be understated: 80% of American adults report feeling stressed about mass shootings, and 75% of U.S. youth report mass shootings being a primary source of stress. *Id*. ¶¶175-76; *see also* CRITICAL INCIDENT REVIEW, *supra*, at 392 (noting psychological effects on students participating in active shooter drills). This fear becomes trauma when a shooting actually occurs. In some studies, as many as 95% of mass shooting survivors, whether or not they sustain injuries, develop PTSD. R. 81 ¶171. The stress seeps into the community, where 5 to 10% of community members who were not primary victims develop PTSD as well. *Id*. ¶172. Even would-be mass shooters themselves are not immune to the terror wrought by assault weapons, as they are influenced by social proof, or the tendency to mimic those who came before them. *Id*. ¶¶122-24. The Parkland shooter, for example,

knew full well that his victims, and the country, would "know who [he was]" with the "power of the A.R. [sic]." *Id*. ¶194. Americans cannot escape the knowledge that assault weapons are commonly used to perpetrate the deadliest mass shootings.

The common-use principle forecloses Viramontes' claim at step one of the *Bruen* analysis. Viramontes identifies literally *no* evidence that any of the assault weapons regulated by the County are commonly, publicly used for a lawful purpose, and does not seriously dispute that such weapons are commonly – indeed, *repeatedly* – used for the unlawful purpose of massacring innocent civilians. Nor can Viramontes dispute that assault weapons are used for politically motivated violence, since an assault weapon was only just recently used to attempt to assassinate former President Trump at a campaign event, injuring him and two others, and killing a volunteer firefighter.

Rather, Viramontes claims that the horrific uses to which assault weapons are commonly put are legally irrelevant, insisting that the inquiry focuses on whether a particular weapon is commonly owned. Viramontes Br. 19-20, 52-53. But as already explained, the law firmly rejected that notion long ago, *Huntly*, 25 N.C. at 422, as fundamentally incompatible with the law of affray from which *Heller* originally derived the common-use principle. It is beyond any reasonable doubt that the repeated use of assault weapons to gun down innocent men, women, and children in their schools, in their places of worship, while shopping for groceries, while supporting a presidential candidate, and even while celebrating this nation's independence, would naturally feel terror at the public sight of such a weapon.

Viramontes' remaining arguments to the contrary are easily disposed of. While Viramontes insists that a weapon must be both "dangerous and unusual" before it can be banned, Viramontes Br. 25 (quoting *Heller*, 554 U.S. at 627), this reads a Supreme Court decision like a statute, which is never appropriate, *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). Illustrating that very problem, Viramontes' reading puts *Heller* in conflict not just with Blackstone, but with the *very passage of Blackstone it cited. See Heller*, 554 at 627 (citing 4 Blackstone, *supra*, at 148-49). But *Heller* nowhere expressed any intention to suddenly depart from Blackstone's understanding of English law, making it apparent *Heller* was using the disjunctive form of "and" – akin to saying "I like to eat apples and bananas" – entirely consistent with Blackstone's stated understanding of English law.

To the extent that Viramontes relies upon assault weapons sales and ownership statistics, Viramontes Br. 49-50, 52-54, the historical traditions endorsed in *Rahimi* long ago rejected the notion that ownership equates to use. Viramontes also relies heavily on surveys of gun owners, *id.* at 50-52, but he forfeited any consideration of those surveys by failing to properly present them to the district court below.

The reason he failed to present those surveys below is obvious. First, they are double-hearsay and thus inadmissible on summary judgment. *Flanagan v. Office of Chief Judge*, 893 F.3d 372, 375 (7th Cir. 2018); *Jackson v. City of Peoria*, 825 F.3d 328, 330 (7th Cir. 2016). Second, they do not even show common use. To the extent

that those surveys state *why* individuals own assault rifles, Viramontes Br. 50-51, aspiring to use a gun for a particular purpose is not the same as actually using it for that purpose, *Bailey*, 516 U.S. at 146.

That leaves only Professor English's vague claim that "gun owners engage in 1.67 million defensive gun uses a year," Viramontes Br. 50-51, but this claim rested on since-discredited methods designed to inflate his numbers, Deborah Azrael, et al., *A Critique of Findings on Gun Ownership, Use, & Imagined Use from the 2021 National Firearms Survey: Response to William English* at 17-21.[3] In fact, Professor English even went so far as to exclude "hundreds of negative responses from gun owners" – just as one would expect given that his research was financed by the gun industry. Mike McIntire, et al., *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, NEW YORK TIMES (June 18, 2024).[4] Even generously treating Professor English as an expert – despite Viramontes' conspicuous failure to offer him as such – these egregious failings motivated by clear financial biases make any supposed expert opinion he sought to provide inadmissible as a matter of law.

