No. 24-1437

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| CUTBERTO VIRAMONTES; CHRISTOPHER KHAYA; SECOND AMENDMENT FOUNDATION, INC.; and FIREARMS POLICY COALITION, | ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiffs-Appellants, | ) ) | No. 1:21-cv-04595 |
| v. | ) ) | |
| COUNTY OF COOK; TONI PRECKWINKLE; KIMBERLY M. FOXX; and THOMAS J. DART, | ) ) ) ) | The Honorable REBECCA R. PALLMEYER, |
| Defendants-Appellees. | ) | Judge Presiding. |

**BRIEF OF AMICUS CURIAE STATE OF ILLINOIS IN SUPPORT OF
DEFENDANTS-APPELLEES AND SEEKING AFFIRMANCE**

**KWAME RAOUL**
Attorney General
State of Illinois

**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for the State of Illinois

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ i

INTRODUCTION AND INTEREST OF AMICUS CURIAE ..................................... 1

ARGUMENT .............................................................................................................. 3

I.    The Record Developed On Remand In *Barnett* Confirms *Bevis* Was Correctly Decided ............................................................................................ 3

    A.    *Bevis* correctly determined that the AR-15 is virtually identical to the M16 machinegun ........................................................................ 3

    B.    *Bevis* correctly identified a military and law enforcement exception to historical restrictions on dangerous and unusual weapons. ................................................................................................ 10

II.    Plaintiffs' Arguments In Support Of Reversal Are Unpersuasive. ................. 12

    A.    *Bevis* was correctly decided. ................................................................. 13

    B.    Plaintiffs' arguments that they should prevail under *Bevis* are incorrect. ................................................................................................ 20

CONCLUSION .......................................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill.) ...................................................... 2

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023)..................................*passim*

*Bianchi v. Brown*,
  No. 21-1255, 2024 WL 3666180 (4th Cir. Aug. 6, 2024) (*en banc*) ...........*passim*

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................*passim*

*Garland v. Cargill*, 602 U.S. 406 (2024) ............................................... 9, 10

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ............. 1, 10, 16, 19

*Nunn v. State*, 1 Ga. 243 (1846) ................................................................ 11

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ............................................. 16

*United States v. Miller*, 307 U.S. 174 (1939) ............................................ 13

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ...................................... 1, 10, 17, 18

**Other Authorities**

Bartetzko, Roland, *How Much Ammo Does A Soldier Carry Into Battle?*,
  Spec Ops Magazine (Apr. 4, 2022) ......................................................... 9

Dep't of the Army, FM 3-22.9, Rifle Marksmanship M16-/M4-Series Weapons
  (Aug. 2008)............................................................................................ 8, 9

Dep't of the Army, TC 3-22.9, Rifle and Carbine (May 2016) ..................................... 8

Rhee, P., MD, et al., *Gunshot wounds: A review of ballistics, bullets,
  weapons, and myths*, 80 Journal of Trauma and Acute Care Surgery 853
  (Mar. 16, 2016)...................................................................................... 5, 6

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

The State of Illinois submits this amicus brief in support of Defendants-Appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

In 2023, this court issued *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), concluding that preliminary injunctive relief was unwarranted because the plaintiffs were unlikely to succeed on the merits of their Second Amendment challenge to restrictions on assault weapons and large-capacity magazines imposed by the State, Cook County, Chicago, and Naperville. In reaching this decision, this court faithfully applied the text-and-tradition test outlined by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and subsequently reaffirmed in *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

*Bevis* decided, first, that based on the record developed in the preliminary injunction proceedings, assault weapons are not "arms" within the Second Amendment's text because they are sufficiently similar to "M-16 rifles and the like," which *Heller* deemed permissible to ban. 554 U.S. at 627. And, second, *Bevis* determined that the challenged laws are "relevantly similar," *Bruen*, 597 U.S. at 29, to historical regulations of dangerous and unusual weapons: The modern and historical regulations share the same justifications (protecting the public from new forms of violence) and impose the same minimal burden on self-defense. This court noted, however, that its analysis was based on a "preliminary look at the subject"

1

and invited the parties to develop further evidence on remand. *Bevis*, 85 F.4th at 1197.

Plaintiffs challenge the same Cook County restriction addressed in *Bevis*, but argue that this court should reach a different result for two reasons. First, plaintiffs argue that *Bevis* was wrong and should be overruled. Second, plaintiffs contend that they should prevail under *Bevis* because assault weapons—specifically, AR-15s—are insufficiently similar to M16 rifles. The State, which imposes similar restrictions on assault weapons and was a party in *Bevis*, has an interest in the proper resolution of these questions. The State agrees with Cook County that plaintiffs are wrong on both fronts and, accordingly, that the district court was right to enter judgment for defendants.

The State writes separately, however, to describe the additional evidence developed in the ongoing litigation in *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill.)— one of the six consolidated cases addressed by *Bevis*—that confirms the preliminary conclusion reached in *Bevis*. In particular, the State has developed further evidence showing that assault weapons "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Bevis*, 85 F.4th at 1195. The State has also presented additional historical research, which confirms that legislatures since the Founding have reserved "especially dangerous" weapons (a category that includes assault weapons) to the military and law enforcement while ensuring that "[m]any other weapons remain that are more universally available" for civilian self-defense. *Id.* at

1201.  Finally, none of plaintiffs' arguments to the contrary are persuasive.

Specifically, plaintiffs' notion that *Bevis* was incorrectly decided, as well as their

contention that plaintiffs should prevail under *Bevis*, is incorrect.  As to the latter,

the additional evidence the State has adduced demonstrates that plaintiffs' primary

theory—that assault weapons are commonly owned and thus immune from

restriction—is based on flawed data.

