No. 24-1437

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————————

CUTBERTO VIRAMONTES, ET AL.,
*Plaintiffs-Appellants*,

*v.*

THE COUNTY OF COOK, ET AL.,
*Defendants-Appellees.*

———————————

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

**BRIEF FOR AMICI CURIAE NEW JERSEY, MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF APPELLEES AND AFFIRMANCE**

MATTHEW J. PLATKIN
 *Attorney General of New Jersey*
Jeremy M. Feigenbaum
 *Solicitor General*
Angela Cai
 *Deputy Solicitor General*
Tim Sheehan
 *Deputy Attorney General*
25 Market St, PO Box 080
Trenton, NJ 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

ANDREA JOY CAMPBELL
 *Attorney General of Massachusetts*
Grace Gohlke
 *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov

(*Additional counsel on signature page*)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ ii

INTERESTS OF AMICI ............................................................................ 1

SUMMARY OF THE ARGUMENT .......................................................... 2

ARGUMENT ............................................................................................ 4

    I.     To Promote the Safety and Well-Being of Their Residents,
           Jurisdictions Impose a Range of Restrictions, Including
           Prohibitions, on Dangerous Weapons and Accessories Not
           Commonly Used for Self-Defense. ....................................................... 4

    II.    Cook County's Restrictions on Assault Weapons Comport with
           the Second Amendment. .......................................................... 8

           A.     Assault Weapons Are Not Presumptively Protected by
                  the Second Amendment. ............................................................ 8

           B.     Cook County's Law Is Relevantly Similar to Historical
                  Restrictions on New, and Distinctly Dangerous, Forms of
                  Weaponry. .................................................................................. 16

CONCLUSION ....................................................................................... 29

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                               **Page(s)**

*Aymette v. State*,
  21 Tenn. 154 (1840).................................................................................23

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023) ...................................................... passim

*Bianchi v. Brown*,
  111 F.4th 438 (4th Cir. 2024) ...................................................... passim

*Capen v. Campbell*,
  —F. Supp. 3d—, 2023 WL 8851005 (D. Mass. 2023)........................ 9, 10, 11, 29

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  664 F. Supp. 3d 584 (D. Del. 2023).....................................................16

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)...................................................................... passim

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...............................................................18

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...................................................... 14, 20

*Garland v. Cargill*,
  602 U.S. 406 (2024)...........................................................................13

*Hartford v. Ferguson*,
  676 F. Supp. 3d 897 (W.D. Wash. 2023)...................................... 16, 29

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011)............................................................27

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...........................................................................20

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010)............................................................2

*Nat'l Ass'n for Gun Rights v. Lamont,*
  685 F. Supp. 3d 63 (D. Conn. 2023)................................... 10, 12, 16, 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022)........................................................... passim

*Ocean State Tactical, LLC v. Rhode Island,*
  95 F.4th 38 (1st Cir. 2024)................................................. passim

*Oregon Firearms Fed'n v. Kotek,*
  682 F. Supp. 3d 874 (D. Or. 2023) .........................................15

*Rupp v. Bonta,*
  —F. Supp. 3d—, 2024 WL 1142061 (C.D. Cal. 2024)................................ passim

*State v. Reid,*
  1 Ala. 612 (1840) ..........................................................28

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011).................................................19

*United States v. Morrison,*
  529 U.S. 598 (2000)..........................................................1

*United States v. Rahimi,*
  144 S. Ct. 1889 (2024)...................................................... passim

*United States v. Salerno,*
  481 U.S. 739 (1987)..........................................................1

*Worman v. Healey,*
  922 F.3d 26 (1st Cir. 2019)................................................27

**Statutes**

18 U.S.C. § 921 ................................................................................4

18 U.S.C. § 922 ......................................................................... 4, 6, 25

National Firearms Act of 1934,
  ch. 757, Pub. L. No. 73-474, 48 Stat. 1236...........................................25

Public Safety and Recreational Firearms Use Protection Act,
  Pub. L. No. 103-322, 108 Stat. 1996-2010 .............................................4

Public Safety and Recreational Firearms Use Protection Act,
  Pub. L. No. 103-322, 108 Stat. 1998-2000 .............................................6

Ch. 77, § 1, 1839 Ala. Laws 67 .........................................................23

Ch. 77, § 2, 1837 Ala. Laws 7 ...........................................................23

1881 Ark. Acts 191, no. 96, § 3 .........................................................23

W. Ball, Revised Statutes of the State of Arkansas, Adopted at the
  October Session of the General Assembly of Said State, A.D. 1837, § 13 ..........23

1933 Cal. Stat. 1169...................................................................26

Act of May 4, 1917,
  ch. 145, 1917 Cal. Sess. Laws 221 ...................................................24

1832 Conn. Acts 391, ch. 25..............................................................21

An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other
  Dangerous Weapons in the District of Columbia,
  Pub. L. No. 72-275, 47 Stat. 650 (1932)..............................................26

Fla. Act of Aug. 8, 1868 ................................................................24

Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425...............................................24

iv

No. 24 § 1, 1838 Fla. Laws 36 ................................................................................23

1837 Ga. Acts. 90, § 1 ...........................................................................................23

An Act to Regulate the Sale, Possession and Transportation of Machine Guns,
   no. 18, §§ 1-2, 1931 Ill. Laws 452-53 ................................................................26

COOK CNTY., ILL., CODE OF ORDINANCES § 54-211 .........................................2, 8

COOK CNTY., ILL., CODE OF ORDINANCES § 54-212 .........................................2, 8

Ill. Act of Apr. 16, 1881, chap. 38 (1885) ............................................................24

1819 Ind. Acts 39 ..................................................................................................23

No. 80, § 1, 1932 La. Acts 336 .............................................................................26

1821 Maine Laws 98, ch. 25 .................................................................................21

1750 Mass. Acts 544, chap. 17, § 1 ......................................................................24

1771-72 Mass. Province Laws 167, ch. 9 ..............................................................21

1782 Mass. Acts 119, ch. 46 .................................................................................21

Mass. Gen. Stat., chap. 164 (1873) § 11 ...............................................................24

1882 Mass. Acts 212, ch. 269 ...............................................................................21

Mass. Gen. Law, chap. 194 ...................................................................................24

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
   Purchasing, Possessing and Carrying of Certain Firearms, § 3 ..........................24

An Act to Regulate and License the Selling, Purchasing, Possessing and
   Carrying of Certain Firearms, 1927 Mich. Pub. Acts 888 ..................................26

Ch. 190, § 1, 1933 Minn. Laws 231 ......................................................................26

George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, (Vol. 2, 1888) ...............................................................24

1825 N.H. Laws 73, ch. 61 .......................................................................21

1772 N.Y. Laws 682, ch. 1549 .................................................................21

1784 N.Y. Laws 627 .................................................................................21

Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256..............................................26

