No. 24-1437

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

CUTBERTO VIRAMONTES, et al.,

*Plaintiffs-Appellants,*

v.

THE COUNTY OF COOK, et al.,

*Defendants-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, NO. 1:22-CV-04775
THE HONORABLE REBECCA R. PALLMEYER, JUDGE PRESIDING

---

### BRIEF OF *AMICUS CURIAE*
### GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
### IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
aaron.marcu@freshfields.com
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

Jennifer B. Loeb
*Counsel of Record*
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
jennifer.loeb@freshfields.com

*Attorneys for Amicus Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1437

Short Caption: Cutberto Viramontes, et al. v. County of Cook, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields Bruckhaus Deringer US LLP

(3)    If the party, amicus or intervenor is a corporation:

      i)    Identify all its parent corporations, if any; and

           None

      ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

           None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Jennifer Loeb    Date: September 4, 2024

Attorney's Printed Name: Jennifer Loeb

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address: 700 13th Street NW, 10th Floor

Washington, DC 20005

Phone Number: (202) 777-4524    Fax Number:

E-Mail Address: jennifer.loeb@freshfields.com

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1437

Short Caption: Cutberto Viramontes, et al. v. County of Cook, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields Bruckhaus Deringer US LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Aaron Marcu     Date: September 4, 2024

Attorney's Printed Name: Aaron Marcu

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: 3 World Trade Center, 51st Floor

New York, NY 10007

Phone Number: (212) 277-4000     Fax Number:

E-Mail Address: aaron.marcu@freshfields.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1437

Short Caption: Cutberto Viramontes, et al. v. County of Cook, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields Bruckhaus Deringer US LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Brandt Henslee    Date: September 4, 2024

Attorney's Printed Name: Brandt Henslee

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 3 World Trade Center, 51st Floor

New York, NY 10007

Phone Number: (212) 277-4000    Fax Number:

E-Mail Address: brandt.henslee@freshfields.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1437

Short Caption: Cutberto Viramontes, et al. v. County of Cook, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Freshfields Bruckhaus Deringer US LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Daniel Hodgkinson    Date: September 4, 2024

Attorney's Printed Name:  Daniel Hodgkinson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: 3 World Trade Center, 51st Floor

New York, NY 10007

Phone Number: (212) 277-4000    Fax Number:

E-Mail Address: daniel.hodgkinson@freshfields.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As          Clear Form

Appellate Court No: 24-1437

Short Caption: Cutberto Viramontes, et al. v. County of Cook, et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Amicus Curiae Giffords Law Center to Prevent Gun Violence

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Freshfields Bruckhaus Deringer US LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and
　　　　None

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
　　　　None

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
　　N/A

Attorney's Signature: /s/Taylor Jachman　　　　　　Date: September 4, 2024

Attorney's Printed Name:  Taylor Jachman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address:  3 World Trade Center, 51st Floor

　　New York, NY 10007

Phone Number: (212) 277-4000　　　　　　Fax Number:

E-Mail Address: taylor.jachman@freshfields.com

rev. 12/19 AK

## TABLE OF CONTENTS

I.      INTEREST OF *AMICUS CURIAE* .................................................................1

II.     INTRODUCTION…………….……..................................................................1

III.    ARGUMENT…………………….……..........................................................2

A.     *Bruen* and *Rahimi* Require Courts to Consider Empirical Research. .............2

B.     Because the Challenged Laws Address Unprecedented Societal and
Technological Conditions, *Bruen* Requires a Nuanced Approach. ..............................3

1.     The Frequency, Lethality, and Geographic Concentration of
Mass Shootings Are Novel Societal Concerns. .......................................4

2.     The Rise of Mass Shootings Coincides with Unprecedented
Societal Concerns that the Founders Could Never Have
Imagined. ...................................................................................5

3.     Advances in Gun Technology Have Combined with Societal
Changes to Create the Perfect Storm for Mass Shootings. ...................7

4.     *Bruen* Requires Nuance When Analyzing Historical Analogues
to the Challenged Laws. ...............................................................9

C.     Plaintiffs' Formulation of "Common Use" Is Inherently Flawed, Nor
Would the Common Use Standard Apply Because the Challenged Laws Are
Not a Categorical Ban............................................................................11

D.     Assault Weapons Are Uniquely Dangerous and Not "Quintessential
Self-Defense" Weapons Protected by the Second Amendment. ..................................14

E.     The Regulation of LCMs Likewise Does Not Burden the Individual
Right to Self-Defense.............................................................................20

IV.    CONCLUSION……………...................................................................22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bevis v. City of Naperville*,
    85 F.4th 1175, 1196 (7th Cir. 2023) ............................................................. *passim*

*Bianchi v. Brown*,
    2024 WL 3666180 (4th Cir. Aug. 6, 2024)................................................10, 14, 15

