No. 24-1437

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————

CUTBERTO VIRAMONTES, ET AL.,

*Plaintiffs-Appellants*,

v.

THE COUNTY OF COOK, ET AL.,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Northern District of Illinois
(No. 21-cv-04595) (Hon. Rebecca R. Pallmeyer)

———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

———————————————

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8215
wtaylor@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

September 5, 2024

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __24-1437__

Short Caption: __Viramontes v. County of Cook__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund)

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Everytown Law

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
         n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
         n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
  n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
  n/a

Attorney's Signature: _/s/ William J. Taylor, Jr._____    Date: _September 5, 2024_____

Attorney's Printed Name: __William J. Taylor, Jr._____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☑  **No** ☐

Address: _Everytown Law, 450 Lexington Avenue, P.O. Box 4184, New York, NY 10017_

_____

Phone Number: _(646) 324-8215_____    Fax Number: _(917) 410-6932_____

E-Mail Address: _wtaylor@everytown.org_____

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

ARGUMENT ......................................................................................... 3

    I.   Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct ........................................ 3

        a.   Plaintiffs' Failure to Adduce Facts Sufficient to Distinguish *Bevis* Is Confirmed, Not Undone, By *Cargill* ..................................... 6

        b.   Plaintiffs' Textual Argument Relies on Unreliable Survey Data ....... 8

    II.   The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ........................ 12

        a.   The Proper Focus for Historical Analysis Is 1868 Rather Than 1791 ............................................................................................. 14

        b.   The Court Should Consider Consistent Later History Regardless of Which Time Period Is the Primary Focus ..................................... 17

CONCLUSION ...................................................................................... 23

# TABLE OF AUTHORITIES

*Cases*

*Antonyuk v. Chiumento,*
  89 F.4th 271, 305 (2d Cir. 2023), *vacated sub nom. Antonyuk v. James,*
  No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) ................................................. 15

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024)...............*passim*

*Bianchi v. Brown,*
  111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom.*
  *Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024)...........................................*passim*

*Capen v. Campbell,*
  No. 1:22-11431, 2023 WL 8851005 (D. Mass. 2023), *appeal docketed,*
  No. 24-1061 (1st Cir. Jan. 17, 2024) ...................................................................... 20

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
  664 F. Supp. 3d 584 (D. Del. 2023), *aff'd on other grounds*, 108 F.4th 194
  (3d Cir. 2024) .......................................................................................................... 21

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.,*
  108 F.4th 194 (3d Cir. 2024) ................................................................................. 5, 7

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................................... 14

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ..................................................................................... 1

*Garland v. Cargill,*
  602 U.S. 406 (2024) ......................................................................................... 6, 7, 8

*Hartford v. Ferguson,*
  676 F. Supp. 3d 897 (W.D. Wash. 2023)................................................................. 21

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) .............................................................................. 19

*Kipke v. Moore,*
  695 F. Supp. 3d 638 (D. Md. 2023) ........................................................................ 16

*Kipke v. Moore*,
No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024), *appeal docketed*,
No. 24-1799 (4th Cir. Aug. 22, 2024) ...................................................................... 16

*Klikno v. United States*,
928 F.3d 539 (7th Cir. 2019) ................................................................................... 15

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024) ......... 15, 16, 19, 20

*Lara v. Comm'r Pennsylvania State Police*,
91 F.4th 122 (3d Cir. 2024) ...................................................................................... 16

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................................................................................................. 20

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719
(4th Cir. July 10, 2023) ............................................................................................. 15

*Md. Shall Issue, Inc. v. Moore*,
--- F.4th ----, 2024 WL 3908548 (4th Cir. Aug. 23, 2024) (en banc) ........................ 5

*Nat'l Ass'n for Gun Rights v. City of Naperville*,
No. 23-1353, 2023 WL 8554177 (7th Cir. Dec. 11, 2023) ........................................ 2

*Nat'l Ass'n for Gun Rights v. Lamont*,
685 F. Supp. 3d 63 (D. Conn. 2023), *appeal docketed*, No. 23-1162
(2d Cir. Aug. 16, 2023) ........................................................................................ 12, 20

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*,
72 F.4th 1346 (11th Cir. 2023) ................................................................................. 15

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .............................................................................................*passim*