Finally, Viramontes argues that assault weapons are "rarely" used for "violent crime," Viramontes Br. 59, but this argument rests on yet more evidence not properly offered below, and is thus forfeited. It also treats common use as a massacre quota which, aside from being grotesque, fundamentally misunderstands

---

[3] Available at https://ssrn.com/abstract=4894282

[4] Available at https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-professor.html

the analysis. Again, that analysis was derived from the English law of affray, *Heller*, 554 U.S. at 627 (citing 4 Blackstone, *supra*, at 148-49), which asks whether sight of a weapon in public would naturally cause terror in the populace, *Rahimi*, 144 S. Ct. at 1901. As this court recognized in *Friedman*, the salience of even relatively infrequent events like mass shootings plays a crucial role in the public's fear of such events. 784 F.3d at 412. Thus, it is simply irrelevant that assault weapons are not *more commonly* used to inflict mass slaughter, since the slaughters they have been used to inflict are enough to naturally instill terror in the public. By contrast, the lack of salience of murders with ordinary handguns, though much more common, explains why they do not instill such terror and are not properly banned as uncommonly used for lawful purposes.

### 2. Assault Weapons Are Not "Arms" Within The Scope Of The Second Amendment Because They Are "Dangerous."

Even had Viramontes established that assault weapons are commonly used for a lawful purpose, they are still not protected "arms." English law prohibited "dangerous *or* unusual weapons," 4 Blackstone, *supra*, at 149 (emphasis added); *accord*, *e.g.*, *English v. State*, 35 Tex. 473, 476 (1872) ("Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."), so assault weapons also fall outside the Second Amendment's prima facie definition of "arms" if they are "dangerous." While the Supreme Court has recognized that the Second Amendment "extends only to certain types of weapons," based on "the character of the weapon," *Heller* at 622, and that there is a historical tradition of prohibiting the carrying of

"dangerous" weapons under which militaristic "weapons that are most useful in military service--M-16 rifles and the like--may be banned," *Heller*, 554 U.S. at 627, its precedent "leaves open" the question how to determine whether a weapon is "dangerous," *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Thomas, J., statement).

The Framers understood "dangerous" weapons to encompass "militaristic" weapons – weapons fundamentally incompatible with longstanding principles of moderate, proportionate self-defense. Indeed, the en banc Fourth Circuit just recently recognized that the Second Amendment "emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to" ordinary self-defense. *Bianchi v. Brown*, No. 21-1255, 2024 U.S. App. LEXIS 19624, at *30 (4th Cir. Aug. 6, 2024) (en banc); *accord id.* at *27 ("What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection.").

Historically, such militaristic weapons were treated differently from ordinary weapons. Ancient Roman law, for example, made loss of a soldier's arms an offense punishable by death, CORPUS JURIS CIVILIS, Dig. 49.16.3, but it was understood that this law applied not to ordinary weapons like "clubs" or "stones," despite their utility in war, but rather only to "those Weapons which are used for the sake of hurting another," John Ayliffe, A NEW PANDECT OF ROMAN LAW 195 (1734). Reflecting this distinction, ancient Roman law made it unlawful for an individual to "collect[ ] arms or weapons at his home or on his farm or at his country house," but

only if they were not "customary for hunting or a journey by land or sea." CORPUS

JURIS CIVILIS, Dig. 48.6.1, and further prohibited the possession of missile weapons

in public, *id.* Dig. 48.6.3.1. Similarly, the laws of ancient Athens provided that

"every Athenian was finable who walked about the city in armour." 4 Blackstone,

*supra*, at 149.

This special treatment of military weapons was adopted by English law as

well. The ancient Athenian prohibition on "armour" was reflected in the Statute of

Northampton, which codified the "offence of *riding or going armed*, with dangerous

or unusual weapons, [a]s a crime against the public peace, by terrifying the good

people of the land," and made it punishable by "pain of forfeiture of the arms, and

imprisonment." 4 Blackstone, *supra*, at 148-49. That is significant because English

law of Blackstone's time did not use the term "armour" in its modern sense – *i.e.*, to

refer to a literal suit of armor. To the contrary, "in English statutes, *armor* is used

for the whole apparatus of war." Noah Webster, AN AMERICAN DICTIONARY OF THE

ENGLISH LANGUAGE (1828) ("Armor").