## ARGUMENT

### I.    The Record Developed On Remand In *Barnett* Confirms *Bevis* Was Correctly Decided.

Consistent with the instructions in *Bevis*, the State has developed additional

evidence in the ongoing *Barnett* litigation.  That evidence, as now explained,

confirms what *Bevis* held based on the preliminary record before it:  that

restrictions on assault weapons do not violate the Second Amendment.

#### A.    *Bevis* correctly determined that the AR-15 is virtually identical to the M16 machinegun.

As *Bevis* explained, based on the record before it, "the AR-15 is almost the

same gun as the M16 machinegun."  85 F.4th at 1195.  "Both weapons share the

same core design, and both rely on the same patented operating system."  *Id.* at

1195-96.  They also "use the same ammunition, deliver the same kinetic energy . . . ,

the same muzzle velocity . . . , and the same effective range."  *Id.* at 1196.  By

contrast, "[t]he only meaningful distinction . . . is that the AR-15 has only

semiautomatic capability," whereas the M16 operates in both automatic and

semiautomatic modes.  *Id.* at 1195.  And in automatic mode, the rate of fire is

higher than in semiautomatic mode.  *Id.* at 1196.  The court further noted that this

analysis was based only on a "preliminary look at the subject," as well as the possibility that plaintiffs could "find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.* at 1197.

On remand, the parties in *Barnett* have continued to develop evidence on the similarities and differences between AR-15s and M16s. And the evidence developed shows that the conclusion *Bevis* drew was correct: the AR-15 is identical to the M16 in all respects but one—the ability to toggle between automatic and semiautomatic fire. *See Barnett* Doc. 185-1 ¶¶52, 118.[1] And that difference does not make the weapon materially different as a practical or constitutional matter. On the contrary, as the *en banc* Fourth Circuit has also recognized, that difference "pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi v. Brown*, No. 21-1255, 2024 WL 3666180, *13 (4th Cir. Aug. 6, 2024) (*en banc*).

In *Barnett*, the State's experts have detailed the many similarities that render the AR-15 "almost the same gun as the M16." *Bevis*, 85 F.4th at 1195; *see also Bianchi*, 2024 WL 3666180, at *15 ("the AR-15—with its military origination, combat-functional features, and extraordinary lethality—has the same basic characteristics, functionality, capabilities, and potential for injury as the M16")

---

[1] Citations to the *Barnett* district court docket appear as "*Barnett* Doc. __," plaintiffs' opening brief as "AT Br. __," and the response brief as "AE Br. __."

(cleaned up).[2]  Most important, the weapons share features that maximize their effectiveness, which, in this context, means "the ability to deliver reliable lethality or the ability to incapacitate the chosen target." *Barnett* Doc. 185-1 ¶28.  The potential lethality, in turn, "is dependent on the balance among several interdependent factors," including caliber, muzzle velocity, kinetic energy, effective range, accuracy, and rate of fire. *Id.*  An examination of each, as well as their combined effect, confirms the validity of the *Bevis* court's determination.

To start, the additional evidence the State has developed shows that M16 rifles fire the same caliber ammunition—.223 or 5.56 mm NATO caliber—at the same velocity as the AR-15. *Id.* ¶102.  In fact, the ammunition used by the military for several M16-series rifles during recent wars is readily available for purchase and use by civilians in AR-15s. *Id.* ¶183.  AR-15s and M16s also have the same performance in terms of muzzle velocity, which measures the speed of the bullet in feet per second when leaving the barrel of a firearm. *Id.* ¶28b.  M16s range from 3,100 to 3,250 feet per second, *id.* ¶47, while AR-15s range from 3,130 to 3,200 feet per second, *id.* ¶¶121, 180; *Barnett* Doc. 194-1 ¶21.

The additional evidence developed also shows that the kinetic energy of a bullet fired from an M16 is akin to one from an AR-15. *E.g.*, Rhee, P., MD, et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 Journal of

<hr>

[2] This brief focuses its analysis on the M16 machinegun discussed in *Bevis* and *Heller*. *E.g.*, *Bevis*, 85 F.4th at 1195.  This analysis is materially similar when applied to the M4 machinegun (referenced by plaintiffs), which is a compact version of the M16 and is also used by U.S. servicemembers. *E.g.*, *Barnett* Doc. 185-1 ¶45.

Trauma and Acute Care Surgery 853, 855-56 (Mar. 16, 2016). This metric is significant because bullets cause damage to human bodies by transferring kinetic energy from the bullet to the body. *Barnett* Doc. 185-3 ¶¶13, 15. In other words, because the kinetic energy of these weapons is the same, the wounds inflicted by M16s fired in combat are identical to wounds inflicted on civilians by AR-15s. *Barnett* Doc. 194-1 ¶36; *Barnett* Doc. 185-1 ¶28c; *Barnett* Doc. 185-3 ¶20.