1821 Tenn. Acts ch. 13 .............................................................................23

1852 Tenn. Acts 246, ch. 169 ...................................................................21

An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36...........23

Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200..................................................23

Ch. 101, § 1, 1838 Va. Acts 76..................................................................23

Ch. 96, 1934 Va. Acts 137-40....................................................................26

An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930................................26

## Court Rules

Fed. R. App. P. 29....................................................................................1

## Other Authorities

H.R. Rep. No. 103-489 .............................................................................3

J. Brabner-Smith, Firearm Regulation, 1 LAW & CONTEMP. PROBS. 400 (1934)....29

R. Spitzer, *Gun Law History in the United States and Second Amendment Right*,

80 LAW & CONTEMP. PROBS. 55 (2017)......................................................... 21, 25

S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) ...............................................21

**INTERESTS OF AMICI**

The *Amici* jurisdictions—New Jersey, Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington—have compelling governmental interests in public safety and crime prevention. In furtherance of those interests, and pursuant to Fed. R. App. P. 29 (a)(2), *Amici* submit this brief to explain why Cook County's regulation of the sale and possession of assault weapons within its borders is wholly consistent with the Second Amendment to the United States Constitution.

There are few interests more paramount to state and local governments than protecting public safety, and especially "the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987). *Amici* bear the solemn responsibility of ensuring the safety of the public and private spaces—schools, grocery stores, houses of worship, and commercial centers—that make up the fabric of daily life in a free and democratic society. We work every day to promote our residents' health, welfare, and security, including by taking steps to curb the threats of mass shootings and other forms of gun violence that harm our residents and inhibit their exercise of constitutionally protected freedoms.

Exercising our police powers in service of these goals, *Amici* have adopted a

range of measures that regulate weapons and weapon accessories, while ensuring that our residents have access to weapons for individual self-defense. Although our regulations differ in substance, *Amici* share the firm conviction that the Constitution allows States and municipalities to address gun violence in a manner that is adapted to their local needs and is consistent with our Nation's historical traditions. In accordance with these objectives, this Court should hold that Cook County's choice to restrict access to "militaristic weapon[s] … capable of inflicting …. grisly damage" comports with the Constitution. *Bevis v. City of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024)*.

## SUMMARY OF THE ARGUMENT

The Second Amendment is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Recognizing that "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.), jurisdictions have adopted a variety of restrictions on weapons and accessories that are not in common use for self-defense. This case concerns one such measure: Cook County prohibits the sale and possession of assault weapons. *See* COOK CNTY., ILL., CODE OF ORDINANCES §§ 54-211, 54-212(a). Like similar laws around the country, Cook County's law preserves the right

of law-abiding, responsible citizens to use firearms for self-defense. The County's regulation applies only to weapons with enhanced "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103-489, at 19-20 (1994).

This Court should affirm the District Court's well-grounded decision granting summary judgment to Cook County. The District Court correctly concluded that the Appellants' challenge is foreclosed by binding Seventh Circuit precedent, which holds that assault weapons may be banned consistent with the Second Amendment. Assault weapons are not "Arms" under the Amendment's original understanding and Cook County's restrictions on assault weapons are "consistent with the principles that underpin our regulatory tradition" of firearm regulation. *Rahimi*, 144 S. Ct. at 1898 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-31 (2022)). From the earliest days of our Nation through Reconstruction to the present, States and the federal government have restricted novel forms of weaponry that pose unique dangers to public safety. These analogous traditions amply justify Cook County's measured restrictions on assault weapons today. *See Bevis*, 85 F.4th at 1202.

**ARGUMENT**

I.   **To Promote the Safety and Well-Being of Their Residents, Jurisdictions Impose a Range of Restrictions, Including Prohibitions, on Dangerous Weapons and Accessories Not Commonly Used for Self-Defense.**

The Second Amendment "extends only to certain types of weapons." *Heller*, 554 U.S. at 623-25. Governments retain latitude to regulate specific categories of weapons and accessories, including by restricting the public carry, possession, and sale of weapons that are not commonly used for self-defense and that pose a threat to our communities. Indeed, the Supreme Court has recognized the constitutionality of laws banning categories of bearable weapons—among them, "short-barreled shotguns," and "M-16 rifles and the like"—because certain "type[s] of weapon[s]" are simply "not eligible for Second Amendment protection." *Id.* at 621-23, 625, 627 (emphasis removed).

Consistent with that guidance, States and the federal government have adopted laws that impose restrictions, including prohibitions, on certain categories of particularly lethal weapons that are not suitable for or commonly used in self-defense. Like the federal government from 1994 to 2004,[1] ten States and the District of Columbia prohibit the purchase and possession of certain semiautomatic assault

_____

[1] Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996-2010, codified at 18 U.S.C. §§ 921 (a), 922 (v) (2000).

weapons.[2] Although state definitions of the prohibited class of weapons differ, they typically encompass weapons like AR-15 and AK-47-style rifles that inflict catastrophic injuries and have distinct combat capabilities, rendering them uniquely devastating in mass shootings.[3] Fourteen jurisdictions ban automatic-fire machine guns, subject to limited exceptions,[4] while 27 States and the federal government ban machine guns manufactured after May 19, 1986, require registration of machine guns owned before that date, or impose other restrictions.[5] Nine States and the District of Columbia also prohibit short-barreled shotguns or rifles,[6] while the federal government and 23 other States impose restrictions on those weapons.[7] Four jurisdictions prohibit high-caliber rifles,[8] five prohibit guns hidden in canes and other covert weapons,[9] and 19 ban grenades, rocket launchers, or other hand-held destructive devices.[10]

---

[2] *See* Appendix Table 1.

[3] *See id.*

[4] *See* Appendix Table 2.

[5] *See* Appendix Table 3.

[6] *See* Appendix Table 4.

[7] *See* Appendix Table 5.

[8] *See* Appendix Table 6.

[9] *See* Appendix Table 7.

[10] *See* Appendix Table 8.

5

States and the federal government likewise regulate accessories that cannot by themselves be used for offensive or defensive purposes but nevertheless enhance the lethality of weapons. Fourteen States and the District of Columbia restrict the size of ammunition magazines that may be used with semiautomatic weapons, while allowing for possession and sale of smaller-capacity magazines.[11] Twenty jurisdictions ban bump stocks, trigger cranks, binary triggers, rapid-fire trigger activators, or other devices used to approximate an automatic rate of fire with a semiautomatic weapon.[12] Silencers or suppressors, used to muffle the sound of a gun when it fires, are banned in eight States and the District of Columbia[13] and subject to restrictions or registration requirements by the federal government and 20 more States.[14]

States and the federal government also restrict the type and size of ammunition that can be purchased or possessed. While all States allow for robust access to ammunition, at least 26 jurisdictions prohibit especially dangerous forms of

---

[11] *See* Appendix Table 9. From 1994 to 2004, the federal government also banned handgun and long-gun magazines capable of holding more than 10 rounds. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000, codified at 18 U.S.C. §§ 921 (a), 922(w) (2000).