*Capen v. Campbell*,
    2023 WL 8851005 (D. Mass. Dec. 21, 2023) ................................................ *passim*

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................................................................ *passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) ...................................................................................20

*Garland v. Cargill*,
    602 U.S. 406 (2024)....................................................................................................1

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...................................................................................15

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    643 F. Supp. 3d 63 (D. Conn. 2023) ..........................................................................1

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .................................................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015)......................................................................13, 14, 17

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024)...............................................................................4, 9, 12

*Or. Firearms Fed'n, Inc. v. Brown*,
    2022 WL 17454829 (D. Or. Dec. 6, 2022) ...............................................................21

*Richmond Boro Gun Club, Inc. v. City of New York*,
    97 F.3d 681 (2d Cir. 1996)......................................................................................18

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ........................................................................1

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) ................................................................ *passim*

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019) ....................................................................21

**Statutes**

Cook Cnty., Ill., Code of Ordinances § 54-211 ........................................ *passim*

Cook Cnty., Ill., Code of Ordinances § 54-212 ........................................ *passim*

**Other Authorities**

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy)
(quoting Judiciary Committee testimony of Captain Mark Kelly) ..........................21

*1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ....................8

Abhinanda Bhattacharyya, *California's complicated history with assault
weapons*, S.F. Chronicle (Nov. 30, 2021), https://tinyurl.com/he8ps4hp ...................19

*Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop Gun
Violence (July 2020), https://tinyurl.com/yjmaba4k ........................................19

Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each
mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4 ...................4

Cameron McWhirter & Zusha Elinson,
*American Gun: The True Story of the AR-15* (2023) ........................................19

Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde
shooting and police response unfolded*, Texas Tribune (July 28, 2022),
https://tinyurl.com/mr4eyjfu .............................................................9

Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was
written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64 .......................7

Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives
(Mar. 12, 2012), tinyurl.com/bdemd7ya ...................................................21

*Critical Incident Review: Active Shooter at Robb Elementary School*, U.S. Dep't
of Justice (Jan. 18, 2024), http://tinyurl.com/2s4y5sz6 ..................................17

Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military
Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye ....................................8

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431,
ECF No. 21-10 (D. Mass. Jan. 31, 2023) ..................................................8

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t ..............................................9

*Gun Accessories for Sale*, Impact Guns, http://tinyurl.com/2apapmh3 ..............................................................................13

Gun Violence Archive 2024, https://tinyurl.com/5t4rrt56 ..............................................................................4

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe ................16

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022) ....................6

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa ..............................................6

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye ............................7

Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317 (2023) ..............................................................................5

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9 ..............................21

*Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (2003) ..............................................................................18

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754 (2019) ..............................................................................20

Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn ..............................................................................4

*Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla. Dep't of Law Enforcement (2019), tinyurl.com/mvs34fky ................................20

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs ..............................................................................9, 20

Matthew McConaughey, Remarks at White House Press Briefing (June 7, 2022), https://www.youtube.com/watch?v=cJOw0XUyTQs ................................17

iv

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc .................................................................................5

Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. Times (June 18, 2024), https://tinyurl.com/49kzj99d .............................................................................11

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b ....................................................16

N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea ...............................................................15, 16, 17

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 .................6

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 ...........................4

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. of Trauma & Acute Care Surgery 853 (2016) ................................8

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx .............................................................6

*Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694 ...............................................................6

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army (2003), https://tinyurl.com/3reu38px........................................16

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27................................................20

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* Poynter (June 29, 2022), https://tinyurl.com/5bffkafr .......................................15

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc ...........................................10

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt.............................................16, 17

Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u ...............................................................7

Stephen W. Hargarten, *The Bullets He Carried*,
21 West. J. Emerg. Med. 1036 (2020) ..................................................................8

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016),
https://tinyurl.com/2p963dxd..............................................................................9

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters'*
*Weapon of Choice*, Rolling Stone (Feb. 22, 2018),
https://tinyurl.com/4nedm6fa...........................................................................15

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New*
*York attack,* Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.........................6

*What is your par time for an AR-15 emergency reload?*, AR15.com  (Nov. 22,
2010), https://tinyurl.com/3csjs7kd ....................................................................8

*Why is a Muzzle Brake Useful?*, U.S. Arms Company,
https://tinyurl.com/2phwka2z ......................................................................18, 19

William English, *2021 National Firearms Survey: Updated Analysis Including*
*Types of Firearms Owned*, Georgetown McDonough Sch. Bus. Rsch. Paper
No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46...................................11

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun
Store, https://tinyurl.com/yc3cv2zc ......................................................................8

# I.    INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others seeking to reduce gun violence and improve the safety of their communities. The organization was founded more than twenty-five years ago and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence, and advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention. Giffords Law Center has filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations, and judges have regularly cited the organization's research and expertise.[2]