*Rupp v. Bonta*,
--- F. Supp. 3d ---, No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024),
*appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024) .................................. 9, 16, 20

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .................................................................................... 4

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ....................................................................*passim*

*We the Patriots, Inc. v. Lujan Grisham*,
  697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal docketed*, No. 23-2166
  (10th Cir. Oct. 20, 2023)........................................................................ 16

*Wilson v. Cook County*,
  937 F.3d 1028 (7th Cir. 2019) ................................................................. 1

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) ................................................................ 16

### Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) .............. 17

Br. for Everytown for Gun Safety as Amicus Curiae, *Bevis v. City of Naperville*,
  No. 23-1353 (7th Cir. May 10, 2023) ............................................... 14, 17

Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use, and
  Imagined Use from the 2021 National Firearms Survey: Response to
  William English*, 798 SMU L. Rev. (forthcoming 2025),
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4894282 .................. 9, 10, 11

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
  (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917
  (now published at 97 Ind. L.J. 1439)...................................................... 17

Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd
  Amendment Battle*, N.Y. Times (June 18, 2024),
  https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-professor.html
  ................................................................................................ 10, 12

Supplemental Declaration and Amended Expert Report of Louis Klarevas,
  *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. May 20, 2024) ................................ 11

Will Van Sant, *Inside the Secret Multimillion-Dollar Operation to Dismantle
  America's Gun Laws*, The Trace (July 30, 2024),
  https://www.thetrace.org/2024/07/gun-rights-lawsuits-donors-trust-funding/ ..... 11

William English, *2021 National Firearms Survey: Updated Analysis Including
  Types of Firearms Owned* (May 13, 2022),
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494......................... 9, 12

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety (hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman used an assault weapon to murder twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Cook County's restrictions on assault weapons are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), as well as under *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024). This Court rejected Second Amendment challenges to this same Cook County ordinance

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

and similar state and local laws in *Friedman*, *Wilson*, and *Bevis*, and should do the same again in this case.

Plaintiffs devote much of their brief to arguing that *Bevis* should be overruled. *See* Dkt. 14 ("Pls. Br.") at 11-13, 19-34. This is an unusual approach given that this Court decided *Bevis* only ten months ago, *see* 85 F.4th 1175, that it denied petitions for rehearing en banc less than nine months ago (with no judge even requesting a vote), *see, e.g.*, *Nat'l Ass'n for Gun Rights v. City of Naperville*, No. 23-1353, 2023 WL 8554177 (7th Cir. Dec. 11, 2023), and that the Supreme Court denied certiorari just two months ago, *see* 144 S. Ct. 2491. In any event, as both the County and the State of Illinois in its amicus brief explain, Plaintiffs' efforts to undo *Bevis* have no merit. *See* Dkt. 20 ("County Br.") 22-54; Dkt. 27 ("Illinois Amicus Br.") 13-19. Developments since this Court decided *Bevis* only make clearer that its decision was correct—including the en banc Fourth Circuit's decision last month in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024), which upheld Maryland's assault weapon law against a Second Amendment challenge. Cook County's ordinance is constitutional, and this Court should affirm. *See* County Br. 22-54; Illinois Amicus Br. 3-12, 20-27.

Everytown submits this amicus brief not to relitigate *Bevis*, but to expand on two points that support the constitutionality of the challenged ordinance under *Bruen*, *Rahimi*, and *Bevis*.

*First*, Plaintiffs have not met their burden on the initial, textual inquiry of the *Bruen-Rahimi* framework. As in *Bevis*, they have failed to show that the assault weapons covered by Cook County's ordinance "are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *See* 85 F.4th at 1194. While this Court noted in *Bevis* that "more evidence" or "[b]etter data" might lead to a different result at the text step, *id.* at 1197, Plaintiffs have presented no such evidence or data. Indeed, if anything, the record now is even less supportive of Plaintiffs' position that assault weapons are "Arms" than it was for plaintiffs in *Bevis*.

*Second*, if the Court addresses whether Cook County's ordinance is "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, it should center its analysis on 1868, when the Fourteenth Amendment was ratified. And, in any event, as in *Bevis*, it should also consider historical evidence from after that period, including from the 20th century. *See* 85 F.4th at 1201-02.