Subsequent English statutes provided that "no Man shall ride in Harness

within the Realm . . . neither with Launcegay," because doing so was "contrary to

the Form of the Statute of Northampton thereupon made." Statute Made at

Westminster in the Seventh Year 1383; *accord* Statute of the Twentieth Year 1396-

97. Both "harness" and "launcegays" were intrinsically military in nature – the

former was literally "the furniture of a military man, or offensive, as a casque,

cuirass, helmet, girdle, sword, buckler, etc.," Webster, *supra* ("H'arness"), the latter

a "light lance" that was "carried in place of the war lance in the fourteenth century," George Cameron Stone, A GLOSSARY OF THE CONSTRUCTION, DECORATION, & USE OF ARMS & ARMOR IN ALL COUNTRIES & IN ALL TIMES 410 (1934). These prohibitions remained English law for centuries, until well after the ratification of the Second Amendment. *See* Repeal of Obsolete Statutes Act 1856, act 19 & 20 Vict. c. 64.

While this evidence confirms this court's conclusion in *Bevis* that there is a long tradition of prohibiting ownership of "militaristic" weapons on the basis of dangerousness, 85 F.4th at 1199, that still leaves open the question *Bevis* left unresolved – how to distinguish such weapons from ordinary weapons of self-defense.

To answer that question, one must examine the right of self-defense recognized at English common law, since *Heller* repeatedly emphasized that "self-defense" is "the *central component* of the right" to keep and bear arms codified by the Second Amendment. 554 U.S. at 599; *accord id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"); *see generally McDonald v. City of Chicago*, 561 U.S. 742 (2010) (repeatedly emphasizing centrality of "self-defense" to Second Amendment right); *accord* Joyce Lee Malcolm, TO KEEP & BEAR ARMS 162 (Cambridge 1994) (explaining that first goal of Second Amendment was "to guarantee the individual's right to have arms for self-defence").

This reflects that the English Declaration of Rights of 1689, which "has long been understood to be the predecessor to our Second Amendment," *Heller* at 593, only guaranteed individuals "Arms *for their Defence . . . as allowed by Law*," 1 W. &

M., ch. 2, § 7 (emphasis added). That italicized language did not, however, make the right subject to legislative enactment via statutory law – a caveat that would have effectively swallowed the right – but rather made it coterminous with the underlying natural, common-law right of self-defense it protected. *See* Stephen Halbrook, *To Bear Arms for Self-Defense*, 21 FEDERALIST SOC'Y REV. 46, 50 (2020) (explaining that Declaration "referred to the common law, not to any statute that might be passed that would negate the right").

Or as Blackstone put it, this language made clear that the right to bear arms was "a public allowance, under due restrictions, of the natural right of resistance and self-preservation." 1 Blackstone, *supra*, at 139; *accord Rex v. Dewhurst* (King's Bench 1820), in 1 John MacDonnell, REPORTS OF STATE TRIALS, NEW SERIES 601-02 (London 1888) (Bayley, J.) (Blackstone meant that the Declaration granted individual the "right to protect himself in his house" and "when he is going singly or in a small party upon the road where he is traveling").

Turning to that right, English common law divided self-defense into two broad categories: (1) "justified" self-defense, when "the defendant prevented a felony"; and (2) "excused" self-defense, when "the defendant was in the midst of a fight." V.F. Nourse, *Self-Defense & Subjectivity*, 68 U. CHI. L. REV. 1235, 1244 (2001). The former has no bearing here, since it focused solely on the actions of the slain – namely, whether the felony being prevented was punishable by death. *Id.* But excusable homicide focused on the actions of the killer and – reflecting the reality of the time that "death could result from even a superficial wound" – was by

37

the thirteenth century "defined as slaying out of literally vital necessity . . . as a last resort." Thomas A. Green, *The Jury & The English Law Of Homicide, 1200-1600*, 74 MICH. L. REV. 413, 420 (1976); *accord* William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 87 (8th ed. London 1824) (self-defense requires "inevitable necessity," where defender "has no other possible means of preserving his life").

Crucially, excused self-defense also took into consideration the nature of the weapon used by the defender. As Blackstone explains, while self-defense "is justly called the primary law of nature," the fact remains that "care must be taken, that the resistance does not exceed the bounds of mere defence and prevention; for then the defender would himself become an aggressor." 3 Blackstone, *supra*, at 4. Thus, the acts that constitute excusable homicide end at "the bounds of moderation, either in the manner, *the instrument*, or the quantity," so an act otherwise permissible by the law becomes "manslaughter at least, and in some cases (according to the circumstances) murder" if a person uses a weapon or implement unsuited for an otherwise-lawful task. 4 *id.* at 182–83 (emphasis added).[5]

In fact, Chief Justice Holt explained as early as 1705 that the moderation principle was a central component of English self-defense, holding that self-defense is inapplicable to "*excessive*" force because the law only protected the use of weapons that are actually "necessary for a man's defense." *Cockcroft v. Smith*, 11 Mod. 43

---

[5] Notably, the identity of the particular weapon used by the defendant was also a common-law component of the crime of manslaughter – use of "a hammer, or such like instrument" was not manslaughter, while "discharging a pistol" was, because the latter is a "dangerous weapon." Hawkins, *supra*, at 90.