These wounds, moreover, are often devastating. The large kinetic energy and force produced by these weapons means that a bullet fired typically creates a large cavity in a human body, with injuries to tissue and surrounding organs. *Barnett* Doc. 194-1 ¶24. These effects are amplified because bullets used by both M16s and AR-15s tend to "yaw" (rotate sideways) and fragment inside the body. *Barnett* Doc. 185-1 ¶44. When a bullet "yaws" or fragments inside the body, it can cause greater injury to adjacent tissue and organs. *Barnett* Doc. 185-3 ¶18; Rhee, *supra* at 863.

Laboratory testing confirms the substantial wounding capabilities of AR-15s. *Barnett* Doc. 185-3 ¶¶21-40. This study found that the energy release per bullet fired from an AR-15 is approximately three times greater than from a Thompson machinegun, approximately four to nineteen times greater than from handguns firing in typical handgun calibers, and approximately ten times greater than a musket ball. *Id.* ¶36. The same study found that the temporary cavity created by a bullet fired from an AR-15 was significantly larger than the cavity sizes caused by Thompson machineguns, handguns, and muskets. *Id.* ¶38; *see also Bianchi*, 2024 WL 3666180, at *12 ("while a typical 9mm bullet wound to the liver from a

commonly used handgun like the Glock 19 will produce a pathway of tissue destruction in the order of one inch to two inches, an AR-15 wound will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete") (cleaned up).

Furthermore, AR-15s typically have the same range and penetration capabilities as M16s. *Barnett* Doc. 185-1 ¶¶104, 180, 191. According to U.S. Army documents, the maximum effective range for both AR-15s and M16s to hit a target is between 460 and 550 meters. *Id.* ¶¶46, 52. By comparison, a 9mm handgun is generally considered to have a maximum effective range of between 0 to 50 yards. *Id.* ¶28e.

The velocity and energy of bullets fired from M16s and AR-15s also enable significant (and similar) penetration capabilities. *Id.* ¶¶180, 183, 193. Most standard-issue ballistic vests provided to law enforcement officers, however, do not protect the body against shots fired by these weapons. *Id.* ¶193; *Barnett* Doc. 185-2 ¶51. Although soft body armor can withstand most handgun bullets, which have velocities that range up to 1,200 feet per second, it cannot withstand the ammunition used by AR-15s and M16s rifles, that achieve muzzle velocities of 3,200 feet per second. *Barnett* Doc. 185-1 ¶193.

Finally, the accuracy and rate of fire of AR-15s and M16s are similar. As explained, M16s can fire in automatic or semiautomatic mode. As plaintiffs do not dispute, AT Br. 54-55, when M16s are used in semiautomatic mode, they have the same accuracy and rate of fire as AR-15s, *Barnett* Doc. 185-1 ¶52. This is notable

because semiautomatic mode is the widely preferred method of fire for the military. *E.g.*, *Barnett* Doc. 37-6 ¶33; *Barnett* Doc. 37-7 ¶34; *see also* Dep't of the Army, FM 3-22.9, Rifle Marksmanship M16-/M4-Series Weapons, at 7-34 (Aug. 2008), https://bit.ly/4e207EJ (hereinafter "2008 Army Field Manual") (M16s "should normally be employed in the semiautomatic fire mode").  Indeed, U.S. Army doctrine provides that "[t]he most important firing technique during fast-moving, modern combat is rapid semiautomatic fire."  2008 Army Field Manual at 7-12.

But even when M16s are used in an automatic setting, the effective rate of fire is similar to AR-15s.  To be sure, when an M16 is used on an automatic setting, it can theoretically fire up to 700 rounds per minute.  *Bevis*, 85 F.4th at 1196; *see also Barnett* Doc. 185-1 ¶49.  There are, however, limitations on both the weapon and the shooter that lower this rate in real-world scenarios.  And there are devices and maneuvers that shooters can deploy to increase the rate of fire of semiautomatic weapons.  Any differences in rate of fire in real-world scenarios are therefore slight.

For instance, many current M16s cannot fire in fully automatic mode; instead, they have a "burst" setting in which they fire three-round bursts with each trigger pull.  *E.g.*, Dep't of the Army, TC 3-22.9, Rifle and Carbine at 2-7 (May 2016), https://bit.ly/4dZT0ws.  In other words, shooters using these weapons do not have even the potential of firing 700 rounds per minute.  And when using the three-round burst setting, shooters will experience additional delays due to the need to

manage recoil between each burst by bringing the weapon back on target. 2008 Army Field Manual at 7-32.

Additionally, M16s are not designed to fire on automatic for extended periods: in fact, the U.S. Army instructs that the "sustained" rate of fire—the rate necessary to prevent the weapon from over-heating and becoming inoperable—is limited to 12 to 15 rounds per minute. *Id.* at table 2-1. The magazine capacity available to a shooter and the need for time to reload also limit the number of rounds that a shooter can fire in a minute. Typically, a soldier's combat ammunition load is 210 rounds spread through seven 30-round magazines. *E.g.*, Roland Bartetzko, *How Much Ammo Does A Soldier Carry Into Battle?*, Spec Ops Magazine (Apr. 4, 2022), https://bit.ly/3Z8JyCM.