[12] *See* Appendix Table 10.

[13] *See* Appendix Table 11.

[14] *See* Appendix Table 12.

ammunition. Twenty-one jurisdictions and the federal government prohibit the possession or sale of armor-piercing bullets, a type of ammunition designed to penetrate metal or armor.[15] Nine prohibit ammunition designed to explode, detonate, or segment upon impact.[16] Multiple jurisdictions prohibit certain large-caliber ammunition, usable with .50- or .60-caliber weapons[17]; hollow-point bullets, designed to expand in their target on impact[18]; and Flechette shells, expelled from guns as pieces of metal wire or dart-like projectiles.[19] Others ban certain forms of shotgun ammunition: "Dragon's breath" shells, which are used to simulate a flamethrower by making shotguns spew fireballs or columns of flames, and bolo shells, designed as two or more metal balls connected by a metal wire.[20]

All told, across our country today, States and the federal government impose a variety of restrictions, including prohibitions, on a diverse array of especially dangerous weapons, accessories, and ammunition. Cook County's law prohibiting assault weapons is of a piece with this tapestry of regulation and, as discussed below, a long history of governmental efforts to deter violence and promote public safety.

---

[15] *See* Appendix Table 13.

[16] *See* Appendix Table 14.

[17] *See* Appendix Table 15.

[18] *See* Appendix Table 16.

[19] *See* Appendix Table 17.

[20] *See* Appendix Table 18.

**II.     Cook County's Restrictions on Assault Weapons Comport with the Second Amendment.**

Against the backdrop of state regulation of unusually dangerous weapons and accessories, and in light of mounting deaths and injuries from mass shootings, Cook County chose to restrict assault weapons, while preserving broad access to firearms commonly used for self-defense. *See* COOK CNTY., ILL., CODE OF ORDINANCES §§ 54-211, 54-212(a). That choice was constitutional.

Under *Bruen* and *Rahimi*, courts evaluate a Second Amendment challenge by making two inquiries. *See Bevis*, 85 F.4th at 1191. First, courts must ask if the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, if the conduct is protected, courts ask if the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Under either step, Cook County's restrictions prove valid.

**A.     Assault Weapons Are Not Presumptively Protected by the Second Amendment.**

In *Bevis*, this Court held that assault weapons are not "Arms" within the Second Amendment's text. *See* 85 F.4th at 1195-96. As this Court explained, "[b]oth Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Id.* at

8

1192; *see Bruen*, 597 U.S. at 32 (Amendment protects firearms "'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). But the "Arms" entitled to protection do not include weapons "that are not possessed for lawful purposes" by civilians, such as "weapons that are exclusively or predominantly useful in military service." *Id.* at 1194. *Heller* itself "placed such weapons of crime and war in explicit contradistinction to the handgun, 'the quintessential self-defense weapon,' which it emphasized was squarely within the ambit of the Second Amendment," and confirmed that "'weapons that are most useful in military service,' such as 'M-16 rifles and the like,' can be 'banned.'" *Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024) (en banc) (quoting *Heller*, 554 U.S. at 627, 629). That describes the items at issue here: as *Bevis* concluded, the restricted assault weapons "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense." *Id.* at 1195.

As many courts have held, assault weapons are not in common use for lawful self-defense. Assault weapons are designed to inflict "catastrophic" injuries by firing high velocity ammunition at "substantially greater range" than handguns. *Capen v. Campbell*, —F. Supp. 3d—, 2023 WL 8851005, at *14, 15 (D. Mass. 2023), *appeal pending*, No. 24-1061 (1st Cir.); *see also Rupp v. Bonta*, —F. Supp. 3d—, 2024 WL 1142061, at *11 (C.D. Cal. 2024), *appeal pending*, No. 24-2583 (9th Cir.) (citing

"undisputed evidence" of AR-15's "combination of lethality and rapid-fire capability allowing 'a shooter to kill dozens of people within a matter of seconds.'"). They were "engineered to generate 'maximum wound effect.'" *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 100 (D. Conn. 2023), *appeal pending*, No.23-1162 (2d Cir.); *see also Bianchi*, 111 F.4th at 455; *Rupp*, 2024 WL 1142061, at *11. These features make modern assault weapons "most useful in prolonged firefights with enemy combatants." *Bianchi*, 111 F.4th at 455. Indeed, assault weapons are the progeny of military arms. *Id.* at *11; *Lamont*, 685 F. Supp. 3d at 100-01. "[T]he AR-15 is almost the same gun as the M16 machinegun," *Bevis*, 85 F.4th at 1195, "show[ing] that these weapons were intended for offensive combat applications rather than individual self-defense," *Bianchi*, 111 F.4th at 454; *Rupp*, 2024 WL 1142061, at *10; *see also Heller*, 554 U.S. at 627 (confirming "M-16 rifles and the like[] may be banned").

Accordingly, many of the features that make assault weapons ideal for offensive combat make them "ill-suited for the vast majority of self-defense situations in which civilians find themselves." *Bianchi*, 111 F.4th at 458. "Rounds from an AR-15 can pass through most construction materials, even at ranges of 350 yards," which "increases the risk, even if the weapons are employed properly, to bystanders, family members, or other innocent persons well outside the intended target area." *Capen*, 2023 WL 8851005, at *15; *Bianchi*, 111 F.4th at 458 ("[F]iring

10

an AR-15 in close quarters will often put the safety of cohabitants and neighbors in jeopardy."). Moreover, assault weapons lack "the advantages that the Supreme Court identified in *Heller* as establishing the handgun as the 'quintessential self-defense weapon ... for home defense,'" *Bianchi*, 111 F.4th at 459, since they are "significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible." *Capen*, 2023 WL 8851005, at *15; *see also Rupp*, 2024 WL 1142061, at *13 (noting that lawful self-defense "generally occurs 'up close'" and "at that range, it is difficult to use an assault rifle").

Nor are assault weapons typically used for self-defense. *See Lamont*, 685 F. Supp. 3d at 96 (noting rifles of "any kind" are used at most in 2% of self-defense incidents); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45 (1st Cir. 2024) ("*OST*") ("[C]ivilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots."). Indeed, these weapons' ability to "rapidly hit very many human targets" is "conducive to combat in war zones," but "not a useful feature for self-defense." *OST*, 95 F.4th at 49.