# II.    INTRODUCTION

The Cook County gun-safety laws regulating the possession, transfer, and sale of assault weapons and large capacity magazines ("LCMs"), Cook Cnty., Ill., Code of Ordinances §§ 54-211, 54-212 (together, the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a), all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than *amicus* contributed to its preparation or submission.
[2] *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 432–433 (2024) (Sotomayor, J., dissenting); *Nat'l Ass'n for Gun Rts. v. Lamont,* 643 F. Supp. 3d 63, 85 (D. Conn. 2023); *Rupp v. Becerra,* 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019).

tradition of firearm regulation." 597 U.S. at 17. *Bruen* requires a "nuanced approach" to historical analysis in cases like this one, which "implicat[e] unprecedented societal concerns or dramatic technological changes," to avoid putting a "regulatory straightjacket" on governments seeking to protect the public from being harmed by dangerous firearms. *Id.* at 27, 30. The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of their times.

This Court, however, need not reach the historical regulation question because Plaintiffs' challenge to the laws fails at *Bruen*'s critical threshold: the weapons and weapon accessories governed by the Challenged Laws are not covered by the plain text of the Second Amendment because they are uniquely dangerous and not quintessential self-defense weapons. The weapons regulated by the Challenged Laws are weapons of war, designed to kill large numbers of people quickly. They are significantly more lethal than any firearms of the 1700s or 1800s.

In addition, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

### III.    ARGUMENT

#### A.    *Bruen* and *Rahimi* Require Courts to Consider Empirical Research.

In *Bruen*, the Supreme Court clarified the standard for determining whether a regulation is constitutional under the Second Amendment: the party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Bruen*, 597 U.S. at 34.

In *United States v. Rahimi*, the Court further explained that its Second Amendment jurisprudence is "not meant to suggest a law trapped in amber . . .  the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. 1889,

1897–98 (2024). Consequently, a modern regulation need not be the "twin" of a historical regulation. *Bruen*, 597 U.S. at 30. The Court has further recognized that, while it is sometimes "relatively simple" to analogize modern regulations to historical laws, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. The Court identified two important—but non-exclusive—considerations for lower courts to use in determining if historical and modern regulations are similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. *Rahimi*, 144 S. Ct. at 1898. Such research helps courts contextualize modern and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires. *Id.*; *see also id.* at 1904 (Sotomayor, J., concurring) ("[T]he Court's interpretation [of *Bruen*] permits a historical inquiry calibrated to reveal something useful and transferable to the present day.").

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of prevailing societal conditions; empirical research provides indispensable evidence of these conditions. After all, as Justice Barrett wrote in *Rahimi*, the Second Amendment does not "force[] 21st-century regulations to follow late-18th century policy choices." *Id.* at 1925 (Barrett, J., concurring).

**B.    Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This

uniquely modern danger motivated the passing of the Challenged Laws, which, like many regulations spanning our Nation's history, were designed to protect the public.[3]

### 1.    The Frequency, Lethality, and Geographic Concentration of Mass Shootings Are Novel Societal Concerns.

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amicus* could find evidence of only two instances of mass shootings in America throughout all of the 18th and 19th centuries,[4] both of which occurred in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[5] The First Circuit recently noted "evidence that 'the first known mass shooting resulting in ten or more deaths' did not occur in this country until 1949." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024) (quoting *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 803 (D. Or. 2022)). One scholar estimates that a total of 25 mass shootings occurred between 1900 and 1965.[6] In astonishing contrast, nearly 3,000 mass shootings have occurred in the United States just since 2020: 611 in 2020, 689 in 2021, 644 in 2022, and 655 in 2023—an average of nearly two mass shootings per day.[7] As of the drafting of this brief, 385 mass shootings have been recorded in the United States so far in 2024.[8]

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in this

---

[3] *See* Defs.' Br. at 5–9.
[4] As used here, a "mass shooting" is a shooting in which four or more people (other than the shooter(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance.
[5] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.
[6] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.
[7] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.
[8] Gun Violence Archive 2024, https://tinyurl.com/5t4rrt56 (last accessed Sep. 4, 2024).

country relative to the rest of the world. A recent comprehensive study analyzing the number of mass shooting incidents and fatalities in 36 developed countries found that: half did not have a single mass shooting between 1998 and 2019; only ten had more than one mass shooting; and only five had more than two.[9] The United States had more than 12 times as many mass shootings as the country with the second-highest count and the greatest number of mass shooting fatalities of all developed countries.[10] The United States makes up 33% of the population of developed countries, yet accounts for 73% of all mass shooting incidents and 62% of fatalities.[11]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any time in our history or in any comparable place in the world.