## ARGUMENT

### I.   Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

The right to keep and bear arms protected by the Second Amendment is "not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), but rather is subject to a range of textually- and historically-grounded constraints, *see, e.g.*, *id.* at 626-27, 627 n.26 (providing a non-exhaustive list of "presumptively lawful" firearm

regulations). Courts assess whether a regulation impermissibly infringes the right to bear arms in two steps: one focused on constitutional text and the other focused on history and tradition. *Bruen*, 597 U.S. at 24. The first step asks whether "the Second Amendment's plain text covers an individual's conduct." *Bevis*, 85 F.4th at 1191 (quoting *Bruen*, 597 U.S. at 24). This textual inquiry may require consideration of "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is an arm that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 32)). In challenges to assault weapons restrictions like Cook County's, the textual inquiry turns on whether "the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1194.

If the challenged law implicates the constitutional text, the court proceeds to the second step, at which it considers whether the government has shown that its law is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. But if any of the threshold requirements are not met, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may restrict them without infringing the Second Amendment. *See Bevis*, 85 F.4th at 1192 (explaining that, if laws do not

implicate protected "Arms," then "the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic process"). This Court correctly recognizes that the burden to satisfy the initial, textual inquiry is on the party challenging a law, *see id.* at 1194 (confirming that "plaintiffs … have the burden" of showing that the regulated weapons are protected "Arms"),[2] and Plaintiffs do not appear to dispute that, *see* Pls. Br. 34-36.

Plaintiffs have not met that burden. This Court recently upheld the denial of a preliminary injunction against this same Cook County assault weapon law (as well as similar state and local laws in Illinois) at the text step, holding that, because of their similarities to "machineguns and military-grade weaponry," assault weapons "may be regulated or banned … without offending the Second

---

[2] *Bruen* made this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied, *see* 597 U.S. at 17, 44 n.11, and nothing in *Rahimi* alters that fact or otherwise disturbs this Court's binding conclusion in *Bevis* that plaintiffs bear the burden at the threshold, textual step. *See, e.g.*, *Rahimi*, 144 S. Ct. at 1907 (Gorsuch, J., concurring) (explaining that the *Rahimi* decision focused on the history step because "no one question[ed] that the law Mr. Rahimi challenge[d] addresses individual conduct covered by the text of the Second Amendment"); *id.* at 1928 (Jackson, J., concurring) (describing *Bruen*'s "two-step evaluation" as beginning with consideration of "whether 'the Second Amendment's plain text covers an individual's conduct'" (citation omitted)); *id.* at 1932 (Thomas, J., dissenting) (listing the text and history steps). Accordingly, the en banc Fourth Circuit has recently rejected the suggestion that *Rahimi* collapsed *Bruen*'s two steps into one, *see Md. Shall Issue, Inc. v. Moore*, --- F.4th ----, 2024 WL 3908548, at * 8 (4th Cir. Aug. 23, 2024) (en banc), and has continued to hold plaintiffs to their burden at the threshold text step in a challenge to an assault weapon restriction similar to Cook County's, *see Bianchi*, 111 F.4th at 447; *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec. (DSSA)*, 108 F.4th 194, 210 (3d Cir. 2024) (Roth, J., concurring).

Amendment." *Bevis*, 85 F.4th at 1195-97. And, as the district court explained, Plaintiffs have not persuasively distinguished their challenge from *Bevis*. App. 14-16; *see also* Illinois Amicus Br. 13-19. This Court should affirm for that reason alone.

Two additional points bear on the textual analysis. As the following subsections explain, (1) the Supreme Court's opinion in *Garland v. Cargill*, 602 U.S. 406 (2024), supports the district court's determination that Plaintiffs failed to show that the rate of fire of assault weapons is meaningfully different from that of machineguns, and (2) Plaintiffs' statistics about ownership and defensive usage of assault weapons are based on unreliable (and irrelevant) survey data.