(King's Bench 1705). The law of self-defense did not give a man the right "in case of a small assault, [to] give a violent or unsuitable return." *Id.* This was because "hitting a man with a little stick on the shoulder, is not reason for him to draw a sword and cut and hew the other." *Id.*

This understanding of the limits of self-defense carried over into American criminal law. The literal *first* reported American decision regarding self-defense rejected that defense specifically because it was not "necessary for the prisoner to avail himself of the instrument" — there, a club — "which occasioned the death. On his own confession, much less would have been sufficient," making his actions "clearly manslaughter." *State v. Wells*, 1 N.J.L. 486, 493 (N.J. 1790). In other words, "[t]he court expressly linked its determination of unnecessary, disproportionate force to the specific arm chosen by the defendant." Eric Ruben, *An Unstable Core: Self-Defense & the Second Amendment*, 108 CALIF. L. REV. 63, 89 (2020). In doing so, *Wells* relied on a decades-old English case, *Reg. v. Nailor*, FOSTER CROWN CASES 278 (Old Bailey 1704), which rejected a plea of self-defense – despite the fact that the defendant was pinned on the ground such that "he could not escape nor avoid the blows" of his attacker – because his use of a penknife to wound and ultimately kill an unarmed attacker was not necessary given the threat he faced. *Wells*, 1 N.J.L. at 492.

The decision in *Nailor* would feature prominently in the seminal work of Nathan Dane, the "Father of American Jurisprudence," and author of the "first great compend of American law." Henry A. Chaney, *Nathan Dane*, THE GREEN BAG,

Vol. III 548 (1891). As Dane explains, the early task faced by American judges and lawyers following the Revolutionary War was to examine the "political" and "moral" principles of the English legal system that had just been cast off, in order to "select[ ] from the English laws, in force in a monarchy, once feudal, those parts of them adopted here, and remaining in force in our republic." 1 Nathan Dane, A GENERAL ABRIDGMENT & DIGEST OF AMERICAN LAW iii (Boston 1823). And one of the principles of English law that remained consistent with the values of this new republic was the principle of moderate self-defense. The law of self-defense required proof that the defendant had "killed his adversary through mere necessity, in order to avoid immediate death." 7 *id.* at 230. Further, Dane notes the significance placed on the specific weapon being used, explaining that the claim of self-defense in *Nailor* failed because the defendant "used a *dangerous* weapon, and hence presumed[ly] he meant to kill." *Id.* (emphasis added).

This was significant because the law requires that "I must increase my force no more or faster than the case or [the attacker's] force requires," and thus prohibits the use of a "deadly weapon" against one who "barely commits a trespass." *Id.* For example, pulling up a "hedge stake" and killing another for damaging a fence is "murder," because it is "an act of violence much beyond the proportion of the provocation," when the use of a different "instrument not likely to kill" in the same circumstances would only be "manslaughter." *Id.*

As all this history demonstrates, a particular weapon is "dangerous," and thus not a prima facie "arm" for purposes of the Second Amendment's text, if it is

fundamentally incompatible with the common-law right to moderate, proportional self-defense protected by the Second Amendment. Such weapons, being unsuitable for moderate self-defense, are militaristic weapons "most useful in military service" and thus "may be banned," just like the M16 machine gun, *Heller*, 554 U.S. at 627, and implements of war like grenade launchers, tanks, and nuclear arms that are also clearly unsuitable for proportionate self-defense. Even before *Heller*, it was well settled that a particular weapon's suitability for self-defense was a central consideration when determining whether that weapon may be banned. *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226, 1232 (Conn. 1995); *People v. Brown*, 235 N.W. 245, 247 (Mich. 1931); *People v. Persce*, 97 N.E. 877, 879, (N.Y. 1912); *State v. Duke*, 42 Tex. 455, 458-459 (Tex. 1874); *State v. Reid*, 1 Ala. 612, 622 (1840). In fact, legislatures specifically made it unlawful to use certain "dangerous and bloody weapons" even in self-defense, by enacting laws stating that a "particular instrument is prohibited in the exercise of that right." *E.g., Day v. State*, 37 Tenn. 496, 501 (1858).