When these limitations are considered, the rate of fire for automatic weapons is substantially lower than 700 rounds per minute. In fact, the military lists the "maximum effective rate of fire" —which is the "highest rates of fire that can be maintained and still achieve target hits"—for M16s as between 150 to 200 rounds per minute in automatic fire. 2008 Army Field Manual at table 2-1 & glossary-7. And the military estimates a range of between 45 to 65 rounds per minute in semiautomatic mode and 90 rounds per minute in a 3-round burst setting. *Id.*

These metrics, moreover, do not account for the many ways in which "AR-15's rate of fire can be easily converted to mimic military-grade machine guns with devices like bump stocks, trigger cranks, and binary triggers." *Bianchi*, 2024 WL 3666180, *13 (cleaned up); *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (Alito, J.,

concurring) ("[A] semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun"). In addition to these devices, as the Supreme Court recognized in *Garland*, "[s]hooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machine guns." 602 U.S. at 406. For example, a "shooter who bump fires a rifle uses the firearm's recoil to help rapidly manipulate the trigger." *Id.*

In short, any minimal difference in rates of fire between the automatic and semiautomatic settings does not render the AR-15 dissimilar to M16s under any meaningful metric. *E.g.*, *Bianchi*, 2024 WL 3666180, *13. Indeed, "[b]etween its firepower, accuracy, and modifiability, the net effect of the AR-15's military combat features is a capability for lethality." *Id.* (cleaned up).

## B. *Bevis* correctly identified a military and law enforcement exception to historical restrictions on dangerous and unusual weapons.

*Bevis* alternately held that the restrictions on assault weapons were consistent with the longstanding tradition of regulating "dangerous and unusual" weapons. *Bruen*, 597 U.S. at 21; *see also Rahimi*, 144 S. Ct. at 1897; *Heller*, 554 U.S. at 627. As *Bevis* explained, these regulations have limited the sale, possession, and use of such weapons since the Colonial era. 85 F.4th at 1190, 1199-1200. In each era, legislatures imposed restrictions on categories of weapons that responded to the particular type of harm those weapons presented when their proliferation caused escalating or novel forms of violence. *E.g.*, *Barnett* Docs. 37-11, 37-12, 37-15. And legislatures reserved certain of these "especially dangerous" weapons to the

military and law enforcement while ensuring that "[m]any other weapons remain that are more universally available" for civilian self-defense. *Bevis*, 85 F.4th at 1201. As support for this latter point, *Bevis* cited a number of historical laws that limited categories of weapons to the military or law enforcement. *Id.* at 1201-02.

On remand, the State supplemented the record with additional historical evidence confirming that *Bevis* correctly described this tradition. For instance, Professor DeLay "explain[ed] historical and legal distinctions between military and civilian firearms in the United States." *Barnett* Doc. 190-2 ¶7. Relevant here, DeLay described how "state and local authorities around the nation enacted numerous laws throughout the [nineteenth] century aimed at addressing the mounting social problems caused by firearms and other deadly weapons." *Id.* ¶88. Many of those laws "included explicit language exempting officers of the state from their provisions." *Id.*; *see also id.* ¶89 (collecting laws). To be sure, some legislatures in the early republic and antebellum eras did not "make such exemptions explicit," but this was because "they thought such exemptions too obvious to be necessary." *Id.* ¶90. For instance, in *Nunn v. State*, 1 Ga. 243 (1846), "one of the most important arms-rights cases from the era," the court criticized the wording of a law banning open carry because its "vague language meant 'that it might be insisted, and with much plausibility, that even sheriffs, and other officers therein enumerated, might be convicted for keeping, as well as carrying, any of the forbidden weapons, while not in the actual discharge of their respective duties.'" *Barnett* Doc. 190-2 ¶90 (quoting *Nunn*, 1 Ga. at 246).

Professor DeLay also explained that "[e]xplicit distinctions in law became much more common" following the Civil War. *Id.* ¶91. Indeed, between 1864 and 1892, at least 18 States and three territories "incorporated explicit exemptions for law enforcement and/or military personnel into laws regulating firearms." *Id.* ¶92 (collecting laws). During this same period, numerous municipalities enacted ordinances with similar language. *Id.* ¶93 (collecting laws). And in the early twentieth century, the distinction between military and civilian uses "became even more pronounced." *Id.* ¶94. For example, although dozens of States regulated automatic and semiautomatic firearms during the 1920s and 1930s, "[n]one of these laws applied to the U.S. military." *Id.*; *see also id.* ¶¶76-78 (collecting laws). Similarly, the federal laws restricting machineguns did not apply to the military or law enforcement. *Id.* ¶95.

All told, the historical evidence, although beyond what was available to this court in *Bevis*, confirms the robust tradition in this country of restricting civilian use of dangerous and unusual weapons, while exempting military and law enforcement officers, that *Bevis* identified.

## II. Plaintiffs' Arguments In Support Of Reversal Are Unpersuasive.

Notwithstanding the foregoing, plaintiffs seek reversal of the district court's decision on two alternative grounds. First, plaintiffs assert that *Bevis* was wrongly decided and should be overruled. Second, they believe that the district court reached the incorrect result under the *Bevis* framework. Plaintiffs are incorrect on both counts.