By contrast, assault weapons *are* used disproportionately in mass shootings, particularly ones resulting in high numbers of fatalities. *See, e.g.*, *Rupp*, 2024 WL 1142061, at *11 (finding "AR-platform rifles ... are used in about 25% of mass shootings" and noting that "there have been 12.9 fatalities per shooting when an

11

assault rifle is used in a mass shooting, as opposed to 7.8 fatalities per shooting where an assault rifle is not used"); *Lamont*, 685 F. Supp. 3d at 99-100 (finding that approximately 50% of "high fatality mass shootings" between 2014-2022 were committed with assault weapons, and "the average number killed or wounded with a semiautomatic rifle was 9.72, higher than the average 5.47 killed or wounded when some other firearm was used"); *Bianchi*, 111 F.4th at 457 (finding "AR-15 or AK-47 type assault rifles … have been used in every major terrorist attack on U.S. soil in the past decade"). Assault weapons' "disproportionate use in mass shootings," *Rupp*, 2024 WL 1142061, at *12, underscores that they are not "in common use for self-defense," *Bevis*, 85 F.4th at 1192.

Nor is there any basis in this record to depart from *Bevis*'s holding. *See* 85 F.4th at 1197. Appellants myopically focus on the automatic-fire capability of M16s, *see* Br.58, but that hardly shows that AR-15s are commonly used for self-defense. Appellants do not refute *Bevis*'s finding stressing "how easy it is to modify the AR-15 by adding a 'bump stock' ... thereby making it, in essence, a fully automatic weapon." 85 F.4th at 1196 (noting bump stock devices enable "rates of fire between 400 to 800 rounds per minute"); *Bianchi*, 111 F.4th at 456 ("[T]he AR-15's rate of fire can 'be easily converted to ... mimic military-grade machine guns' with devices

12

like bump stocks, trigger cranks, and binary triggers.").[21] And "use of M-16s in automatic mode does not appear to be common" even in the military. *Rupp*, 2024 WL 1142061, at *10. Indeed, "[t]he U.S. Army Field Manual instructs that semiautomatic fire is '[t]he most important firing technique during fast-moving, modern combat' because it 'is the most accurate technique of placing a large volume of fire on ... multiple, or moving targets.'" *Bianchi*, 111 F.4th at 456. The mere fact of the M16's automatic capability thus "pales in significance compared to the plethora of combat-functional features that makes the [M16 and AR-15] so similar." *Id.* Appellants fall short of establishing that the AR-15 is "materially different from the M16," *Bevis*, 85 F.4th at 1197—let alone is in common use for self-defense.

Appellants get no further with their alternate methodology, which looks primarily to surveys suggesting common ownership of AR-15s. *See* Appellants' Br.48-53. But *Bevis* was clear that Second Amendment protection extends only to "weapons in common use for self-defense," and not to weapons reaching a certain number in circulation. 85 F.4th at 1192 (rejecting challengers' argument based on "numbers alone"). That is compelled by precedent, which holds that whether a

---

[21] Appellants' reliance on *Garland v. Cargill*, 602 U.S. 406 (2024) is puzzling, as *Cargill* itself emphasized that "[s]hooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machineguns." *Id.* at 411; *see also id.* at 429 (Alito, J., concurring) ("[A] semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun").

specific weapon falls within the Second Amendment right turns on whether it is in common *use* for self-defense, not common *ownership*. *See Bruen*, 597 U.S. at 38 (referring to "commonly *used* firearms for self-defense"); *id.* at 70 (describing "right to bear commonly *used* arms in public"); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held *and used* for self-defense" (emphases added)). Courts thus must consider whether the weapon actually "facilitate[s] armed self-defense," which is "the central component of the Second Amendment right." *Bruen*, 597 U.S. at 28-29; *see also Bianchi*, 111 F.4th at 459-60 (rejecting view that "so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited" as "misread[ing] *Heller* and *Bruen*"); *OST*, 95 F.4th at 51 (explaining the Supreme Court "has not suggested that the constitutionality of arms regulations is to be determined based on the ownership rate of the weapons at issue, regardless of its usefulness for self-defense").

Moreover, a tally approach of ownership figures is hopelessly circular. The quantity of a weapon in circulation depends in large part on when prohibitive legislation was enacted; had governments banned AR-15s the moment they became commercially available, their circulation numbers would be negligible. *See OST*, 95 F.4th at 50-51. But "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see*

*also Bevis*, 85 F.4th at 1198-99. Such a position would "ignore[] the reality that weapons may well proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense," and "foreclose the ability of legislators to assess these characteristics and to enhance their knowledge through observation and experience." *Bianchi*, 111 F.4th at 460-61; *see also OST*, 95 F.4th at 50. And if a tally threshold were all that was needed to secure constitutional protection for a firearm, manufacturers could "secure constitutional immunity for their products" by flooding the market with "a sufficient quantity before legislatures can react"—a wholly illogical proposition. *Bianchi*, 111 F.4th at 461; *see also Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 916 (D. Or. 2023), *appeal pending*, No. 23-35479 (9th Cir.).[22]

Appellants never address this broken logic. Instead, their position would yield a conclusion that *Heller* found "startling": that the Second Amendment somehow protects machine guns. 554 U.S. at 624-25. After all, data suggest that civilians legally own hundreds of thousands of machine guns. *See Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* ("*DSSA*"), 664 F. Supp. 3d 584, 592

---

[22] Indeed, if one "looked to numbers alone, the federal assault weapons ban would have been constitutional before 2004, but unconstitutional thereafter," when "these weapons began to occupy a more significant share of the market." *Bevis*, 85 F.4th at 1199. That result "lacks both textual and historical provenance," *id.*, and is illogical. *See Bianchi*, 111 F.4th at 461.

(D. Del. 2023), *aff'd*, 108 F.4th 194 (3d Cir. 2024). Under Appellants' ownership-tally approach, that would suffice for constitutional protection—an untenable position the Supreme Court has rejected. *See Heller*, 554 U.S. at 624; *OST*, 95 F.4th at 48-49 (comparing machineguns to assault weapons). Multiple circuits have likewise rightly rejected Appellants' proposed test. *See Bevis*, 85 F.4th at 1190; *Bianchi*, 111 F.4th at 459-61; *OST*, 95 F.4th at 51.

Assault weapons are not actually in common use for self-defense, or suitable for that purpose. This Court should adhere to its opinion in *Bevis*—which joined a chorus of courts post-*Bruen* that have come to the same conclusion. *See, e.g.*, *Bianchi*, 111 F.4th at 441-42; *Rupp*, 2024 WL 1142061, at *19; *Lamont*, 685 F. Supp. 3d at 103; *see also Hartford v. Ferguson*, 676 F. Supp. 3d 897, 903-904 (W.D. Wash. 2023).

### B.    Cook County's Law Is Relevantly Similar to Historical Restrictions on New, and Distinctly Dangerous, Forms of Weaponry.

While this Court concluded that the very similar challenge in *Bevis* could "be resolved at the first step of the *Bruen* framework," this Court went on "for the sake of completeness" to hold that Illinois's ban on assault weapons is also "consistent with the history and tradition of firearms regulation" at *Bruen*'s second step. *Bevis*, 85 F.4th at 1197-98. If the Court reaches *Bruen's* second step here, it should conclude, as it did in *Bevis*, that there exists a longstanding tradition of restrictions

16

that are relevantly similar to Cook County's modern enactment.