### 2. The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns that the Founders Could Never Have Imagined.

Several modern social phenomena coincided with a surge in mass shootings during the 21st century, making the prevention of gun violence especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

#### a. Social Media

Social media platforms create a means of communication exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists;[12] a mounting body of

---

[9] Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317, 331 (2023).

[10] *Id.*

[11] *Id.* ("[M]ass shootings are a uniquely American problem.").

[12] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

evidence demonstrates that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[13]

Many perpetrators of mass shootings have been inspired by violent and extremist discourse they see online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the gunman published a racist manifesto online before broadcasting the shooting live on social media.[14] The gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [] mass shooting."[15] The Buffalo shooter also posted material on another social media platform "with the explicit goal of provoking future mass shootings."[16] The shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[17] Likewise, on May 7, 2023, another mass shooter killed eight people in Allen, Texas after being influenced by white supremacist materials he found on social media.[18]

        b.    Urbanization

Urbanization has also radically transformed society since the Founders' era. In 1800, the United States averaged 6.1 people per square mile.[19] By 2020, the population had increased by 1,500% to an average of 93 people per square mile.[20]

---

[13] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[14] *See Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

[15] *Id*. at 3.

[16] *Id.* at 15.

[17] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[18] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[19] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx.

[20] *Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694.

This explosion in population density has profoundly changed how people associate. People gather in large groups more frequently than could have been possible before extensive urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, crowded night clubs, sports arenas and stadiums, concerts, movie theaters, malls, and parades. This change is true even in rural areas where, because of modern transportation capabilities, large crowds can gather easily, such as at a Friday night high school football game. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event. At the Route 91 Music Festival in Las Vegas, a single shooter killed 60 concertgoers and injured more than 850 others in just 11 minutes.[21]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than ever before.

Modern firearms far surpass their Founding-era counterparts in lethality. The typical Revolutionary-era musket: (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[22] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[23] (30 times more); (ii) can shoot accurately from around 400 yards[24] (7 times as far); (iii)

---

[21] Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I. Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u.

[22] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64.

[23] *Id*.

[24] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

produces a muzzle velocity of around 3,251 feet per second[25] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[26] *See Bevis v. City of Naperville*, 85 F.4th 1175, 1196 (7th Cir. 2023) (discussing the AR-15's effective range, muzzle velocity, and delivery of kinetic energy); *Capen v. Campbell*, 2023 WL 8851005, at *12 (D. Mass. Dec. 21, 2023), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024) (observing that "[t]he features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable"). One study calculated that "the number of bullets and their energy fired by the Sandy Hook shooter equaled an estimated 171 militiamen storming the school."[27]

Even the leading repeating firearm of the Civil War era was a far cry from modern weapons like an AR-15 rifle. The 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[28] a maximum range of approximately 100 yards (one-fourth of an AR-15), a muzzle velocity of 1,100 feet per second (one-third of an AR-15),[29] required the shooter to manually manipulate a large lever under the rifle before each shot,[30] and could fire only ten shots per minute.[31] Using a

---

[25] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 853, 856 (2016).
[26] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.
[27] Stephen W. Hargarten, *The Bullets He Carried*, 21 West. J. Emerg. Med. 1036 (2020) (measuring the kinetic energy release of a Bushmaster assault rifle and a 1780s-style musket).
[28] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.
[29] Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.
[30] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023).
[31] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3.

semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds,[32] – or 266 rounds in one minute – which the United States Army defines as "rapid semiautomatic fire."[33]

Increased firepower, with advanced ballistics,[34] make modern firearms far deadlier and fundamentally different from their historical predecessors. "[T]oday's semiautomatic weapons fitted with LCMs are 'more accurate and capable of quickly firing more rounds' than their historical predecessors. And they are substantially more lethal." *Ocean State*, 95 F.4th at 44. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in mere seconds before he can be located and stopped. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired at least 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any responder set foot in the building."[35] The ratifiers of the Second Amendment could not in their worst nightmares have imagined such rapid, indiscriminate carnage.

### 4.    *Bruen* Requires Nuance When Analyzing Historical Analogues to the Challenged Laws.

In passing the Challenged Laws, the Cook County legislature contended with realities that legislatures of the past did not: mass shootings that were occurring more frequently than ever before, structural shifts in society, and rapid advances in gun technology. *See Ocean State*, 95 F.4th at 44 (finding "no direct precedent for the contemporary and growing societal concern that [semiautomatic weapons fitted with LCMs] have become the preferred tool for murderous

---

[32] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.
[33] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.
[34] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t.
[35] Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu.

individuals intent on killing as many people as possible, as quickly as possible"). These drastic societal and technological changes require this Court, under *Bruen*, to employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

To analogize past and present "hows," this Court must determine, as it did in *Bevis*, whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 597 U.S. at 29; *Bevis*, 85 F.4th at 1199–1200. The Cook County legislature chose to restrict the use and sale of specific, especially dangerous firearms and accessories to protect public safety, while preserving residents' right to protect themselves with more than a thousand makes and models of legal firearms. This is consistent with this nation's "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing." *Bianchi v. Brown*, 2024 WL 3666180, at *5 (4th Cir. Aug. 6, 2024); *see infra* § II.D. "This is enough," this Court correctly reasoned, "to satisfy the 'how' question *Bruen* identified." *Bevis*, F.4th at 1199–1200.