### a. Plaintiffs' Failure to Adduce Facts Sufficient to Distinguish *Bevis* Is Confirmed, Not Undone, By *Cargill*

One factor this Court has found relevant to the comparison between machineguns, which uncontroversially may be regulated or prohibited, and the assault weapons regulated by Cook County is the weapons' comparative rates of fire. *See Bevis*, 85 F.4th at 1195-97; *accord Bianchi*, 111 F.4th at 456. In *Bevis*, this Court observed that the M16 machinegun "has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of 'only' 300 rounds per minute" unless modified with devices like "a bump stock or a 'binary' trigger, which can double the rate at which semiautomatic weapons can be fired." 85 F.4th at 1196. Based on this data and other record evidence, the Court found the AR-15 to be "indistinguishable from th[e M16] machinegun." *Id.* at 1197. But it acknowledged the preliminary posture of the case and noted that discovery might produce "[b]etter

data on firing rates," including information on comparative reloading time, which could "change the analysis of whether the AR-15 and comparable weapons fall on the military or civilian side of the line." *Id.*

Plaintiffs suggest that Justice Sotomayor's recent dissent in *Cargill* "provided [that] better data." Pls. Br. 5. There, Justice Sotomayor said that a "regular person" can fire "around 60 rounds per minute" with an unmodified AR-15, while a "professional sport shooter" can fire "up to 180 rounds per minute" with the same weapon. 602 U.S. at 433 (Sotomayor, J., dissenting). It is true that Justice Sotomayor's numbers are lower than those credited by this Court in *Bevis*, but they do nothing to rescue Plaintiffs' case. First and obviously, Justice Sotomayor's comments are from a dissent, and consequently are not controlling. And Justice Sotomayor said nothing about reloading time, which this Court explicitly stated could be relevant to assessing rate of fire. *See Bevis*, 85 F.4th at 1197.

Other statements from *Cargill* and other federal courts of appeals regarding rates of fire are much more relevant to the question before this Court than an out-of-context comment in a dissent. Courts and jurists have observed that AR-15s can easily be modified to shoot at rates comparable to automatic fire. *See, e.g.*, *Bianchi*, 111 F.4th at 456 ("[T]he AR-15's rate of fire can be easily converted to mimic military-grade machine guns with devices like bump stocks, trigger cranks, and binary triggers." (citation omitted and alteration adopted)); *DSSA*, 108 F.4th at 214 n.79 (Roth, J., concurring) (noting that "semi-automatic rifles can be modified to fire at rates approaching that of their fully automatic counterparts" with "ease"); *see*

*also Cargill*, 602 U.S. at 429 (Alito, J., concurring) ("[A] semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun."). These findings are consistent with *Bevis*. *See* 85 F.4th at 1196. Plaintiffs offer nothing to challenge that consensus, nor have they otherwise met their burden of proving that the rate of fire of assault weapons differs so dramatically from that of machineguns as to remove them from the sphere of "weapons that are exclusively or predominantly useful in military service," *id.* at 1194, which are not "Arms" within the Second Amendment's text.

Most significantly of all, the *Cargill* majority maintained that an AR-15 can fire at machinegun-like rates *even without the use of a bump stock*, if the shooter is trained in using a "bump-firing" technique. *See Cargill*, 602 U.S. at 411. The Court stated:

> Shooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machineguns. One technique is called bump firing. … *Although bump firing does not require any additional equipment*, there are accessories designed to make the technique easier. A "bump stock" is one such accessory.

*Id.* (emphasis added); *see also Bianchi*, 111 F.4th at 456 (quoting from this portion of *Cargill*). Accordingly, if *Cargill* had any effect on the rate-of-fire issue, it would be to suggest that *Bevis underestimated* the rate at which AR-15s are capable of firing—thus making even clearer that prohibiting them is consistent with the Second Amendment's plain text.

### b. Plaintiffs' Textual Argument Relies on Unreliable Survey Data

Additionally, in considering whether the regulated assault weapons are suitable for self-defense, this Court should not rely on the conclusions of William

English's 2021 National Firearms Survey. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 ("English Survey"). The English Survey is a self-published study of the results of an online questionnaire completed by gun owners in 2021. *Id.* at 1. Plaintiffs cite the English Survey for several points, including that (1) 30.2% of gun owners (or about 24.6 million people) own AR-15-style assault weapons, and (2) gun owners "engage in 1.67 million defensive gun uses a year," including "over 200,000 defensive uses of rifles a year." Pls. Br. 49-51. The English Survey is not a reliable source. It has not been published in accordance with professional norms, and its conclusions are out of step with those of properly-conducted studies.