The example of these principles in application most familiar to lawyers is the longstanding prohibition on spring guns. Such guns were "especially in vogue" in England in the latter half of the eighteenth century. Miller Christy, *Man Traps & Spring-Guns*, OUTING, vol. XLI, issue 6, at 729 (1903); *accord* Ed Tangen, *Spring Guns*, 1 AM. J. POLICE SCI. 307, 307 (1930) (spring guns "were much used in England against poachers and trespassers"). Despite the popularity of spring guns at a time when "[t]he Englishman's right to be armed was in its heyday," Malcolm,

*supra*, at 165, Parliament in 1827 banned the use of spring guns, with a limited exception for home defense between sunset and sunrise, Spring Gun Act 1827, 7 & 8 Geo. 4, ch. 18 (recodified as Offenses Against the Person Act 1861, 24 & 25 Vict., ch. 100, § 31). American law followed suit – to this day, states criminalize spring guns, *e.g.*, 720 ILCS 5/24-1(a)(5); Mich. Comp. Laws § 750.236, and the rule against their use is so well-settled at common law that law students study the famed spring gun case, *Katko v. Briney*, 183 N.W.2d 657 (Iowa 1971).

The bans on spring guns are particularly informative because they were not based on spring guns' unusual lethality or other destructive potential – after all, spring guns were largely similar to ordinary handguns and rifles, only modified to fire remotely. *See* Christy, *supra*, at 730-31 (providing images of spring guns). Rather, they were based on spring guns' fundamental incompatibility with moderate self-defense, in two critical respects. First, spring guns risked injury to innocents: a child "in pursuit of a straying peacock," a maid killed in her employer's house, a gardener killed in his employer's garden. Christy, *supra*, at 729-30. The problem was that spring guns – while effective criminal deterrents – "did not possess the power to discriminate between a depredator and the owner of the property they were intended to protect" and "maimed or killed him just as promptly and impartially as [they] would have killed a trespasser and a thief." *Id.* at 730. The debates over the 1827 spring-gun ban confirmed that Parliament was deeply concerned with injury to innocents, with one member comparing the use of a spring gun to firing a military weapon – "a cannon" – in the middle of a street to rid it of

criminals. House of Commons Debates, March 23, 1827, vol. 17, cc19-34 (comments of William Smith). That concern remains a driving force behind the rule against spring guns that persists in American law. *See Katko*, 183 N.W.2d at 661 (noting instances in which innocent policeman and small boy were killed by spring guns); *see also Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 733 (1998) (noting spring guns inflict "indiscriminate violence").

Second, spring guns were incompatible with the common-law principle that an individual cannot "us[e] more force than is absolutely necessary" in his defense, due to "the sacred regard which our law every where exhibits for the life and safety of man—its tardiness and reluctance to proceed to extreme violence." Rev. Sydney Smith, *Man Traps & Spring Guns*, THE EDINBURGH REVIEW, Vol. 35, Issue 70, at 417 (1821); *accord id.* at 414 ("You cannot shoot a man that comes on your land, because you may turn him off by means less hurtful of him . . ."); *id.* at 412-13 (also noting limits of English law). This fear was echoed by Parliament when banning spring guns, with one proponent noting the "anxious caution the law surrounds the life of man, even where the person slain has been the original aggressor; how minutely it exacts, that the object of attack shall not have exceeded the limits of a just and necessary defence." House of Commons Debates, *supra* (comments of Sir Edmund Carrington). This concern, too, underlies American laws against spring guns, which are outlawed specifically because their use is inconsistent with lawful self-defense. *See Katko*, 183 N.W.2d at 660.

Applying that principle to the undisputed evidence in this record, it is immediately clear that assault weapons are, by their very nature, fundamentally incompatible with moderate, proportionate self-defense. Such weapons are very powerful and effective at a long range, and are more likely to travel easily through walls, vehicles, body armor, and the human body, regardless of whether the shooter intends to do so. R.81-10 at ¶¶13–14; R. 81-5 at 30-32; R. 81-14 ¶14; R. 81-4 at ¶123, 132. They are capable of producing astonishing harm to the human body: decapitation, R. 81 ¶4; R. 81-4 ¶97, exploded limbs and organs, *id.* ¶98, lethal wounds the size of soda cans, *id.* ¶¶101-03. Their use in response to an attack reflects a *maximization* of force to ensure that the attacker is not merely driven off, but slain. Further, given the effective range of assault weapons when compared to the population density of Cook County, there are few, if any, places where one could safely discharge them without knowingly or unknowingly endangering the bodily safety of a third party. At common law, the use of such extraordinary force "equivalent to a deliberate act of slaughter" would not have constituted lawful self-defense, 4 Blackstone, *supra*, at 199-200, so the possession of the weapon designed solely to exert such force would not have been protected either.