**A.** *Bevis* **was correctly decided.**

Plaintiffs first argue that this court should overrule *Bevis* because it is "fundamentally incompatible" with Supreme Court precedent. AT Br. 18. But *Bevis* faithfully applied the text-and-tradition test outlined by the Supreme Court in *Heller* and *Bruen* (and subsequently confirmed in *Rahimi*). Plaintiffs' three arguments to the contrary—that *Bevis* improperly included a military exception to the textual inquiry, should have resolved the case based solely on a "common use" standard, and conducted an "unnecessary foray into history," *id.* at 19-34—are unpersuasive.

First, plaintiffs argue that *Bevis* applied an incorrect definition of "arms" in its textual analysis—specifically, that it improperly "read into the term 'bearable arms' an implicit carve out for any 'weapons that may be reserved for military use.'" *Id.* at 19 (quoting *Bevis*, 85 F.4th at 1194-95). Instead, plaintiffs assert, the plain text covers all arms that a person can bear and, at least, all firearms. *Id.* at 34-36. But as this court explained in *Bevis*, by using the phrase "bearable arms," the Supreme Court did not mean that the Second Amendment presumptively protects any weapons that a person can bear, like shoulder-fired rocket launchers. 85 F.4th at 1182. On the contrary, the Court made clear that the right to armed self-defense necessarily excludes firearms that do not further that right, such as "weapons that are most useful in military service" (including "M-16 rifles and the like") or those typically used for criminal purposes. *Heller*, 554 U.S. at 627; *United States v. Miller*, 307 U.S. 174, 178 (1939) (short-barreled shotguns).

It is also untrue, as plaintiffs assert, that *Bevis* misread the Supreme Court's discussion of machineguns in *Heller*. AT Br. 20-21. According to plaintiffs, *Heller* only "suggest[ed] that machineguns might be unprotected," and it made that statement in the context of its historical analysis, not in the plain text. *Id.* at 20. But *Heller* squarely stated that "weapons that are most useful in military service— M-16 rifles and the like—may be banned." 554 U.S. at 627. In fact, the Court considered it "startling" that its opinion could be interpreted to find the machinegun ban unconstitutional. *Id.* at 624. There was no ambiguity in these statements, as plaintiffs suggest, nor were they made in the context of a historical tradition analysis. Rather, *Heller* addressed machineguns in two places: (1) in a section explaining why *Heller* was consistent with the Court's prior precedent, *id.* at 624, and (2) as part of the Court's discussion on the limitations of the scope of the right itself, *id.* at 627-28.

Relatedly, plaintiffs make the assertion that *Heller* was not "singling out M16s to be banned *because* they were useful for military service," but rather was "addressing M16s directly because it viewed them as possibly outside the Amendment's protective scope *despite* their utility to the military." AT Br. 22. But plaintiffs offer no support—in *Heller* or elsewhere—for this theory. Nor could they. As *Bevis* correctly noted, *Heller* drew a clear distinction between "arms in common use . . . for lawful purposes like self-defense," 554 U.S. at 624 (cleaned up), and those like machineguns, which are "useful in warfare" and can be banned consistent with the Second Amendment, *id.* at 624, 627.

And, contrary to plaintiffs' argument that the weapons brought by ordinary people to serve in the militia were "military weapons" because they were used in the militia, AT Br. 22, the Court explained that the weapons traditionally used in the militia were those that would have otherwise fallen on the self-defense side of the line, not those designed for, or most useful in, the military, *Heller*, 554 U.S. at 624, 627. In other words, the fact that certain weapons were used by the militia did not place them presumptively within the protections of the Second Amendment; the Court instead looked to the underlying use and purpose of those weapons. And here, as the Fourth Circuit explained in *Bianchi*, assault weapons "are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road in colonial America—the disarmament of whom the Second Amendment was ratified to prevent." 2024 WL 3666180, *10. Instead, they are "military-grade" and "excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Id.*

Second, plaintiffs assert that *Bevis* wrongly determined at the first step of the *Bruen* analysis that "'bearable arms' was code or shorthand for only those arms that are 'in common use' for lawful purposes." AT Br. 24. Rather, plaintiffs contend, the common-use inquiry belongs at *Bruen*'s second step and stands for the proposition that weapons cannot be categorically banned consistent with the historical tradition of firearms regulation if the weapons are commonly possessed *today*. *Id.* at 24-25. At the threshold, plaintiffs' argument misdescribes *Bevis*, which addressed whether

assault weapons were in "common use" in the second step of the analysis, and not in the first. 85 F.4th at 1198 (assuming that the "common use" aspect of *Bruen* "is a step two inquiry").

In any event, plaintiffs' attempt to replace the historical tradition test articulated in *Bruen* with a "common use" standard conflicts with *Bruen*, which requires courts to evaluate whether the challenged regulation is "is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17.[3] Indeed, plaintiffs' theory would effectively eliminate the historical inquiry for cases involving laws prohibiting a type of weapon, if it could be shown that the weapon is in "common use." That, combined with plaintiffs' proposed "bearable arms" standard, would render the government powerless to ban any commonly owned firearm, no matter how dangerous or inappropriate for self-defense. As even the dissenting judge in *Bevis* recognized, *Bruen* and *Heller* do not require that extreme result. *Bevis*, 85 F.4th at 1211 (Brennan, J., dissenting) ("just because a weapon is in common use does not necessarily mean a government is barred from regulating it").