As this Court explained in *Bevis*, restrictions on protected arms are constitutional if the government can demonstrate that they are "part of an enduring American tradition of state regulation." *Id.* at 1199 (quoting *Bruen*, 597 U.S. at 69). Laws like Cook County's that restrict unusually dangerous weapons have a long historical pedigree. From the earliest days of our republic through today, governments have restricted access to uniquely dangerous weapons that pose an inordinate public safety risk once those weapons emerged in the commercial market.

To determine whether a statute is consistent with a historical tradition of firearms regulation, courts must reason by analogy. *Bruen*, 597 U.S. at 27-30. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. This Court's task is to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898. The Supreme Court has identified "at least two metrics" for analyzing whether historic and modern regulations are relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. This analogical inquiry does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 144 S. Ct. at 1898.

Indeed, the Supreme Court in *Rahimi* cautioned that "some courts have

17

misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* But, properly understood, the Second Amendment "permits more than just those regulations identical to ones" within our nation's early history. *Id.* And in cases like this one—involving "unprecedented societal concerns" as well as "dramatic technological changes" posed by assault weapons—the analogical reasoning should be undertaken with a "more nuanced approach." *Bruen*, 597 U.S. at 27, 30. *See also Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) ("[h]istorical regulations reveal a principle, not a mold"); *Bianchi*, 111 F.4th at 463 (applying "nuanced approach" to challenge to Maryland's assault weapons restriction where "[r]apid advancements in gun technology" have created "mass carnage" unknown to "our forebears").

While the Supreme Court has left open whether a court should "primarily" look to Founding-era or Reconstruction-era history in evaluating the Nation's traditions, *Rahimi,* 144 S. Ct. at 1898 n.1, this Court has held that, "when state- or local-government action is challenged, … the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). This holding is consistent with *Bruen* and *Heller*, which compel the conclusion that courts must consider the broad sweep of our country's history—including nineteenth- and twentieth-century history—when reviewing the

constitutionality of a state or local law. In both *Heller* and *Bruen*, the Court thoroughly examined eighteenth- and nineteenth-century statutes and case law in assessing the constitutionality of the challenged laws. *See Bruen*, 597 U.S. at 44-70; *Heller*, 554 U.S. at 600-19. The Court made clear that post-ratification history is not only relevant, but a "critical tool of constitutional interpretation" that elucidates "the public understanding of a legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 605 (emphasis removed); *see also Rahimi*, 144 S. Ct. at 1916 (Kavanaugh, J., concurring) ("[T]he Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text."). *Heller* conducted an extensive review of post-ratification sources from 1803 to 1891, *see* 554 U.S. at 605-19, and *Bruen* did likewise through 1890, *see* 597 U.S. at 67. *Heller* took pains to distinguish post-ratification history, which it endorsed, from "postenactment legislative history," which it dismissed as a "contradiction in terms." 554 U.S. at 605 (emphasis removed).

Twentieth-century history that does not "contradict[] earlier evidence" is also relevant. *See Bruen*, 597 U.S. at 66 n.28. In *Heller*, the Court characterized laws that originated in the twentieth century—among them, laws banning people with felony convictions or mental illness from possessing weapons—as "longstanding" and "presumptively lawful." 554 U.S. at 626-27 & n.26; *see United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) ("[T]he modern federal felony firearm disqualification

law … is firmly rooted in the twentieth century."). Similarly, "*Heller* deemed a ban on private possession of machine guns to be obviously valid," despite the fact that "states didn't begin to regulate private use of machine guns until 1927." *Friedman*, 784 F.3d at 408.

Furthermore, twentieth-century history can be uniquely probative in cases involving emergent weapons that did not become widely publicly available until the last century. The absence of eighteenth- and nineteenth-century legislative enactments addressing such weapons cannot be dispositive, because there would have been scant reason for States to regulate the weapons during those eras. Just as "[t]he First Amendment does not require States to regulate for problems that do not exist," neither does the Second Amendment impose such a nonsensical burden. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted). Moreover, the Constitution does not require States to legislate to the zenith of their authority by, for example, restricting curio weapons or those that have yet to pose a public-safety problem; rather, the Constitution allows States the flexibility to "adopt laws to address the problems that confront them." *Id.*; *see also Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues … assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them.")

Thus, Cook County's law restricting assault weapons finds ample relevantly similar historical analogues. As this Court has already explained, there is a "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices." *Bevis*, 85 F.4th at 1199.

From the colonial period on, States and municipalities adopted measures that, like Cook County's present-day law, sought to restrict the firepower of weapons in order to promote public safety.[23] *See* S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 511 (2004) ("Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds."); R. Spitzer, *Gun Law History in the United States and Second Amendment Right*, 80 LAW & CONTEMP. PROBS. 55, 80-81 (2017) (summarizing gunpowder storage laws). These gunpowder restrictions "resulted from the accumulation of firepower disproportionate to the lawful purpose

---

[23] *See, e.g.,* 1782 Mass. Acts 119, ch. 46 (fining any person who "shall take into any [house or building] within the Town of Boston, any … Fire-Arm, loaded with, or having Gun-Powder."); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627 (restricting home storage of gunpowder to "four stone jugs or tin cannisters" of seven pounds each); 1882 Mass. Acts 212, ch. 269 (requiring registration of gunpowder in excess of one pound stored in buildings); 1771-72 Mass. Province Laws 167, ch. 9 (requiring gunpowder imported into Massachusetts to be stored in public magazines); *see also* 1832 Conn. Acts 391, ch. 25; 1825 N.H. Laws 73, ch. 61; 1821 Maine Laws 98, ch. 25; 1772 N.Y. Laws 682, ch. 1549; 1852 Tenn. Acts 246, ch. 169.

of individual self-defense" and so are early examples of arms-related restrictions that "respond[] to the most urgent and visible threats" of the time, "while nonetheless protecting the core right of their citizens to defend themselves with arms in pressing circumstances." *Bianchi*, 111 F.4th at 464.

Similarly, States and the federal government have historically adopted measures that, like Cook County's ordinance, regulate novel and unusually dangerous weapons that contribute to crime without corresponding utility for self-defense. This tradition followed a predictable pattern: first, new weapons technologies were developed; second, they spread into society and created a public safety threat; and third, governments enacted regulations to dampen weapons-related criminality and violence. *See Bianchi*, 111 F.4th at 462 ("[T]he arc of weapons regulation in our nation has mimicked a call and response composition, in which society laments the harm certain excessively dangerous weapons are wreaking, and the state, pursuant to its police power, legislates in kind.").