The motivation behind the Challenged Laws—their "why"—is, fundamentally, to promote public safety. Gun regulations at the Founding and throughout our history had the same motivation: protecting the public from deadly harm.[36] Indeed, as the Fourth Circuit recently explained, "[l]imitations on [the] right to self-defense have been recognized in common law since before our nation's founding. . . . [I]t is not just the rights to life and liberty of the defender that matter, but also those of other members of society. Else, how could we have any society at all?" *Bianchi*, 2024 WL 3666180, at *8. Thus, there is a strong and easily discernible link between the past and present "whys."

---

[36] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc.

Employing *Bruen*'s nuanced approach, the Challenged Laws are relevantly similar to many historical weapons regulations, and thus are consistent with our Nation's tradition of firearm regulation. *See Rahimi*, 144 S. Ct. at 1898 ("[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.").

### C.    Plaintiffs' Formulation of "Common Use" Is Inherently Flawed, Nor Would the Common Use Standard Apply Because the Challenged Laws Are Not a Categorical Ban.

Preliminarily, Plaintiffs are incorrect that the restricted weapons and magazines are in "common use" and therefore presumptively entitled to Second Amendment protection because "estimates of their prevalence [] places the number of AR-15s alone in civilian hands[37] in the tens of millions."[38] For support, Plaintiffs rely on an unpublished, non-peer-reviewed summary of an online survey.[39] While Plaintiffs present this survey as if it were an unbiased academic study, it was originally commissioned by Plaintiffs' counsel specifically for use in lawsuits such as this one.[40] Further, the summary itself acknowledges that actual ownership numbers are likely lower than stated because the survey asked whether respondents had "ever owned" such a rifle or magazine,[41] and its estimate thus does not account for obsolescence, destruction, or sale and double counting of these weapons.[42]

---

[37] This is a false representation. The survey used to support this notion did not survey only civilians, nor did it delineate between civilian and non-civilian ownership.

[38] Pls.' Br. at 15.

[39] Pls.' Br. at 50 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"), https://tinyurl.com/yc3fer46).

[40] Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. Times (June 18, 2024), https://tinyurl.com/49kzj99d.

[41] *English Survey* at 22, 33.

[42] *Id.* at 33.

Even were it accurate, Plaintiffs' use of ownership and retail statistics to define "common use" is incurably flawed: the argument necessarily assumes that every individual who has ever bought or owned one of these weapons is a civilian, still owns the weapon, actively uses it, and most important, uses it only for lawful self-defense.[43]

A recent decision by the U.S. District Court for the District of Massachusetts highlights another fallacy inherent in the claim that ownership and retail statistics can insulate a uniquely dangerous firearm from regulation:

> [Plaintiffs' position] would lead to a host of absurd results . . . . [T]he constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have been considered within the ambit of the Second Amendment at the time of ratification . . . would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales out[paced] legislation . . . Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned[.]

*Capen*, 2023 WL 8851005, at *8. In *Bevis*, this Court similarly expounded on the problems with Plaintiffs' common use argument, ultimately "declin[ing] to base [its] assessment of the constitutionality of these laws on numbers alone [because] [s]uch an analysis would have anomalous consequences." 85 F.4th at 1198–1199; *see Ocean State*, 95 F.4th at 50 (using a "popularity test" to determine if an arm may be regulated "contravenes case law in addition to logic").

Plaintiffs' use of ownership statistics to define "common use" also ignores the requirement that such weapons must be actually used for *lawful self-defense*, not merely owned or manufactured for self-defense or even used for lawful recreation. *See Bruen*, 597 U.S. at 28

---

[43] Plaintiffs themselves acknowledge that it would be "impossible" to establish common use by relying on such statistics. Pls.' Br. at 36.

(Second Amendment protects only "instruments that facilitate armed self-defense"); *Rahimi*, 144 S. Ct. at 1897 (the Second Amendment "secures for Americans a means of self-defense"); *Bevis*, 85 F.4th at 1193 ("[T]he definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense.").