As an initial matter, the English Survey has not undergone the academic review process that is standard for social-science research. "[T]he normal scientific process requires peer-review prior to publication. The drafts [of the English Survey] that have been cited by litigants and others have not undergone this scientific review." Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 798 SMU L. Rev. (forthcoming 2025) (manuscript at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4894282. To the contrary, the author simply posted his analysis online. At least one federal court has opined that it "could disregard the English [Survey] in its entirety" in part because "Plaintiffs did not submit a version of English's article that has actually been *published*." *Rupp*

*v. Bonta*, --- F. Supp. 3d ---, No. 8:17-cv-00746, 2024 WL 1142061, at *17 n.19 (C.D. Cal. Mar. 15, 2024), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024). The author has also proven uncooperative in alternative efforts to test his work, such as through the adversarial process. In litigation regarding a Washington State assault weapon restriction, for instance, plaintiffs rescinded their reliance on Dr. English's research when faced with efforts to compel his testimony. *See* Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. Times (June 18, 2024), https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-professor.html. The academic process ensures that social science is reliable and sound. The English Survey lacks those critical safeguards.[3]

The English Survey's results should also be disregarded because they are inconsistent with those of properly-conducted research. A group of five professors from Harvard, Duke, and Northeastern, including four with expertise in "the estimation of rates of gun ownership, use, and misuse" who have made "extensive use of population surveys" in their work, recently reviewed the English Survey. Azrael et al., *supra*, at 1-3. They found serious issues with the study's methodology and statistical results. *Id*. at 3. For example, they noted that the Survey's estimate of 1.67 million annual defensive gun uses is 24 times higher than the estimate of the U.S. Bureau of Justice Statistics, which used data collected by the U.S. Census Bureau through the "very high quality" National Crime Victimization Survey

---

[3] Moreover, as Illinois notes in its amicus brief, the author's failure to disclose the source of the Survey's funding likely violates professional norms and obligations as a social-science researcher. *See* Illinois Amicus Br. 22.

between 2014 and 2018. *Id*. at 5. The reviewers attribute this discrepancy to several key errors in English's study design: To name a few, he defined defensive gun uses extremely broadly (so as to potentially include incidents in which the gun owner criminally misused their firearm), and his estimation erroneously assumed that the use of firearms for self-defense is uniform across age. *Id*. at 5-6, 14-21. Similarly, the reviewers found the Survey's estimate of total AR-15 ownership to be significantly inflated (nearly double the industry estimate of the total number of AR-15-style rifles made and imported from 1990 to 2020), likely due to inaccurate sampling methods and misleading phrasing of the relevant survey questions. *Id*. at 4, 7-10. In short, one of the reviewers has "said some of Dr. English's findings on self-defense 'strain credulity' and his methodology yielded 'absurd' estimates." McIntire & Kantor, *supra* (quoting Dr. Matthew Miller of Northeastern University and Harvard University). Other scholars have similar concerns. *See*, *e.g.*, Supplemental Declaration and Amended Expert Report of Louis Klarevas 10-11, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. May 20, 2024), ECF No. 190-1 ("Klarevas Report") (discussing "methodological issues" with English Survey);[4] *see also* Will Van Sant, *Inside the Secret Multimillion-Dollar Operation to Dismantle America's Gun Laws*, The Trace (July 30, 2024), https://www.thetrace.org/2024/07/gun-rights-lawsuits-donors-trust-funding/ (noting

---

[4] Dr. Klarevas's expert report also addresses issues with other survey and industry data that Plaintiffs attempt to rely on in their brief. *See id*. at 12-21 (discussing data and survey findings from (i) publications of the National Shooting Sports Foundation and (ii) a Washington Post/Ipsos poll, which are cited and discussed at Pls. Br. 49-50, 51-54); Illinois Amicus Br. 24-25.

that "[a]cademics on both sides of the gun debate have found defects in English's work," including Florida State Professor Gary Kleck, who described issues with the author's sampling methods).