Reduced to a fine point, firing a weapon that has the capacity to pierce body armor at 500 yards, R. 81-4 ¶¶96, 132, equipped with a large-capacity magazine or not, within densely populated Cook County, is excessive force, and not self-defense, and thus a crime. *See, e.g., People v. Murillo*, 587 N.E. 2d 1199, 1204 (1st Dist. 1992) (finding that self-defense was no longer a defense and became excessive force

when shooting a person multiple times, including while the person no longer posed a threat). This is particularly true when there is an easily available alternative: a handgun, with one-tenth of the range of an assault weapon, R. 81-15 at 3. Such conduct that endangers a third party also gives rise to a separate criminal charge under Illinois law. *See*, *e.g.*, 720 ILCS 5/24-1.5. Similarly, a person can be charged with aggravated discharge of a firearm when he or she "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS 5/24-1.2.

The excessiveness of the force exerted by assault weapons is only compounded by their recognized capacity for inflicting indiscriminate harm on innocents. *See Bianchi,* 2024 U.S. App. LEXIS 19624, at \*49 ("its all too frequent use in terrorism, mass killing, and police murder shows that the AR-15 offers firepower ill-suited and disproportionate to fulfilling the Second Amendment's purpose of armed self-defense"). And because the exercise of lawful self-defense is the central purpose for which the Second Amendment was adopted, assault weapons' incompatibility with lawful self-defense renders them dangerous, militaristic weapons that fall outside the protections of that Amendment's plain text. *See id.*

Viramontes has virtually nothing to say about the dangerousness inquiry. Instead, Viramontes simply declares that a weapon "is not more dangerous merely because it can fire faster." Viramontes Br. 16. Such undeveloped, ipse dixit declarations, offered without any supporting legal authority, are forfeited on appeal,

*White*, 879 F.2d at 1513. Viramontes never addresses the County's argument that assault weapons are "dangerous" because of their incompatibility with moderate self-defense. Rather, he claims that assault weapons are "useful" for self-defense in the abstract, Viramontes Br. 43, but makes no argument as to how they are useful beyond their capacity for killing. As history makes clear, the lethality of a weapon has never made its use lawful, but actually served to disqualify it for use in self-defense at common law, thus disqualifying that weapon for Second Amendment protections hinging on that common-law right.

### 3. The County's Assault Weapons Ban Is Consistent With The Legal Principles Underpinning This Nation's Traditions.

Even assuming that assault weapons are "arms" within the text of the Second Amendment, the Ordinance survives *Bruen*'s second step because it is consistent with this nation's "long-standing tradition of regulating . . . especially dangerous weapons." *Bevis*, 85 F.4th at 1199. As *Rahimi* explains, the question under *Bruen's* second step is not whether the government can identify historical laws identical to the modern law at issue, but rather "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898; *Id*. at 1904 (Sotomayor, J., concurring). principles need not be derived from laws specifically targeting firearms, but rather from any laws with applicability to firearms – for example, the surety laws considered analogous in *Rahimi* "could be invoked to prevent all forms of violence, including spousal abuse" involving no weapons at all, but "also targeted the misuse of firearms." *Id.* at 1900.

With the benefit of *Rahimi*'s clarifications regarding the proper mode of analysis under *Bruen*'s second step, it is clear that *Bevis* was correct to recognize that assault weapons regulations are consistent with the principles underlying this nation's regulatory traditions. If anything, *Rahimi* teaches that *Bevis* significantly *understated* the amount of support found in the historical record. Not only are bans on assault weapons supported by the legal principles underlying bans on weapons like spring guns and Bowie knives, but they also find support in the principles underlying the strict historical regulations on implements of mass death such as gunpowder.

Starting with the former, the history of regulation of weapons incompatible with moderate self-defense easily aligns with the County's regulation of assault weapons in both "why" and "how" they affect individuals' ability to use certain weapons in self-defense. As to "why," we explain above that it has long been accepted that the government may regulate the possession of certain weapons when they have proven themselves incompatible with the common law right to moderate self-defense. That same concern about assault weapons' fundamental incompatibility with the moderate right to self-defense, due to their capacity to inflict extraordinary, lethal harm on the human body, is what motivated the County's regulation here. And as to "how," those historical laws limited individuals' ability to use certain dangerous weapons for self-defense by banning their possession – and even their use for self-defense – just as the County's ordinance does here.

47

While the historical tradition of restricting possession of weapons incompatible with moderate self-defense should alone suffice to uphold the County's law, that tradition is only reinforced by the additional historical tradition of restricting access to weapons capable of inflicting rapid mass casualties, as demonstrated by historical regulations of gunpowder. Unlike cannons or similar weapons of mass destruction that existed at the time of the founding, gunpowder could be acquired and stored by average citizens, who could theoretically stockpile large amounts of gunpowder in their homes or places of business. Thus, gunpowder gave an average citizen the ability to kill many people quickly, as assault weapons do today.