Third, plaintiffs contend that *Bevis* conducted a "critically flawed" historical analysis that focused on "just seven examples of historical laws" showing that "historically, military firearms could be banned." AT Br. 28-29. But this court's analysis did not rely on only seven laws, nor was it limited to the tradition of

---

[3] Plaintiffs include a lengthy discussion of *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), as support for their theory. But the Ninth Circuit vacated that decision. *See Teter v. Lopez*, 93 F.4th 1150 (9th Cir. 2024) (granting rehearing *en banc*).

military exemptions. Rather, it found that the tradition of restricting certain dangerous and unusual weapons for civilian use included a tradition reserving some of them, if appropriate, to the military or law enforcement. *Bevis*, 85 F.4th at 1199-1202. That tradition is supported by many federal, state, and local laws, a sampling of which were highlighted in the decision. These laws were set forth in expert declarations in the consolidated *Bevis* actions, *Barnett* Docs. 37-11, 37-12, 37-15, and have since been supplemented by the State in their ongoing litigation, as explained *supra* Section I.B.

Plaintiffs also incorrectly contend that the analogues cited by *Bevis* are not "relevantly similar" to restrictions on assault weapons for various reasons. AT Br. 29-33. But plaintiffs' attempt to isolate individual laws and distinguish them by claiming that none is sufficiently analogous cannot overcome the evidence that restrictions on assault weapons are consistent with the historical tradition of regulating dangerous and unusual firearms. As the Supreme Court reiterated in *Rahimi*, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition"; it does not require locating a specific regulation that is "a dead ringer or historical twin." 144 S. Ct. at 1898 (cleaned up). Indeed, in upholding 18 U.S.C. § 922(g)(8) as consistent with the historical tradition of disarming dangerous individuals, the Court noted that "Section 922(g)(8) is by no means identical to [the] founding era regimes, but it does not need to be." *Id.* at 1901.

In any event, plaintiffs' arguments about the individual laws are incorrect. For instance, plaintiffs claim that the Boston and Cleveland ordinances cited in *Bevis*—which exempted the military from restrictions on discharging weapons within city limits—are "not 'relevantly similar' to a law banning civilians from owning certain firearms at all." AT Br. 29. But as explained, a law need not be identical to be a sufficient analogue, especially when considered in the context of the broader historical tradition discussed. *Rahimi*, 144 S. Ct. at 1898; *id.* at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). Furthermore, laws regulating the use of firearms (as opposed to their possession) are relevant to the analysis because they share the same justifications (protecting the public from new forms of violence) and impose the same minimal burden on self-defense (by restricting only the conduct causing the violence while leaving other means of armed self-defense available). *Id.* at 1897-98.

Plaintiffs also assert that *Bevis* wrongly claimed that there were dozens of examples of laws prohibiting possession of Bowie knives, with exemptions for military uses. AT Br. 30. But *Bevis* never made that claim: It stated that there were "dozens of examples of Bowie knife regulations, forbidding *or limiting the use of* these dangerous weapons" and noted that "[s]everal of those featured military exceptions." 85 F.4th at 1201 (emphasis added). In any event, the court's statement about the prevalence of Bowie knife restrictions, as well as military

exemptions to those laws, was, if anything, an underrepresentation of their commonality, as explained, *supra* Section I.B.

Finally, plaintiffs assert that the federal laws cited in *Bevis* are inapposite because they are too late in time. AT Br. 32-33. According to plaintiffs, "[t]he critical period for historical restrictions that shed light on the scope of the Second Amendment is the period immediately following its ratification in 1791." *Id.* at 33. This is untrue. To be sure, *Bruen* indicated that, when reasoning by analogy, courts should begin with the public understanding of the right during the Founding and Reconstruction eras. 597 U.S. at 27-29. But "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution." *Id.* at 35-36 (cleaned up). To that end, subsequent history can shed light on the public understanding of the Second Amendment, so long as that history does not "contradict[ ] earlier evidence." *Id.* at 66 n.28. And when the regulation at issue implicates "unprecedented societal concerns or dramatic technological changes," courts should apply a "more nuanced approach" to reasoning by analogy. *Id.* at 27. As *Bevis* rightly concluded, evidence of our country's tradition of regulating "dangerous and unusual" weapons—beginning prior to the Founding era, continuing through the 18th and 19th centuries, and confirmed by early 20th-century regulations—demonstrates that the Act is relevantly similar to firearms regulations of the past. 85 F.4th at 1201-02.

**B. Plaintiffs' arguments that they should prevail under *Bevis* are incorrect.**

Plaintiffs alternatively assert that the district court wrongly granted summary judgment to defendants under *Bevis*. But each of their arguments is unpersuasive.

To begin, plaintiffs assert that under *Bevis*, because "an arm may only be banned if it is 'exclusively or predominantly' military in nature, so long as Plaintiffs can demonstrate that the banned rifles have some substantial utility to civilians trying to defend themselves, then they are 'arms' under the text of the Second Amendment." AT Br. 42-43. And, plaintiffs contend, they have satisfied that standard because assault weapons are "better suited for lawful self-defense" than other weapons. *Id.* at 43. Plaintiffs are incorrect.

For starters, plaintiffs misdescribe the standard set forth in *Bevis*. There, this court distinguished "Arms that ordinary people would keep at home for purposes of self-defense" from those "that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1194. And the court ultimately concluded that AR-15s were not protected because the evidence showed that assault weapons "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.* at 1195. It did not— in either its iteration of the standard or its application—indicate that an arm is protected if it clears a threshold utility for self-defense purposes, regardless of its other characteristics and uses, as plaintiffs suggest.