In the early nineteenth century, States increasingly began imposing

restrictions on weapons like Bowie knives[24] and pocket pistols[25] that were contributing to rising murder rates. *See Aymette v. State*, 21 Tenn. 154, 158 (1840) (in upholding law banning sale and concealed carry of Bowie knives, distinguishing between protected weapons and "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin"). Many of the laws prohibited concealed carry of these weapons, and some, like Arkansas's and Tennessee's postbellum statutes regulating pocket pistols, likewise banned sales. *See* An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36; 1881 Ark. Acts 191, no. 96, § 3. *See also OST*, 95 F.4th at 46 (discussing "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent.").

---

[24] *See, e.g.*, 1837 Ga. Acts. 90, § 1; Ch. 77, § 2, 1837 Ala. Laws 7, 7; No. 24 § 1, 1838 Fla. Laws 36, 36; Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200; Ch. 101, § 1, 1838 Va. Acts 76, 76; Ch. 77, § 1, 1839 Ala. Laws 67, 67. "Designed for the express purpose of fighting, dirks and Bowie knives generally had longer blades than ordinary knives, crossguards to protect users' hands, and clip points that made it easier to stab an opponent." *Bianchi*, 111 F.4th at 465.

[25] *See, e.g.*, 1819 Ind. Acts 39; 1821 Tenn. Acts ch. 13, p. 15; W. Ball, Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, § 13, 280 (1838); Ch. 101, § 1, 1838 Va. Acts 76, 76.

This era also saw continued regulation of clubs and other blunt weapons, including slung shots.[26] For example, as early as 1750, Massachusetts enacted a law authorizing the dispersal or seizure of groups of twelve or more people armed with "clubs or other weapons." 1750 Mass. Acts 544, chap. 17, § 1. The most common regulatory method during the 19th century was the prohibition of concealed carry, but at or around the time of Reconstruction, several states prohibited the manufacture and/or sale of slung shots, including Massachusetts in 1850, Florida in 1868, Illinois in 1881, and Minnesota in 1888.[27] Illinois's 1881 law also prohibited possession. Later, additional states similarly prohibited possession of items like slung shots, billy clubs and bludgeons.[28] *See also Bianchi*, 111 F.4th at 466-67 & nn.5-10 (citing restrictions on "excessively dangerous weapons such as Bowie knives, dirks, sword

---

[26] A slungshot is a hand-held weapon comprising "a weight fastened to the end of a chain or rope that can be swung around to apply blunt force to an opponent." *Bianchi*, 111 F.4th at 467 n.9.

[27] Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11; Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425; Ill. Act of Apr. 16, 1881, chap. 38 (1885) 88, § 1; George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

[28] *See, e.g.,* Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221-22; 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

canes, metal knuckles, slungshots, and sand clubs"). *See generally* Spitzer, *Gun Law History*, 80 Law & Contemp. Probs. at 62–68.

During the 1920s and 1930s, the Nation witnessed a new wave of regulation of emergent weapons that threatened public safety. Restrictions of this era "include[] bans on sawed-off shotguns … [and] restrictions on machine guns, most of which have been effectively banned nationally since 1986." *OST*, 95 F.4th at 46. Sawed-off shotguns were regulated federally in 1934, "after they became popular with the 'mass shooters of their day'—notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *Id.* at 47.[29] Machine guns were also first regulated by Congress in 1934, about fifty years after their invention, *id.* at 50, and "have been effectively banned nationally since 1986," *id.* at 46.[30] *See also Bianchi*, 111 F.4th at 470 ("At least 29 states enacted anti-machine-gun laws between 1925 and 1934[.]") & n.14 (citing state statutes).

During these decades, a number of jurisdictions also banned or otherwise restricted high-capacity semiautomatic weapons shortly after they began to proliferate, typically in the same legislation that established the accepted tradition of

---

[29] *See, e.g.*, National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236.

[30] *See, e.g.*, National Firearms Act of 1934; 18 U.S.C. § 922 (o).

banning machine guns. *See Heller*, 554 U.S. at 627 (noting it "would be startling" if "the National Firearms Act's restrictions on machineguns … might be unconstitutional").[31] In the same era, regulations limiting magazine capacity were also common: many states imposed some limitation, typically restricting the number of rounds to between five and eighteen.[32]

This tradition of regulating unusually dangerous weapons is relevantly similar to the challenged Cook County ordinance in how and why the enactments burden the right to armed self-defense. With respect to how: both types of measures regulate specific dangerous weapons used for criminal and other violent purposes, rather than standard weapons of self-defense. Unlike the laws at issue in *Heller* and *Bruen*, the enactment at issue here, like its historical antecedents, does not amount to a ban on an entire class of arms and does not effectively prohibit citizens from carrying firearms for self-defense. Indeed, given how rarely assault weapons are used for self-

---

[31] *See* An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, no. 372 § 3, 1927 Mich. Pub. Acts 888, 888-89; Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256, 256-57; An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat. 650, 650 (1932); Ch. 190, § 1, 1933 Minn. Laws 231, 232; Ch. 96, 1934 Va. Acts 137-40.

[32] *See, e.g.*, 1933 Cal. Stat. 1169, 1170; No. 80, § 1, 1932 La. Acts 336, 337; An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930.

defense purposes, *see supra* at 9-13, Cook County's ordinance imposes at most a negligible burden on the right to armed self-defense. *See Heller v. District of Columbia*, 670 F.3d 1244, 1261-62 (D.C. Cir. 2011) ("*Heller II*") (District's comparable ban on assault weapons does "not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun" and does not "impose a substantial burden on" the right to self-defense (quoting *Heller*, 554 U.S. at 629)), *abrogated in part on other grounds by Bruen*, 597 U.S. 1; *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) (law banning assault weapons "does not heavily burden the core right of self-defense" because using these weapons for self-defense "is tantamount to using a sledgehammer to crack open the shell of a peanut"), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.

The analogical reasoning prescribed by *Bruen* does not require that the only analogue for a weapon-specific ban is another weapon-specific ban. Such a tight degree of fit would result in a "law trapped in amber," precisely what the Court in *Rahimi* rejected. 144 S. Ct. at 1898. *Rahimi* underscored that a modern law that is "by no means identical" to historical regulations can survive a Second Amendment challenge and that a court's analogical reasoning can comprise several types of historical laws that, "taken together," form the shared "principle" underpinning a modern regulation and its historical predecessors. *Id.* at 1901; *see also id.* at 1925 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged

27

regulation need not be an updated model of a historical counterpart."). *Rahimi* thus only bolsters this Court's previous analysis in *Bevis*, where it held the "long-standing tradition of regulating the especially dangerous weapons of the time" matched the "how" of Illinois's law banning sale and possession of assault weapons. *Bevis*, 85 F.4th at 1199. Indeed, the historical evidence in this case presents a far closer fit than the evidence that *Rahimi* relied on. *See* 144 S. Ct. at 1901 (upholding federal ban on possession by individuals subject to domestic-violence restraining orders based on historical surety and going-armed laws, even though such laws were not possession bans); *see also id.* at 1942-43 (Thomas, J., dissenting) (describing the differences between the historical statutes and modern law).