Further, *District of Columbia v. Heller* stands only for the proposition that an "entire class" of arms cannot be "banned" if it is in common use. 554 U.S. 570, 628 (2008). The Challenged Laws do not ban possession of all "rifles" or "semiautomatic rifles." Far from an absolute ban, the statute regulates certain, enumerated semiautomatic firearms with "military-style features."[44]

The Challenged Laws' restriction on LCMs is even further from a "prohibition of an entire class of 'arms.'" *Heller*, 554 U.S. at 628. First, the Challenged Laws only restrict specific magazines "with the capacity to accept more than ten rounds."[45] Further, LCMs are not "arms" within the plain meaning of the Second Amendment, but rather, are non-essential firearm accessories.[46] Even if the Court considers magazines "as a general class" to be a component required for firearms to function, and thus entitled to some Second Amendment protection, "LCMs as a specific subset of that class are never necessary for a firearm to function." *Capen*, 2023 WL 8851005, at *18. By regulating LCMs, the Challenged Laws simply require individuals to reload their weapon after discharging ten rounds of ammunition. *See Bevis*, 85 F.4th at 1197 ("Anyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size."); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) ("[W]hile citizens may not acquire high-capacity magazines, they can purchase any

---

[44] Defs.' Br. at 9.

[45] COOK CNTY., ILL., CODE OF ORDINANCES ("COOK CNTY. CODE") § 54-211.

[46] Gun retailers also make this distinction. *See, e.g.*, *Gun Accessories for Sale*, Impact Guns, http://tinyurl.com/2apapmh3 (advertising "gun accessories online as well [as firearms and ammunition]. […] From gun cleaning materials to extended and high-capacity magazines.").

number of magazines with a capacity of ten or fewer rounds."). This restriction on only a specified type of magazine stands in stark contrast to the one invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Cuomo*, 804 F.3d at 628.

The Challenged Laws regulate specific, enumerated, especially dangerous firearms, features, and accessories posing a threat to society. They do not constitute a complete ban on an entire class of weapons, nor do they regulate at all the particular type of arms that the Supreme Court held to be constitutionally protected in *Heller*.

### D. Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 597 U.S. at 4. The Court expressly cautioned, however, that the Second Amendment should not be understood to bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21. Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27. "[W]hile the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Bianchi*, 2024 WL 3666180, at *10.

The Challenged Laws fit squarely in this historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of assault rifles with features that turn them into dangerous military-style firearms designed and suited for war. The AR-15, for example, traces

its origins to a military-grade rifle designed in the late 1950s.[47] The AR-15 is functionally the same as the M16, an automatic weapon designed for military combat that the Supreme Court has recognized can be banned. *See Heller*, 554 U.S. at 627. Just because the AR-15 does not fire automatically (absent easily obtainable accessories)[48] does not make it appropriate for civilian use. *See Bianchi*, 2024 WL 3666180, at *13 ("The primary difference between the M16 and AR-15— the M16's capacity for automatic fire . . . pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar."); *Bevis*, 85 F.4th at 1195 (finding that "the AR-15 is almost the same gun as the M16 machinegun" because "[b]oth weapons share the same core design, and both rely on the same patented operating system").[49] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next bullet in order to reduce recoil and makes it easier for a gunman, *i.e.,* a soldier, to maintain aim, increasing accuracy.[50] This system propels the bullet "at a speed that would cross six football fields in a second."[51]

It is the AR-15's "phenomenal lethality" that has made versions of it the United States military's standard-issue assault rifle since the Vietnam War.[52] The United States Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid

---

[47] *See* Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

[48] "The similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 . . . [to] mak[e] it, in essence, a fully automatic weapon." *Bevis*, 85 F.4th at 1196.

[49] *See also Kolbe v. Hogan*, 849 F.3d 114, 139-40 (4th Cir. 2017) (the AR-15 "is simply the semiautomatic version of the M16 rifle used by our military and others around the world.").

[50] *Id.*

[51] N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea.

[52] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa; *see also* Defs.' Br. at 2

[semiautomatic] fire can be."[53] Indeed, virtually all of the world's armies now use assault rifles that are variants of the AR-15.[54] *See Bevis,* 85 F.4th at 1195 ("[T]hese assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than . . . [the] types of firearms that are used for individual self-defense").

Not only are assault weapons exponentially more lethal than firearms available during the ratification of the Second or Fourteenth Amendments, their military-grade mechanics and resulting devastation to the body also thoroughly distinguish them from modern handguns—the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Though any bullet can kill when it hits a vital organ, according to Babak Sarani, a trauma surgeon and authority on casualties from mass shootings, the energy of a bullet fired from an AR-15 "is so massive it has to go someplace, and your body will literally tear apart."[55]

Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona, has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[56] These bullets need not hit an artery to cause catastrophic bleeding: "The bullet from an AR-15 passes through the body like a cigarette boat traveling at maximum speed through a tiny canal."[57] While a bullet fired from a handgun takes a relatively linear path, the speed of a bullet from an AR-15 creates a blast effect on impact, causing internal damage far outside the bullet's

---

[53] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[54] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b.

[55] Kirkpatrick, *supra* note 51.

[56] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt.