These methodological concerns with the English Survey include that the author worded some of the survey questions "in a manner that suggests a negative framing of regulations on firearms and magazines," which can "cue[]" respondents (who are all gun owners) to answer defensively. Klarevas Report, *supra*, at 10. Dr. English also failed to disclose in his report the most suggestive portions of the survey questions. *See* McIntire & Kantor, *supra* (explaining that the author omitted the prefaces to some of the survey questions from his report, prefaces "whose wording, according to some polling experts, essentially invited respondents to rebut supposed misconceptions about guns," and providing several examples). Stated plainly, the English Survey's conclusions about the number of AR-15s in circulation and the frequency of their use for self-defense are likely inaccurate and overstated. It should play no role in the Court's analysis.[5]

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

Because the district court correctly determined that the assault weapons restricted by Cook County are not "Arms" protected by the Second Amendment, App. 13-16, this Court need not reach *Bruen*'s historical step. *See Bevis*, 85 F.4th at

---

[5] The English Survey's conclusions are also not determinative of the textual issues in this case even on their own terms. A "survey on the reason for which the survey respondents reportedly bought their assault weapons does not demonstrate that assault weapons … possess characteristics that make them well-suited for self-defense." *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 97 (D. Conn. 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023).

1192. But if it does reach that step, the Court may confront the question whether the most relevant time period for its historical inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791.

To be clear, this Court need not resolve that question to uphold Cook County's ordinance. Just as it did at the preliminary injunction stage in *Bevis*, the Court should find that the County's restrictions on assault weapons are constitutional because they are consistent with "the long-standing tradition of regulating the especially dangerous weapons of the time"—a tradition that has persisted from the founding era, to the 19th century, through Reconstruction, into the 20th century, and up to the present day. *See Bevis*, 85 F.4th at 1199, 1201-02; Dkt. 29 ("State AG Amicus Br.") 21-29 (discussing this history and tradition); *accord Bianchi*, 111 F.4th at 469-70 (upholding Maryland's assault weapon restriction as a continuation of "the broad[] and consistent story of our nation's regulation of excessively dangerous weaponry"). *Bevis* considered this entire, centuries-long tradition of regulation, without determining which time period (the Reconstruction era or the founding era) should be the primary focus of its historical inquiry. *See Bevis*, 85 F.4th at 1197-1202. The same reasoning controls here. If, however, the Court finds it necessary to decide the question, it should reject Plaintiffs' contention that the "critical period" is around 1791, *see* Pls. Br. 33, and conclude that the most relevant time period for the historical inquiry centers around the Reconstruction

era and extends thereafter, including into the 20th century. *See Bevis*, 85 F.4th at 1199, 1201-02.

### a. The Proper Focus for Historical Analysis Is 1868 Rather Than 1791

If the Court reaches the question of whether the historical analysis centers on 1791 or 1868, it should favor the later period. Everytown detailed the reasons why that is the correct conclusion under an originalist analysis in its prior amicus brief in *Bevis. See* Br. for Everytown for Gun Safety as Amicus Curiae 8-18, *Bevis v. City of Naperville*, No. 23-1353 (7th Cir. May 10, 2023), ECF No. 89 ("Everytown *Bevis* Amicus Br."). We highlight here a few of those reasons.

To begin, because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*), focusing on 1868 in a case against a state or locality is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? After all, the Constitution's protection of the right to keep and bear arms did not constrain the states and localities until 1868; they are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* at 37. This Court recognized that principle even before *Bruen*, explaining that "when state- or local-government action is challenged, … the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Multiple courts since *Bruen*, faced with challenges to state or local gun laws, have likewise concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 305, 318 n.27 (2d Cir. 2023) (observing that "evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era"), *vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (granting certiorari, vacating judgment, and remanding to Second Circuit for further consideration in light of *Rahimi*);[6] *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) (explaining that where the understanding of the right differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[7] *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582 (D. Md. 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to

---

[6] The Supreme Court's grant, vacate, and remand (GVR) order in *Antonyuk* is not a determination on the merits. *See, e.g.*, *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019) ("The GVR order … is an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, *whatever those views might be*." (emphasis added)). Courts have continued to rely on *Antonyuk* since the GVR, including on this time-period question. *See, e.g.*, *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024).

[7] Although *Bondi* has been vacated for rehearing en banc, it remains persuasive because its reasoning and authorities are robust.

the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Rupp*, 2024 WL 1142061, at \*9, \*31-32 (concluding that "ratification of the Fourteenth Amendment is the operative period from which to discern the public understanding of the Second Amendment").[8] As one court recently observed, these many cases reflect a "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era." *LaFave*, 2024 WL 3928883, at \*8.[9]

Existing Supreme Court doctrine does not resolve the issue. Both *Bruen* and *Rahimi* expressly left the question open, pointing to "ongoing scholarly debate on

---

[8] *See also, e.g.*, *Kipke v. Moore*, 695 F. Supp. 3d 638, 651 (D. Md. 2023) (agreeing with *Maryland Shall Issue*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at \*5 (D. Md. Aug. 2, 2024) (affirming prior reasoning on summary judgment), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall Issue*), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023).