And that lethal potential was often realized – in London alone, a gunpowder explosion at Tower Hill in 1552 killed seven, an explosion at Crooked Lane in 1560 killed eleven, another at Fetter Lane in 1583 killed three, another at Tower Street in 1650 killed 67 and destroyed fifteen houses, and in 1715 over a hundred houses on Thames Street were destroyed in a fire caused by a gunpowder explosion that leveled a house. R. 81 ¶245.[6] Following the famed Gunpowder Plot of 1605, in which Guy Fawkes and his coconspirators amassed 36 barrels of gunpowder to level the House of Lords, *see generally*, Alan Haynes, THE GUNPOWDER PLOT (History Press 1994), the Founders would have been well-aware of the destructive potential of excessive quantities of gunpowder.

---

[6] The problem was not limited to London – more than twenty major gunpowder explosions rocked European cities and towns between 1400 and 1850. *Id.*

Reflecting this danger, states and localities have extensively regulated gunpowder since pre-colonial England and the earliest days of the American Republic. R. 81 ¶247-248. In England, the explosion at Crooked Lane led to an outright ban on gunpowder storage in houses, though that ban was later modified to allow storage of two pounds of powder. *Id.* In addition, the English law of nuisance also placed severe limits on individuals' ability to store gunpowder in their homes. By the 1700s, it was settled in the English courts that the storage of large amounts of gunpowder in one's home constituted an indictable offense against the crown, even if the activity was longstanding, and even "though gunpowder be a necessary thing, and for defence of the kingdom." *Anonymous*, 12 Mod. 342 (King's Bench); *accord, e.g.*, *Rex v. Taylor*, 2 Str. 1167 (King's Bench). Notably, these restrictions were not limited to individuals with a history of unsafe practices or violations of the law – rather, they applied to all citizens equally, law-abiders and lawbreakers alike, without regard to the fact that the defendant's activities had never injured others, *see Anonymous*, *supra*.

This regulatory tradition carried over to the United States, where the use of gunpowder quickly proliferated due to its "obvious importance for public defense, frontier security, and hunting," and the "demand for a host of developmental projects in a labor-scarce economy, including mining, canal building, and road building." William J. Novak, THE PEOPLE'S WELFARE 63 (2000). Despite the extraordinary popularity and usefulness of gunpowder, it was "particularly susceptible" to the law of nuisance, *id.*, and the courts recognized that "the keeping

of gunpowder . . . in large quantities in the vicinity of one's dwellinghouse or place of business, is a nuisance per se, and may be abated as such by action at law, or by injunction," H.G. Wood, A PRACTICAL TREATISE ON THE LAW OF NUISANCES 142 § 142 (1875). Early American cities were incorporated with the express authority to regulate gunpowder, *e.g.*, An Act to Incorporate the City of Key West, ch. 58, § 8, 1838 Fla. Laws 70, and multiple states limited the amount of gunpowder a person could possess, Saul Cornell & Nathaniel DeDino, *A Well Regulated Right*, 73 FORDHAM L. REV. 487, 510–12 (2004) (describing numerous gunpowder storage laws). Such regulations persist to this day, despite the advent of cartridges making it generally unnecessary for the average person to possess freestanding gunpowder. *E.g.*, 720 ILCS 5/47-5(7) (forbidding powder magazines near incorporated towns in Illinois).

The "why" behind the regulations was self-apparent – as the courts have explained, a "deposit of a large quantity of gunpowder in the midst of a populous city" could lead to an explosion, "and such would be the terrible and wide-spread destruction from it that the whole population would live in dread of some horrible catastrophe." *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1851). This fear supported legislation because "the dangers would be real, and all men of reflection and prudence would feel them to be so, and therefore their apprehensions would be well founded." *Id.* at 216–17. And, notably, regulations on gunpowder storage were not limited to individuals with a history of unsafe practices regarding the storage of gunpowder – rather, they applied to all citizens equally, law-abiders and

50

lawbreakers alike. What's more, regulations often limited the quantity of gunpowder, reflecting the common wisdom that there is a line between a safe measure of powder for private use, and a stockpile of materiel that could cause mass casualties in an instant, before the government had a chance to react.

The "why" behind regulations on assault weapons is virtually identical. Like stockpiles of gunpowder, they give a single individual the extraordinary ability to kill great numbers of people quickly. And as with gunpowder in the 1500s through the 1700s, that fatal potential has been repeatedly realized, as mass shootings perpetrated with assault weapons now occur with troubling regularity in this nation's schools and public places. And just like the gunpowder used in the famed Gunpowder Plot, assault rifles have been utilized in an attempted act of political violence, in the recent assassination attempt on former President Trump. Nick Penzenstadler, *Gun Used in Trump Shooting: New Details about Rifle Emerge*, USA TODAY (July 16, 2024) https://www.usatoday.com/story/news/investigations/2024/07/16/trump-shooting-assassination-gun-details/74425138007/. As a result, just as was once the case with gunpowder, the innocent, law-abiding people of Illinois now live in dread of the next act of domestic terror to be committed using assault weapons. And those fears are even more well-founded than the fear that justified strict historical regulation of gunpowder – where gunpowder was strictly regulated in London after its misuse caused only two local explosions that resulted in a grand total of 18 deaths, the

51

misuse of assault weapons has resulted in multiple mass shootings and an incomprehensible number of American lives lost.