In any event, plaintiffs are wrong that assault weapons are well-suited for self-defense. On the contrary, the features that are restricted under the Cook County ordinance (and the similar Illinois law) were designed for the battlefield, not self-defense. *See, e.g.*, *Barnett* Doc. 185-1 ¶81; *Bianchi*, 2024 WL 3666180, *12 (describing "combat-functional features that the AR-15 and M16 share" and concluding that "many of the [AR-15's] combat-functional features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves"). For example, although a pistol grip or thumbhole stock "may be useful during military operations because it helps the shooter stabilize the weapon and reduce muzzle rise during rapid fire, [it] is not necessary to operate a firearm safely in lawful self-defense situations." *Barnett* Doc. 37-7 ¶¶13-14; *see also*, *e.g.*, *id.* ¶15 (protruding grips were "developed as a feature for troops charged with fast and efficient killing of enemy combatants in offensive warfare," but are unnecessary for self-defense). Likewise, barrel shrouds are "useful in military operations"—but unnecessary for self-defense—because they "allow the shooter to attach various accessories" like lights, optical sights, and laser aiming devices. *Id.* ¶19.

Plaintiffs next assert that assault weapons are chosen by Americans for self-defense purposes. AT Br. 48-49. As support, plaintiffs cite ownership and production surveys. *Id.* at 49-53. But this argument is based "on numbers alone"—the approach *Bevis* rejected because it creates "anomalous consequences." 85 F.4th at 1199. For example, in 1994, the Federal Assault Weapons Ban "made civilian possession of AR-15s (among other assault weapons) unlawful," and "few civilians

owned AR-15s." *Id.* But after the legislation expired in 2004, "these weapons began to occupy a more significant share of the market." *Id.* If common use were tied solely to numbers, "the federal ban would have been constitutional before 2004, but unconstitutional thereafter." *Id.* at 1199. Similarly, the constitutionality of the federal anti-machinegun statute (which *Heller* had confirmed, *id.* at 1189) would depend on that statute's continued existence, *id.* at 1190. Plaintiffs' attempt to relitigate this aspect of *Bevis* should be rejected.

But even if ownership and production data were dispositive, plaintiffs' evidence is flawed in meaningful ways, as the evidence presented by the State in the ongoing *Barnett* litigation demonstrates. For example, plaintiffs rely heavily on a 2021 survey conducted by William English that estimates 24.6 million people have owned an AR-15 or similar rifle. AT Br. 50. As the State's expert explained, however, there are "ethical and methodological concerns with [this] survey that raise suspicions about the underlying data and Professor English's analysis of the data." *Barnett* Doc. 190-1 at 9. For starters, the survey does not meet "the standards of practice of the American Association for Public Opinion Research" for several reasons, including that English has never disclosed his sources of funding or the "weighted results" of the study. *Id.*

Furthermore, the survey "suffers from methodological issues." *Id.* at 10. For instance, it relies on "unweighted data," even though the survey was "not demographically representative of gun owners." *Id.* Relying on unweighted results in these circumstances "can produce skewed, unreliable findings." *Id.* Additionally,

the survey asked questions about gun ownership in the past tense, notwithstanding that the results purport to reflect current ownership. *Id.* And the questions were worded in another improper way—specifically, "in a manner that suggests a negative framing of regulations on firearms and magazines." *Id.* When questions "[s]ubtly cue[ ] respondents to perceive regulations in an unfavorable manner," it "runs the risk of producing biased results." *Id.*

Finally, the survey's results relating to AR-15 ownership are unreliable because "English arbitrarily excluded any responses that indicated they had owned over 100 AR-15-style rifles." *Id.* And by excluding those respondents, he "buries one of the most striking findings in the survey: a tiny number of gun owners have owned the majority of AR-15-style rifles." *Id.* at 11. Indeed, when those respondents are included, it shows that ".5% of respondents account for ownership of 37.1% of all AR-15-style rifles." *Id.* And when "the respondents who owned more than 10 AR-15-style rifles are separated from those who have owned 10 or less, the data indicates that 59.0% of AR-15-style rifles have been owned by just 4.3% of AR-15-style rifle owners." *Id.* These results, if accurate, are consistent with other sources showing that "AR-15-style rifles are largely concentrated in the hands of a fraction of all AR-15-style rifle owners, let alone all gun owners." *Id.*; *Barnett* Doc. 37-4 ¶27 (data showing that 6.4 million gun owners, which is less than 8% of the 81 million gun owners in the United States and 2% of all Americans, possess assault rifles).

Plaintiffs also rely heavily on several surveys conducted by the National Shooting Sports Foundation, an industry trade organization. AT Br. 51-53. These surveys, too, are unreliable. For example, plaintiffs cite an NSSF survey on production data, *id.* at 52-53, purporting to show that between 1990 and 2021, approximately 28.1 million "modern sporting rifles" entered the domestic market. But these results "cannot be verified because the underlying data and formula used to calculate the figure have not been made available by the NSSF." *Barnett* Doc. 190-1 at 12. According to NSSF, the source data for this estimate comes from the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives, the International Trade Commission, and industry reporting. *Id.* This claim is problematic, however, because neither the ATF nor the ITC maintain data on modern sporting rifles. *Id.* at 12-13. Accordingly, "any determinations as to the number of [modern sporting rifles] in circulation made by the NSSF would necessarily be the result of consulting industry sources that have not been shared," making NSSF's estimate "unverifiable." *Id.* at 13.