As this Court has already confirmed, the purpose of Cook County's law is also relevantly similar to the purpose of this tradition of regulation: to enhance public safety in the face of new weapon technology that has threatened, or already inflicted, significant harm on American citizens. *See Bevis*, 85 F.4th at 1200 ("Historical regulations show that at least since the Founding there has been an unbroken tradition of regulating weapons to advance similar purposes.") The Bowie-knife restrictions of the early 1800s, for example, were intended "to promote personal security, and to put down lawless aggression and violence." *State v. Reid*, 1 Ala. 612, 617 (1840). And the early twentieth-century regulation of machine guns and semiautomatic weapons stemmed from concern over the "growth of armed

28

gangsterism [that] resulted in the use of more deadly weapons by criminals." J. Brabner-Smith, Firearm Regulation, 1 LAW & CONTEMP. PROBS. 400, 405 (1934).

At bottom, as this Court and a number of other courts have now concluded, there is "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians." *Bianchi*, 111 F.4th at 471; *see also NAGR*, 685 F. Supp. 3d at 108-113; *Rupp*, 2024 WL 1142061, at \*19-36; *Hartford*, 676 F. Supp. 3d at 904-07; *DSSA*, 664 F. Supp. 3d at 597-603; *Capen*, 2023 WL 8851005, at \*18-20. Cook County's choice to restrict access to assault weapons is consistent with the principles underpinning a long tradition of relevantly similar historical antecedents, and it comports fully with the Second Amendment.

## CONCLUSION

This Court should affirm the order of the District Court.

Respectfully submitted,

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
*Solicitor General*
25 Market St. PO Box 080
Trenton, NJ 08625
(862) 350-5800

/s/ Grace Gohlke
Grace Gohlke
*Assistant Attorney General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2527

jeremy.feigenbaum@njoag.gov          grace.gohlke@mass.gov

Date: September 4, 2024

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General for the*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*State of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This Amicus Curiae brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29 (a)(5) because this brief contains 6,803 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Amicus Curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

Date: September 4, 2024

## <u>CERTIFICATE OF SERVICE</u>

On September 4, 2024, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the First Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div style="margin-left: 40%;">

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General
New Jersey Attorney General's Office

</div>

Date: September 4, 2024

## **APPENDIX**

This Appendix is included pursuant to Fed. R. App. P. 28(f).

## **Table 1: Assault Weapon Restrictions**

The following jurisdictions restrict the possession or sale of assault weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 30500-30515, 30600, 30605. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202a-202c. |
| **Delaware** | Del. Code tit. 11, §§ 1465-1466(a). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.9. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-303. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(w), -5(f) |

| **New York** | N.Y. Penal Law §§ 265.00(22), 265.02(7). |
| **Washington** | Wash. Rev. Code §§ 9.41.0001, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1). |

## Table 2: Laws Banning Automatic Weapons

The following jurisdictions ban automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 32625. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(5), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(10), 7-2502.01, 7-2502.02(a)(2). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(i). |
| **Iowa** | Iowa Code §§ 724.1(a), 724.3. |
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1751 to 40:1752. |

| | |
|---|---|
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(*i*), -5(a) |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-8(a). |
| **Wisconsin** | Wis. Stat. § 941.26(1g)(a). |

## Table 3: Laws Requiring Registration of Pre-1986 Automatic Weapons

The following jurisdictions require that all automatic weapons manufactured before 1986 be registered with a licensing agency as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(C). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53-202. |

| | |
|---|---|
| **Florida** | Fla. Stat. §§ 790.001(9), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(2), 16-11-122, 16-11-124(4). |
| **Indiana** | Ind. Code Ann. §§ 35-47-5-8 to 35-47-5-8-10. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, §§ 1051-1052. |
| **Maryland** | Md. Code Ann. §§ 4-401 to 4-405. |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(a), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(a). |
| **Montana** | Mont. Code Ann. §§ 45-8-302 to 45-8-304. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |

| Ohio | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| --- | --- |
| Oregon | Or. Rev. Stat. § 166.272. |
| Pennsylvania | 18 Pa. Cons. Stat. Ann. § 908. |
| South Carolina | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| South Dakota | S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6. |
| Tennessee | Tenn. Code Ann. §§ 39-17-1302(a)(3), (d). |
| Texas | Tex. Penal Code §§ 46.01(9), 46.05(a)(1)(B). |
| Virginia | Va. Code §§ 18.2-288 to 18.2-298. |
| Washington | Wash. Rev. Code §§ 9.41.010(29), 9.41.190. |
| West Virginia | W. Va. Code § 61-7-9. |

### Table 4: Laws Banning Short-Barreled Shotguns or Rifles

The following jurisdictions ban possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 33210, 33215. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(4), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(15), (17), 7-2502.01, 7-2502.02(a)(1), (a)(3). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(ii). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 121; Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(15) to 11-47-2(16), 11-47-8(b). |

## Table 5: Laws Restricting Short-Barreled Shotguns or Rifles

The following jurisdictions restrict the possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(6), 921(a)(8), 922(a)(4). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(D). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Florida** | Fla. Stat. §§ 790.001(10)-(11), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(4)-(5), 16-11-122, 16-11-124(4). |
| **Iowa** | Iowa Code § 724.1C. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Michigan** | Mich. Comp. Laws § 750.224b. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(b). |
| **Montana** | Mont. Code Ann. § 45-8-340. |

| | |
|---|---|
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.275. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-02-03. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (46), 22-14-6. |
| **Texas** | Tex. Penal Code §§ 46.01(10), 46.05(a)(1)(C). |
| **Washington** | Wash. Rev. Code §§ 9.41.010(41)-(42), 9.41.190. |
| **Wisconsin** | Wis. Stat. § 941-28. |

## Table 6: Laws Banning 50-Caliber and Other High-Caliber Rifles

The following jurisdictions ban possession of rifles designed to shoot 50-Caliber and other High-Caliber ammunition.

| Jurisdiction | Jurisdictional Law |
| --- | --- |
| **California** | Cal. Penal Code §§ 30530, 30600, 30610. |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(8A), 7-2502.01, 7-2502.02(a)(7). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(15)-(16), 5/24-1.9. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(3), (5), 2C:39-3(a). |

## Table 7: Laws Banning Covert Weapons

The following jurisdictions ban possession of covert and hidden firearms as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
| --- | --- |
| **Alabama** | Ala. Code § 13A-11-54. |
| **California** | Cal. Penal Code § 24410. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 131N. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(hh), 2C:39-3(m). |
| **New York** | N.Y. Penal Law § 265.02(6). |

## Table 8: Laws Banning Destructive Devices

The following jurisdictions ban the possession of grenades, rocket launchers, bombs, and other destructive devices as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16460, 18710. |
| **Colorado** | Colo. Rev. Stat. § 18-12-109(2)(a). |
| **Connecticut** | Conn. Gen. Stat. § 53-80(a). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1444(a)(1), (b)(1). |
| **District of Columbia** | D.C. Code § 22-4515a. |
| **Florida** | Fla. Stat. §§ 790.001(4), 790.161. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(iii). |
| **Iowa** | Iowa Code §§ 101A.1(2A), 724.1(1)(c), 724.3. |
| **Massachusetts** | Mass. Gen. Laws ch. 266, § 102(c). |
| **Minnesota** | Minn. Stat. § 609.668. |

| | |
|---|---|
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(1), 2C:39-3(a). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Oregon** | Or. Rev. Stat. § 480.070. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-21. |
| **Utah** | Utah Code Ann. § 76-10-306(3). |
| **Virginia** | Va. Code Ann. § 18.2-85. |
| **Wisconsin** | Wis. Stat. § 941.26(2)(c). |

## Table 9: Laws Restricting Magazine Capacity

The following jurisdictions restrict the quantity of rounds able to be fired from a single magazine as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16740, 32310. |
| **Colorado** | Colo. Rev. Stat. §§ 18-12-301, 302, 303. |
| **Connecticut** | Conn. Gen. Stat. § 53-202w(a)(1). |

| | |
|---|---|
| **Delaware** | Del. Code Ann. tit. 11, §§ 1468, 1469(a). |
| **District of Columbia** | D.C. Code § 7-2506.01(b). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.10. |
| **Maryland** | Md. Code Ann., Crim. Law § 4-305(b). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). |
| **New York** | N.Y. Penal Law § 265.02(8). |
| **Oregon** | 2022 Oregon Ballot Measure 114, § 11. |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3. |
| **Vermont** | Vt. Stat. Ann. Tit. 13, § 4021. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(22), 9.41.370. |

## Table 10: Laws Banning Bump Stocks or Similar Devices

The following jurisdictions ban the possession or sale of bump stocks, trigger cranks, trigger activators, and other devices designed to artificially increase the rate of fire for semi-automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 32900. |
| **Connecticut** | Conn. Gen. Stat. § 53-206g. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(6), (b)(2). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Florida** | Fla. Stat. § 790.222. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8.5. |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(14). |
| **Iowa** | Iowa Code § 724.29. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-305.1(a). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Michigan** | Mich. Comp. Laws § 750.224e. |

| | |
|---|---|
| **Minnesota** | Minn. Stat. § 609.67. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.274. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(ee)-(ff), 2C:39-3(*l*). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(3), (19), 11-47-8(d), 11-47-8.1. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4022. |
| **Virginia** | Va. Code Ann. § 18.2-308.5:1. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(5), 9.41.220. |

## Table 11: Laws Banning Silencers

The following jurisdictions ban the possession or sale of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 33410. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(3), (b)(1). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(6). |
| **Massachusetts** | Mass. Gen. Laws ch. 269, § 10A. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(g), 2C:39-3(c). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20. |

## Table 12: Laws Restricting Silencers

The following jurisdictions restrict the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. § 921(a)(3); 26 U.S.C. §§ 5841(a), 5845(a)(7), 5861. |
| **Alaska** | Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(B). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(ii), 13-3102(A)(3), 17-251. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Georgia** | Ga. Code Ann. §§ 16-11-121(7), 16-11-122. |
| **Iowa** | Iowa Code § 724.1B. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(4). |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(b), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(c). |

| | |
|---|---|
| **Montana** | Mont. Code Ann. § 45-8-337. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(5), 2923.17(A), (C)(5). |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. § 908. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (17), 22-14-6. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4010. |
| **Washington** | Wash. Rev. Code § 9.41.250(1)(c). |
| **Wisconsin** | Wis. Stat. § 941-298. |

**Table 13: Laws Banning Armor-Piercing Ammunition**

The following jurisdictions ban the possession of ammunition designed to penetrate body armor or vehicle armor as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(17)(B)-(C), 922(a)(7)-(8). |
| **Alabama** | Ala. Code § 13A-11-60(a). |
| **California** | Cal. Penal Code §§ 16660, 30315, 30320. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(1), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(i), 7-2506.01(a)(3). |
| **Florida** | Fla. Stat. §§ 790.31(1)(a), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Indiana** | Ind. Code Ann. § 35-47-5-11.5. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(6). |
| **Kentucky** | Ky. Rev. Stat. Ann. §§ 237.060(7), 237.080. |

| | |
|---|---|
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1810-40:1812. |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, § 1056. |
| **Michigan** | Mich. Comp. Laws § 750.224c. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.273. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(gg), 2C:39-3(f). |
| **North Carolina** | N.C. Gen. Stat. § 14-34.3. |
| **Oklahoma** | Okla. Stat. tit. 21, §§ 1289.19-1289.22. |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20.1. |
| **South Carolina** | S.C. Code Ann. § 16-23-520. |
| **Texas** | Tex. Penal Code §§ 46.01(12), 46.05(a)(2). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## <u>Table 14: Laws Banning Explosive Ammunition</u>

The following jurisdictions ban the possession of high-explosive incendiary ammunition designed to explode or impart energy upon contact via a charge as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(b), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-3.1(a)(6). |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.3. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.4). |
| **New York** | N.Y. Penal Law § 265.01(7). |
| **Tennessee** | Tenn. Code Ann. § 39-17-1304(b). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 15: Laws Banning Large-Caliber Ammunition

The following jurisdictions ban the possession of large-caliber ammunition as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
| --- | --- |
| **California** | Cal. Penal Code § 18735. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(2), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(iii), 7-2506.01(a)(3). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-1.9(a)(6), (b), (c) (possession ban effective Jan. 1, 2024). |

## Table 16: Law Banning Hollow-Point Bullets

The following state bans the possession of hollow-point and other ammunition designed to expand on impact as part of its firearm safety laws.

| *State* | *State Law* |
| --- | --- |
| **New Jersey** | N.J. Stat. Ann. § 2C:39-3(f). |

## Table 17: Laws Banning Flechette Ammunition

The following states ban the possession of flechette shells, or other ammunition that can be fired in a firearm and that expels two or more pieces of fin-stabilized solid metal wire or two or more solid dart-type projectiles, as part of their firearm safety laws.

| *State* | *State Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16570, 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(f), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |

## Table 18: Laws Banning Dragon's Breath and Bolo Shells

The following states ban the possession of "Dragon's Breath" shells (ammunition that when fired produces sparks and flames simulating a flamethrower) and bolo shells (ammunition containing two or more large lead balls connected by a wire, that when used may sever a target's limb, as part of their firearm safety laws).

| *State* | *State Law* |
|---|---|
| **Florida** | Fla. Stat. §§ 790.31(1)(d)-(e), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.2, 724.3. |