[57] Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe.

path and gaping exit wounds that drastically reduce a person's chance of survival.[58] The impact of a bullet fired from an AR-15-style weapon is even more catastrophic on the compact body of a child. In Uvalde, children's bodies were "so mutilated that only DNA tests [or clothing, like one child's] green converse could identify them. Many children were left not only dead, but hollow."[59] Just some of the 13 bullets fired from an AR-15 that hit one Parkland student "tore [his] chest apart" and created exit wounds in his head so "gaping" that portions of his brain were found on the walls.[60] "That degree of destruction . . . is possible only with a high-velocity weapon."[61]

As this Court recognized in *Bevis*, assault weapons are weapons of war,[62] and the features regulated by the Challenged Laws increase their lethality, placing the weapons with these features far outside the category of "quintessential self-defense weapons" at issue in *Heller* and more like machine guns, which are not protected by the Second Amendment. *See Staples v. United States*, 511 U.S. 600, 611–12 (1994).

As the Second Circuit observed in *Cuomo*, which *Bruen* has done nothing to upset, "[the] net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general," such that citizens would not require such weapons or features for ordinary self-defense. 804 F.3d at 262. The features regulated by the Challenged Laws increase a weapon's lethality because they enable shooters to

---

[58] Zhang, *supra* note 56.

[59] Matthew McConaughey, Remarks at White House Press Briefing (June 7, 2022), https://www.youtube.com/watch?v=cJOw0XUyTQs. *See also Critical Incident Review: Active Shooter at Robb Elementary School*, U.S. Dep't of Justice at 255 ("Families were asked to provide descriptions of their children, but due to the condition of the victims' bodies, families were also asked for descriptions of their children's clothing[.]"); Defs.' Br. at 1–2.

[60] Kirkpatrick, *supra* note 51.

[61] *Id.*

[62] The Second Amendment protects "arms that ordinary people would keep at home for purposes of self-defense," not "weapons that are exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194.

sustain rapid fire for longer and enhance control during this prolonged fire.[63] Prolonged rapid firing of an assault weapon has only one purpose: to inflict carnage on a massive scale.

For example, pistol grips[64] enhance a shooter's control and reduce fatigue, especially during prolonged episodes of offensive rapid fire. Pistol grips also allow a shooter to fire from the hip instead of the shoulder, making it easier to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make [] spray firing from the hip particularly easy.").

Protruding grips that can be held by the shooter's non-trigger hand[65] enable a shooter to exert leverage on the gun with both hands, reducing recoil and maintaining greater control during rapid firing.[66] Further, "when shooting a semi-auto rifle in rapid fire mode, an enormous amount of heat is generated" by the barrel.[67] Thus, by holding the protruding grip, rather than the hot barrel, the shooter can sustain rapid fire for longer continuous periods.[68] A barrel shroud[69] offers similar protection in prolonged offensive firing.

Muzzle brakes[70] diminish the recoil produced by firing a round.[71] "Without the big kick from recoil, your body can handle the shot process from your gun for longer periods."[72] Because the shooter's "hands are not going to tire from struggling to grip the gun and fight the recoil," he

---

[63] *Id.*

[64] Cook Cnty. Code §§ 54-211(1)(A), (4)(A).

[65] *Id.* §§ 54-211(1)(B), (3)(A), (4)(B).

[66] *See Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence ("EFSGV"), 9 (Sept. 2003).

[67] *Keeping hot barrels accurate*, AP (Aug. 10, 2018), https://tinyurl.com/3e9td6m5.

[68] *See* EFSGV, *supra* note 67.

[69] Cook Cnty. Code §§ 54-211(1)(D), (3)(C).

[70] *Id.* §§ 54-211(1)(E), (3)(D).

[71] *Why is a Muzzle Brake Useful?*, U.S. Arms Company, https://tinyurl.com/2phwka2z.

[72] *Id.*

can sustain rapid fire for prolonged periods.[73] The recoil reduction also allows for use of larger guns.[74]

Folding and telescoping stocks[75] allow one section of the stock to fold or "telescope" into another, shortening the weapon and making it more concealable.[76]

Detachable magazines[77] equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[78] Detachable magazines can hold as many as 100 rounds[79] and are especially lethal when used in combination with "features that allow [for] enhanced control while firing multiple rounds."[80]

\* \* \*

Assault rifles and weapons outfitted with the features regulated by the Challenged Laws are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Supreme Court has held the Second Amendment protects. These "rifles were designed to achieve a simple goal: fire a lot of bullets fast to kill or maim as many enemy soldiers as possible."[81] And until the public availability of these destructive weapons is curtailed, as is the constitutionally permissible purpose of the Challenged Laws, they will continue to be used as horrific offensive weapons to commit mass killings of innocent civilians, just as they were in Parkland, Orlando, Uvalde, Highland Park, Buffalo, Las Vegas, and many other domestic massacres.

---

[73] *Id.*
[74] *Id.*
[75] COOK CNTY. CODE §§ 54-211(1)(C), (3)(B), 4(C).
[76] Abhinanda Bhattacharyya, *California's complicated history with assault weapons*, S.F. Chronicle (Nov. 30, 2021), https://tinyurl.com/he8ps4hp.
[77] COOK CNTY. CODE § 54-211(1)(C), (3)(B).
[78] *See Assault Weapons and Large Capacity Magazines*, EFSGV (July 2020), https://tinyurl.com/yjmaba4k.
[79] *Id.*
[80] *Id*.
[81] Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15* 4 (2023).

### E.    The Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense.

The LCM provision of the Challenged Laws regulate how frequently a shooter must reload their weapon. *See Bevis*, 85 F.4th at 1197 (explaining that LCM regulations do not place restrictions on ammunition because "[a]nyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size."). Indeed, LCMs are designed to perpetrate devastation on a massive scale by enhancing an already especially dangerous firearm's ability to fire more than ten rounds in rapid succession *without the need to reload*. "In the 30 seconds it takes a person to reload and shoot a 10-round magazine three times, someone with a 100-round magazine can shoot 100 bullets without reloading."[82] LCMs thus increase the lethality of attacks by eliminating the critical pause during which the gunman would have to reload and the gunman's targets could escape or attempt to disarm him.[83] Consequently, "firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[84] States that have restricted access to LCMs—usually defined with a ten-round limit—experience 63% fewer mass shootings than states that do not.[85]

Numerous federal and state courts have found no evidence that firing more than ten bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) (observing that "as in other cases," the record offered no indication that "the added benefit of a[n] [LCM]—being able to fire more than 10 bullets in

---

[82] Mark Berman & Todd C. Frankel, *High-capacity-magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2024), https://tinyurl.com/yc8xs3m8.

[83] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to load a new magazine enabled a teacher and ten students to flee. *Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla. Dep't of Law Enforcement, at 32 (2019), tinyurl.com/mvs34fky.

[84] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019).

[85] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

rapid succession—has *ever* been realized in self-defense in the home"); *Worman v. Healey,* 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired.").

Empirical research further demonstrates that the ability to fire more than ten rounds without reloading does not aid in self-defense. The National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* (0.5%) involved more than ten rounds of ammunition. *See Or. Firearms Fed'n*, 644 F. Supp. at 799–800. Other sources confirm that the average number of shots fired by civilians in self-defense is only about two.[86] That figure aligns with FBI statistics, which suggest that "the average gunfight includes 3 rounds fired."[87] As these authorities and statistics show, the Challenged Laws do not impose a burden on an individual's right to possess a firearm for lawful self-defense—LCMs are not used or useful in self-defense.

Nothing exemplifies the needlessness and destructive capability of LCMs more poignantly than the words of Mark Kelly, United States Senator, retired astronaut, and husband of Giffords Law Center founder and mass shooting survivor Gabby Giffords. Testifying before Congress about the shooting that nearly took his wife's life, Senator Kelly said: "The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green . . . . When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it [and was subdued]. I contend if [the shooter] . . . did not have access to a high-capacity magazine . . . Christina-Taylor Green would be alive today."[88]

---

[86] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001).

[87] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9.

[88] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

## IV.    CONCLUSION

For the reasons set forth above and in the Defendants' Brief, the Challenged Laws are constitutional, and this Court should affirm the judgment of the District Court.


Dated: September 4, 2024                    Respectfully submitted,

                                            /s/ *Jennifer B. Loeb*
                                            Jennifer B. Loeb
                                              *Counsel of Record*
                                            FRESHFIELDS BRUCKHAUS DERINGER US LLP
                                            700 13th Street NW, 10th Floor
                                            Washington, DC 20005
                                            (202) 777-4500
                                            jennifer.loeb@freshfields.com

                                            Aaron R. Marcu
                                            Brandt Henslee
                                            Daniel Hodgkinson
                                            Taylor Jachman
                                            FRESHFIELDS BRUCKHAUS DERINGER US LLP
                                            3 World Trade Center, 51st Floor
                                            175 Greenwich Street
                                            New York, NY 10007
                                            (212) 277-4000
                                            aaron.marcu@freshfields.com
                                            brandt.henselee@freshfields.com
                                            daniel.hodgkinson@freshfields.com
                                            taylor.jachman@freshfields.com

                                            *Counsel for Amicus Curiae*
                                            Giffords Law Center to Prevent Gun Violence

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Seventh Circuit Rule 29 because this brief contains 7000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Seventh Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

Dated: September 4, 2024

*/s/ Jennifer B. Loeb*
Jennifer B. Loeb
*Counsel for Amicus Curiae*
Giffords Law Center to Prevent Gun Violence