[9] This Court should not follow the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for cert. filed*, No. 24-93 (U.S. July 30, 2024). Instead of engaging with originalist principles, the Third Circuit based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. *See id.* at 133-34 (citing *Bruen*, 597 U.S. at 37). In *Worth v. Jacobson*, the Eighth Circuit pointed to this same assumption in the case law to similarly conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." 108 F.4th 677, 697 (8th Cir. 2024). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that both *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38. At the very least, because they relied on an assumption and cannot be squared with originalist principles, *Lara* and *Worth* are not persuasive. *See Rupp*, 2024 WL 1142061, at \*32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles and … the Court is persuaded that Reconstruction-era practice provides the most probative evidence of the Second Amendment's meaning").

whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 597 U.S. at 37-38; *see Rahimi*, 144 S. Ct. at 1898 n.1 (again recognizing that debate and reiterating that "under the circumstances, resolving the dispute was unnecessary to decide the case"). As Everytown's amicus brief in *Bevis* explains, *see* Everytown *Bevis* Amicus Br. 11-13, if this Court decides to resolve the question here, the better view—and the one supported by the only two scholars *Bruen* cited on this issue—is that 1868 meanings bind states, localities, and the federal government. *See Bruen*, 579 U.S. at 37-38 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)). Thus, 1868 (and the Reconstruction era) is the originalist answer to the time period question.

### b. The Court Should Consider Consistent Later History Regardless of Which Time Period Is the Primary Focus

In *Bevis*, this Court preliminarily upheld Cook County's assault weapon restriction based on its recognition that the law continues "the long-standing tradition of regulating the especially dangerous weapons of the time." 85 F.4th at 1199; *see also id*. at 1201 ("Both the states and the federal government have long contemplated that the military and law enforcement may have access to especially dangerous weapons, and that civilian ownership of those weapons may be

restricted."). Plaintiffs offer nothing to undermine *Bevis*'s approach to or reading of this history, and this Court should not diverge from it.

   *Bevis* found evidence of the tradition of regulating especially dangerous weapons in, for example, a 1746 Boston law outlawing the discharge of canons, guns, and pistols within city limits (except for soldiers on training days); similar 19th-century ordinances from other cities, including Cleveland, Ohio; laws from "the late 1880s" forbidding or limiting the civilian use of "dangerous and concealable weapons" such as metal knuckles, Bowie knives, daggers, pistols, and/or clubs, including an 1884 Arkansas Bowie knife restriction; a 1934 federal law imposing taxation and registration requirements on privately-owned firearms; a 1968 federal law "severely restrict[ing]" the sale and delivery of machineguns and other "destructive devices"; and a 1986 law banning new civilian ownership of machineguns. *Id.* at 1201-02; *see also* Illinois Br. 16-17 (noting that these specific laws highlighted in *Bevis* were just a "sampling" of the many laws in the record evidencing this tradition). This regulatory tradition, "unchanged" from before the Second Amendment's ratification through the 20th century, evidenced the constitutionality of Cook County's ordinance in *Bevis*, and continues to evidence it in this case. *See Bevis*, 85 F.4th at 1202; *see also* Illinois Br. 11-12 (discussing and providing additional examples of this regulatory tradition); State AG Amicus Br. 21-29 (same).

   *Bevis*'s consideration of post-Reconstruction history is correct and consistent with the Supreme Court's approach to the historical analysis. *Heller* and *Bruen*

confirmed that examining post-ratification sources is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605). *Bruen* also explained that "a regular course of practice" following the enactment of a constitutional provision "can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up). *Rahimi* rested its decision upholding the challenged law in significant part on laws that were passed between 1836 and 1868, *see* 144 S. Ct. at 1900 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23),[10] and concurring justices emphasized the importance of post-ratification history, *see id.* at 1917 (Kavanaugh, J., concurring) (explaining that "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text"); *id.* at 1924 (Barrett, J., concurring) (confirming that "postenactment history can be an important tool").

In addition, *Bruen* counsels that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry, 597 U.S. at 27, including "a more expansive approach to historical analogy." *LaFave*, 2024 WL 3928883, at *7; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles …

---

[10] The statutes *Rahimi* referenced by citation to *Bruen* are surety laws from Wisconsin (1838), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), Oregon (1854), District of Columbia (1857), Pennsylvania (1860), and West Virginia (1868). *See Bruen*, 597 U.S. at 56 & n.23.

must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period—making the consideration of later history "particularly crucial." *LaFave*, 2024 WL 3928883, at *7; *see McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them.").

Such a nuanced approach is warranted in this case. As the en banc Fourth Circuit recently explained, assault weapons "are not our forebears' arms," and mass shootings "are not our forebears' calamities." *Bianchi*, 111 F.4th at 464. It is thus especially appropriate to look to history from the late-19th century and into the 20th century, when semiautomatic firearms first became commercially available, for evidence about their constitutionality. *Id.* at 469-70. That history reveals a familiar pattern: once the excessively dangerous nature of assault weapons became clear, legislatures restricted civilian access to them. *Id.* at 469-71; *see also Bevis*, 85 F.4th at 1201-02 (relying on both late-19th- and 20th-century weapons laws to uphold assault weapon restrictions); *Rupp*, 2024 WL 1142061, at *28-36 (same); *Capen v. Campbell*, No. 1:22-11431, 2023 WL 8851005, at *19 (D. Mass. 2023) (same), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024); *Lamont*, 685 F. Supp. 3d at 103-04, 109-113, 109 n.51 (same), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023);

*Hartford v. Ferguson*, 676 F. Supp. 3d 897, 906-07 (W.D. Wash. 2023) (same); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 600-603 (D. Del. 2023) (same), *aff'd on other grounds*, 108 F.4th 194 (3d Cir. 2024).

Plaintiffs ask this Court to disregard all 20th-century evidence because *Bruen* declined to consider some late-19th- and 20th-century evidence. *See* Pls. Br. 33. But *Bruen* did not give less weight to that evidence because it was "irrelevantly late," as Plaintiffs suggest. *See id*. Rather, *Bruen* did so because the later evidence "contradict[ed] earlier evidence" in the record in that case. 597 U.S. at 66-67, 66 n.28; *see id*. at 64-66 (discounting 1871 Texas law and 1871 and 1875 Texas court decisions because they were from a "single state" and "contradict[ed] the overwhelming weight of other evidence"). Both *Heller* and *Bruen* extensively relied on 19th-century evidence when it did *not* contradict overwhelming earlier evidence. *See, e.g.*, *Bruen*, 597 U.S. at 21 (recounting that *Heller* had considered, among other things, "19th-century cases that interpreted the Second Amendment," the "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and the work of "post-Civil War commentators" (quoting *Heller*, 554 U.S. at 610, 614, 616-19); *id*. at 51-57 (discussing mid-19th-century cases and statutes); *id*. at 60 (surveying "public discourse surrounding Reconstruction" as demonstrating "how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens"). Likewise, in this case, there is no earlier evidence that contradicts the later history supporting

Cook County's ordinance. That ordinance continues a regulatory tradition that has been consistent and widespread since the founding era, *see supra* pp. 17-21; State AG Amicus Br. 21-29, and thus *all* evidence of that tradition is properly before this Court.

Relying on post-ratification evidence is entirely consistent with—indeed, compelled by—controlling precedent from this Court and the Supreme Court. *Bevis* was correct to consider 19th- and 20th-century history in rejecting a challenge to Cook County's ordinance at the historical step, and the same result is warranted in this case.

## CONCLUSION

The Court should affirm the district court's grant of summary judgment for Defendants.

Dated: September 5, 2024                    Respectfully submitted,

/s/ William J. Taylor, Jr.
Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 517-6620
fjamison@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as modified by Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word, in 12-point Century Schoolbook font, and complies with Circuit Rule 29 in that this brief contains 6,082 words, excluding the portions exempted by Fed. R. App. P. 32(f).

<u>/s/ William J. Taylor, Jr.</u>
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

<u>/s/ William J. Taylor, Jr.</u>
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*