Beyond the fact that gun powder and assault weapons could be used purposefully for violence, they share the quality of a lurking "nuisance" because their mere presence carries the potential for mass death, regardless of the owner's intent. The Sandy Hook massacre, for example, was carried out by an individual who gained access to his law-abiding mother's assault weapon and who likely would not have found other means to commit his crime. This potential for extreme violence is exacerbated by the weapons psychological effect on their users, by increasing aggressive thoughts and aggression. R. 81 ¶122-123.

Gunpowder regulations and bans on assault weapons are also relevantly similar in "how" they affect law-abiding citizens' right to armed self-defense. Certainly, laws imposing restrictions on the storage of gunpowder imposed some burden on the ability of an individual to engage in armed self-defense, because they "would at the very least have made it difficult to reload the gun to fire a second shot unless the homeowner happened to be in the [location] where the extra gunpowder was required to be kept." *Heller*, 554 U.S. at 686 (Breyer, J. dissenting). But as the *Heller* majority recognized, this burden was minimal, particularly in comparison to "an absolute ban on handguns." *Id*. at 632.

Bans on assault weapons and large-capacity magazines impose a comparably minimal burden on armed self-defense — like the historic English regulations of gunpowder, which allowed a small amount of gunpowder with significantly lesser

destructive power to be stored in homes, they allow individuals seeking to engage in armed self-defense to retain possession of a host of weapons that are extremely well-suited for that purpose. The regulations of gunpowder only prohibited possession of amounts of gunpowder with no practical utility for self-defense – no individual defending himself from a home invader could possibly use thirty pounds of gunpowder in his defense without simply detonating it and risking great harm to innocent bystanders. Similarly, the regulations at issue here only prohibit the possession of weapons with no discernible additional self-defense utility beyond what is already provided by other, less destructive weapons. Indeed, Viramontes is conspicuously unable to identify even a single actual use of assault weapons in lawful self-defense, which is strong indication that inability to obtain assault weapons has a negligible or even nonexistent effect on individual's ability to engage in lawful self-defense. *See Ocean State*, 95 F.4th at 45. And this comes as no surprise, given that assault weapons are, by their extraordinarily destructive nature, incompatible with lawful, moderate self-defense.

Given the undisputed historical tradition of strictly regulating public access to weapons fundamentally incompatible with lawful self-defense, particularly when that incompatibility arises from that weapon's ability to indiscriminately inflict rapid mass casualties on innocent bystanders, it seems beyond any doubt that the County's regulation of assault weapons here does not offend the Second Amendment, and is thus constitutional.

Viramontes' cursory argument to the contrary is unavailing. Viramontes declares "that *only* 'dangerous and unusual' arms can be banned," Viramontes Br. 36 (emphasis added), but he is conspicuously unable to identify even a single statement in *Heller* or *Bruen* identifying this as the *only* historical tradition that might be considered at *Bruen*'s second step. And, again, Viramontes largely ignores *Rahimi*, which conclusively disposes of the notion that the historical traditions identified in *Heller* and *Bruen* are exclusive. That said, it is beyond dispute that assault weapons are both dangerous and unusual as those terms were historically understood. Viramontes' argument gets him nowhere.

## CONCLUSION

————

This court should affirm the judgment of the district court.

Respectfully submitted,

KIMBERLY M. FOXX
State's Attorney of Cook County

BY: s/ *Jessica M. Scheller*
Jessica M. Scheller
Assistant State's Attorney
Chief; Advice, Business & Complex
Litigation Division
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-6934
Jessica.Scheller@cookcountysao.org

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)

_____

     In accordance with Fed. R. App. P. 32(g), I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,984 words, beginning with the words "Jurisdictional Statement" on page 1 and ending with the words "Respectfully submitted" on page 54. In preparing this certificate, I relied on the word count of the word-processing system used to prepare the brief, which was Microsoft Word.

s/ <i>Jessica M. Scheller</i>
Jessica M. Scheller, Attorney

## CERTIFICATE OF SERVICE

_____

     I certify that on August 28, 2024, I electronically filed the attached Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ <i>Jessica M. Scheller</i>
Jessica M. Scheller, Attorney