The NSSF surveys of consumers and firearm dealers suffer from similar flaws. The consumer survey conducted in 2021 (and published in 2022), for example, "does not appear to meet scientific standards" because, among other problems, the survey sample appears to be skewed (for example, 96% of respondents were males). *Id.* at 18-19. Additionally, the survey includes a disclaimer indicating that it is unreliable, noting that it "cannot guarantee the accuracy of the information contained." *Id.* at 18 (cleaned up). But even if the information were

accurate, the survey's findings, like the English study, suggest a pattern of "concentrated" ownership with respect to modern sporting rifles. *Id.* Indeed, only 24% of respondents indicated that they owned a single modern sporting rifle. *Id.*

Similarly, the Washington Post survey cited by plaintiffs to show ownership of "AR-15-style rifles" contains notable limitations. AT Br. 49-50. For example, this "poll only surveyed a small sample of AR-15-platform firearm owners (399 respondents in total)," meaning that there is a "margin of sampling error of plus-or-minus 5.5%," which translates to a range of over 4 million people. *Barnett* Doc. 190-1 at 20. Additionally, the wording of the questions likely led to imprecise responses from participants. In particular, because the survey—which purported to show ownership of AR-15-style rifles—"queried ownership of 'any semi-automatic weapon built on a common AR-15 platform,' it likely captured respondents who own AR-15-platform handguns as well as those who own AR-15-platform rifles." *Id.* at 19-20.

Plaintiffs next argue that AR-15s are distinct from M16s because of the latter's ability to fire in automatic mode. AT Br. 54. But *Bevis* rejected that as a relevant distinction, absent any further development of evidence. 85 F.4th at 1197. And here, as Cook County rightly asserted, plaintiffs have not set forth that evidence. *See* AE Br. 19-22. Nor could they: as explained, the AR-15 is much more like an M16 than other firearms typically used for individual self-defense. *Supra* Section I.A.

Nevertheless, plaintiffs assert that "*Bevis* did not appreciate the true importance of the distinction between semiautomatic and automatic fire"—"an

automatic firearm will continue to fire as long as the trigger is depressed . . . , but a semiautomatic firearm, once it has fired, will not fire again until the person controlling it pulls the trigger." AT Br. 55. Accordingly, plaintiffs argue, "semiautomatic fire is inherently more accurate than automatic fire" and thus more useful to self-defense. *Id.* The relevant question, however, is not whether AR-15s are marginally more useful for self-defense than M16s; instead, the appropriate inquiry is whether AR-15s are more like weapons typically used for self-defense or like M16s. Plaintiffs have made no attempt to satisfy that inquiry. By contrast, the evidence presented in *Bevis*, by Cook County here, and in the ongoing *Barnett* litigation confirms that AR-15s are militaristic, offensive weapons akin to machineguns.

Plaintiffs further assert that the distinction between automatic and semiautomatic fire is relevant because automatic fire "is critically important to military tactics," such as by "establishing fire superiority through use of suppressive fire." AT Br. 56 (cleaned up). But as explained, *supra* Section I.A., soldiers equipped with M16s overwhelmingly use semiautomatic fire. That the military deploys automatic fire in specific, rare instances does not render the AR-15 sufficiently distinct from the M16 to make a difference as a constitutional matter.

Plaintiffs next contend that *Cargill* "undermines any attempt to equate the two rifles based on rate of fire." AT Br. 57. But as support, plaintiffs cite to the *dissent's* statement that automatic mode allows for a rate of fire of 700 to 950 rounds per minute, whereas a "regular person with an AR-15 can achieve a fire rate

of around 60 rounds per minute." *Id.* (cleaned up).  Furthermore, this statement compares the theoretical rate of fire for automatic weapons with the maximum effective rate of fire for semiautomatic weapons (which is 45 to 60 rounds per minute).  As explained, *supra* Section I.A., the difference between automatic and semiautomatic fire is not so stark when both are viewed through the lens of the maximum effective rate, which takes into account real-world circumstances.

Finally, plaintiffs argue that they should prevail under *Bevis* because while AR-15s are in common use for lawful purposes, they are "very rarely" used for "violent crime."  AT Br. 59.  As support, plaintiffs cite statistics showing that handguns are the most common murder weapon.  *Id.* at 59-61.  As Cook County explains, however, this disregards the frequency with which assault weapons are used to kill people in mass shootings.  *See* AE Br. 5-8, 29-30.  Additionally, as the Fourth Circuit noted, "[t]heir utility for mass killing has made the AR-15 and similar assault rifles the most popular arms for terrorist attacks in the United States," as well as uniquely dangerous to law enforcement.  *Bianchi*, 2024 WL 3666180, *14.

## CONCLUSION

For these reasons, the judgment below should be affirmed.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

September 4, 2024

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in Circuit Rule 29 because it contains 6,963 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

/s/ Sarah A. Hunger
SARAH A. HUNGER

September 4, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, I electronically filed the foregoing Brief of Amicus Curiae State of Illinois with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER