No. 24-1437

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CUTBERTO VIRAMONTES, et al.,

*Plaintiffs-Appellants,*

v.

THE COUNTY OF COOK, et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS (No. 21-cv-4595)
HONORABLE REBECCA R. PALLMEYER

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

David H. Thompson
  *Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................iii

INTRODUCTION ..................................................................1

ARGUMENT ..........................................................................2

I.  *Friedman* and *Wilson* Are Not Controlling. ...................2

II.  Plaintiffs' Arguments Under *Bevis* Are Properly Before
This Court ......................................................................3

    A.  *Bevis* Did Not Resolve the Constitutionality of the
Ordinance. ...............................................................4

    B.  Plaintiffs Have Not Waived or Forfeited Any Argument
Under *Bevis*. ............................................................5

    C.  Plaintiffs Can and Should Prevail Under *Bevis*. ...................11

III.  In The Alternative, This Court Should Overrule *Bevis* As
Inconsistent With *Bruen*. ..............................................12

    A.  The Plain Text of the Second Amendment Includes Even
"Dangerous and Unusual" Arms Within "Arms." ................14

    B.  The County Has No Historical Support for Its Weapons
Ban. ......................................................................16

        1.  The Banned Firearms Are "In Common Use." ...............16

        2.  There Is No Tradition of Banning "Dangerous"
Weapons Unless They Are Also Unusual. .......................23

        3.  The Banned Firearms Are Not "Dangerous" In Any
Constitutionally Relevant Way. ......................................27

CONCLUSION ...................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**                                                    **Page**

*Bailey v. United States,*
516 U.S. 137 (1995) ...................................................................... 18

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023)............................................ 1, 3, 4, 28

*Bew v. City of Chicago,*
252 F.3d 891 (7th Cir. 2001) ......................................................... 6

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024)....................................................... 10

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ...................................................................... 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ... 1, 12, 13, 14, 15, 16, 19, 21, 22, 23, 24, 27, 33

*Dunagin v. City of Oxford,*
718 F.2d 738 (5th Cir. 1983) .......................................................... 9

*Free v. Peters,*
12 F.3d 700 (7th Cir. 1993) ........................................................... 9

*Friedman v. City of Highland Park,*
136 S. Ct. 447 (2015) .................................................................... 20

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ......................................................... 2

*Gallagher v. San Diego Unified Port Dist.,*
14 F. Supp. 3d 1380 (S.D. Cal. 2014) ........................................ 5, 6

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011)............................................ 20, 25, 26

*Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.,*
916 F.2d 1174 (7th Cir. 1990) ....................................................... 8

*Lebron v. Nat'l R.R. Passenger Corp.,*
513 U.S. 374 (1995) ........................................................................ 6

*New York State Rifle & Pistol Association v. Bruen,*
597 U.S. 1 (2022) .........................................1, 12, 15, 19, 24, 27, 29

*People v. White*,
409 N.E. 2d 73 (Ill. App. Ct. 1980).................................28

*Saban v. U.S. Dep't of Lab.*,
509 F.3d 376 (7th Cir. 2007) .........................................13

*Staples v. United States*,
511 U.S. 600 (1994) .........................................................1

*State v. Huntly*,
25 N.C. 418 (1843)..........................................................17

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023)..........................................10

*Teter v. Lopez*,
93 F.4th 1150 (9th Cir. 2024)........................................10

*United States v. Billups*,
536 F.3d 574 (7th Cir. 2008) .......................................6, 7

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) ..............................................10, 11

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) .....................................................4, 5

*Wiesmueller v. Kosobucki*,
547 F.3d 740 (7th Cir. 2008) ...........................................8

*Wilson v. Cook County*,
937 F.3d 1028 (7th Cir. 2019) ..........................................2

## Rules and Legislative Materials

FED. R. EVID. 201 & 1972 Advisory Committee Notes.............................8

Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271, § 1.............27

## Other Authorities

Benjamin M. Blau et al., *Guns, laws and public shootings in the United States*, 48 APPLIED ECON. 1 (2016) ................................25

Br. for the United States as Amicus Curiae, *District of Columbia v. Heller*, No. 07-290 (U.S. Jan. 11, 2008) ......................................9, 10

Br. of Violence Pol'y Ctr. et al. as Amici Curiae in Supp. of Pet'rs, *District of Columbia v. Heller*, No. 07-290, 2008 WL 136348 (U.S. Jan. 11, 2008) ....................................................................24

Dave Campbell, *A Look Back at the Thompson Submachine Gun*, NRA (Apr. 17, 2019), https://bit.ly/3ZlZL5y ..........................................22

*Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States,* U.S. DEP'T OF JUST., FBI, https://bit.ly/3IF5A6M (last visited Oct. 16, 2024) ....................................................... 24, 25

Stephen Halbrook, AMERICA'S RIFLE: THE CASE FOR THE AR-15 (Google Books ed. 2022) ................................................................31

Louis Jacobson, *Fact-check: Could individuals own cannons during the Revolutionary War?*, AUSTIN AM.-STATESMAN (June 30, 2020), https://bit.ly/3AdxCp8 ...............................................................33

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 ..........25

David Kopel, *How powerful are AR rifles?*, REASON MAG. (Feb. 27, 2023) .................................................................... 30, 31

Anthony F. Milavic, *It's the Cartridge, Stupid—Not the Rifle*, U.S. NAVAL INST. (Aug. 2002), https://bit.ly/41lJdLj .............................31

Joseph E. Persico, *The Great Gun Merchant*, 25 AM. HERITAGE (Aug. 1974), https://bit.ly/48bDEmW............................................33

Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes Assault Weapons From Other Firearms*, REASON (Oct. 31, 2018)..............31

Daniel W. Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171 (2020) ........................25

# INTRODUCTION

Cook County's brief is notable for what it does not do. It does not dispute that AR-15-style rifles, which the County bans, are the most popular rifles in the country and one of the most popular firearms of any type. It does not claim that the modern, semiautomatic AR-15-style rifle, which has "traditionally ... been widely accepted as [a] lawful possession[,]" *Staples v. United States*, 511 U.S. 600, 611–12 (1994), is a military firearm anywhere in the world. It does not dispute that semiautomatic fire is inherently more accurate than automatic fire, the paradigmatic uniquely military feature of military rifles. And it does not dispute that the AR-15-style rifle is both "bearable" and preferred for purposes of self-defense by millions of law-abiding Americans. Those salient points are enough for Plaintiffs to win this case regardless of whether this Court applies the standard from *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) or *District of Columbia v. Heller*, 554 U.S. 570 (2008).

What the County does, instead, is ask the Court not to consider the arguments in this case at all, and treat two pre-*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), decisions of this Court

as controlling. Failing that, the County asks the Court to ignore Plaintiffs' arguments and close its eyes to indisputable facts, because it claims that Plaintiffs waived and forfeited virtually every argument they make on appeal. But these claims lack merit. And what the County is left with, as a final alternative, is a plea for this Court to permit it to ban common semiautomatic rifles, including AR-15-style rifles, because the County considers them to be "dangerous" weapons. But that principle is inconsistent with Supreme Court precedent and the facts, which show that the banned arms are not "dangerous" in any relevant sense.

## ARGUMENT

### I. *Friedman* and *Wilson* Are Not Controlling.

The County begins by arguing that Plaintiffs' claims are foreclosed by this Court's decisions in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019) (per curiam). Br. of Defendants-Appellees 15–16, Doc. 20 (Aug. 29, 2024) ("County Br."). This argument has a central problem, which Plaintiffs identified in their opening brief, and for which the County has no answer: It is incompatible with *Bevis*. *See* Br. of Plaintiffs-Appellants 37–38, Doc. 14 (June 24, 2024) ("Pls'. Br."). The County suggests *Bevis*'s

lengthy analysis merely "confirmed *Friedman* and *Wilson*'s ongoing vitality" but that does not make sense. County Br. 16. Under *Friedman* and *Wilson*, the Illinois ban (and related local bans) at issue in *Bevis* would be constitutional, full stop. But the Seventh Circuit in *Bevis* did not finally resolve the issue but rather laid out a framework (different from the analysis in *Friedman*) for analyzing Second Amendment challenges to bans on types of firearms and firearm magazines and couched its analysis in explicitly preliminary terms. *See Bevis*, 85 F.4th at 1203. Had *Friedman* and *Wilson* still controlled, it would have gone further.

## II. Plaintiffs' Arguments Under *Bevis* Are Properly Before This Court

The County next urges this Court not to reach Plaintiffs' arguments that they can (and should) prevail on this appeal under *Bevis*, arguing that Plaintiffs have misconstrued the scope of *Bevis* and have waived or forfeited nearly all their arguments on appeal. County Br. 17–18. These assertions lack merit.

## A. *Bevis* Did Not Resolve the Constitutionality of the Ordinance.

The County starts by attacking strawmen, rebutting a purported argument that "*Bevis* is distinguishable, because *Bevis* did not involve the Ordinance at issue here," with the fact that the County's ordinance *was* before this Court in *Bevis*. County Br. 18. But Plaintiffs have not made that argument. Rather, Plaintiffs argued: (1) that this Court can and should overrule *Bevis* as inconsistent with *Heller*, *Bruen*, and *Rahimi*, and (2) even if the Court applies *Bevis*, Plaintiffs can succeed in showing that Cook County's ordinance is unconstitutional on final judgment under the standard laid out in that decision. Nowhere did Plaintiffs suggest that *Bevis* was somehow distinguishable because the panel conducted its analysis primarily with respect to PICA. The critical point is that, on its own terms, *Bevis*'s conclusions about the constitutionality of the bans at issue were explicitly preliminary. *See, e.g.*, *Bevis*, 85 F.4th at 1197 ("We conclude this portion of the opinion by stressing again that this is just a preliminary look at the subject."); County Br. 18–19. *Bevis* did not even finally resolve the parties' claims in *Bevis*, so it is hard to understand how it could have finally resolved them in this case. While this Court may conclude that the analytical

framework laid out in *Bevis* should govern, the application of that framework on summary judgment is not controlled by the preliminary application in *Bevis*. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

### B. Plaintiffs Have Not Waived or Forfeited Any Argument Under *Bevis*.

1.  The County claims that "Viramontes raises various arguments framed to distinguish the facts of this case from *Bevis* which were never asserted in the lower court and should thus be deemed forfeited." County Br. 19. This argument is difficult to understand. The cross-motions for summary judgment below were fully briefed by June 2023, *see* D. Ct. Doc. 118, months before the Seventh Circuit decided *Bevis* in November 2023. And following *Bevis*, the district court did not solicit additional briefing from the parties, so the only substantive discussion of the *Bevis* standard anywhere in the district court record was a brief notice of supplemental authority filed by the County and a similarly brief response filed by Plaintiffs. *See* D. Ct. Docs. 122, 123. Plaintiffs are aware of no authority—and the County cites none—holding that arguments regarding *new authority* can be deemed forfeited or waived on appeal if not made in a notice of supplemental authority to the

district court. *See Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d 1380, 1388 (S.D. Cal. 2014) ("The language of [Rule 28(j)] itself does not indicate any mandatory directive that a party must supplement or raise an intervening decision or else risk waiver of arguments that rely on new law.").

2.     The County next argues that Plaintiffs' reliance on evidence that "was not presented to the district court, or was presented only in his response to the County's statement of material facts" similarly violates forfeiture principles. County Br. 19. But again, *Bevis* had not been decided when Plaintiffs briefed the case in the district court, so it is hardly surprising that Plaintiffs did not make specific factual or legal contentions that would have supported their arguments under *Bevis*.

Even if the timing issue did not fully explain any of Plaintiffs' omissions below, it would not matter. It is well-settled that "when a new argument supports a claim made before the district court, [this Court] will usually address it." *Bew v. City of Chicago*, 252 F.3d 891, 895 (7th Cir. 2001); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). Here, where Plaintiffs continue to press the same claim—that the Ordinance is unconstitutional under the Second Amendment—and at

most "offer[] a new twist on [previously made] argument[s] based upon additional authority on appeal," a finding of forfeiture would be inappropriate. *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008).

3. The County claims that Plaintiffs' reliance on certain factual material is inappropriate because Plaintiffs either did not disclose that evidence below or did not cite it in their affirmative Rule 56.1 statement of material facts. County Br. 20. To be clear, Plaintiffs provided the County with adequate notice and copious material in the district court. In their response to the County's lengthy Rule 56 statement of material fact, Plaintiffs provided the County with over 2,000 pages of exhibits, included among which were most, if not all, of the documents and sources Plaintiffs have cited here and to which the County now objects. *See* D. Ct. Docs. 98-1–98-13, Exs. 1–105. Thus, when the County claims, for example, that Plaintiffs "fail[ed] to properly present [surveys of gun owners regarding the types of firearms they own] to the district court below," County Br. 31, its objection is not to Plaintiffs having failed to provide notice of these surveys below, but to the way in which they were referenced in the summary judgment record. Given that Plaintiffs cited one of these surveys *in their complaint, see* D. Ct. Doc. 1, ¶ 27 (citing

William English, *2021 National Firearms Survey*, https://bit.ly/3rYa13k), any claim to lack of notice is baseless. As for the form of Plaintiffs' reference to them, in addition to attaching these documents to their response to the County's Rule 56 statement, Plaintiffs cited those that were relevant to their affirmative case in the argument section of their own summary judgment brief. *See* D. Ct. Doc. 102 at 8–10.

This was entirely appropriate, given that these surveys (and the law review articles, journal articles, and books Plaintiffs cited in their briefs below and to this Court), all pertain to "legislative facts," or general facts about the world, not specific to the parties before the Court, to which the rules of evidence do not apply. *See* FED. R. EVID. 201 & 1972 Advisory Committee Notes; *see also Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). Because such facts are the underpinnings of a legal argument, "[legislative] facts and the sources from which they are derived could be incorporated in the argument section of the brief, but they can with equal propriety be set forth in the statement of facts." *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing Seventh Circuit Rule 28). That Plaintiffs took the former approach does not justify the County's request to this Court to

blind itself on appeal. And because the rules of evidence do not apply to such facts, the County's claim that, in addition to not being disclosed, the objected-to surveys are "double hearsay," *see* County Br. 31, may be rejected out of hand.

Indeed, even if Plaintiffs had not disclosed *any* of the sources in their opening brief in the district court or made them part of the record below in some way, this Court's review of them would still be unrestricted. This Court gives *de novo* review to determinations of legislative fact, *see Free v. Peters*, 12 F.3d 700, 705–06 (7th Cir. 1993), and it is not limited to the record below in reviewing materials on which to make "findings" of legislative fact, as the Supreme Court's practice amply demonstrates. *See Dunagin v. City of Oxford*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (en banc) (Reavley, J., plurality op.) ("The writings and studies of social science experts on legislative facts are often considered and cited by the Supreme Court with or without introduction into the record or even consideration by the trial court."). Indeed, the Supreme Court in both *Heller* and *Bruen* directly engaged with legislative facts regardless of whether they had been cited below, going so far as to decline, in both cases, specific requests to remand for factual

findings to be made in the district court. *See* Br. for the United States as Amicus Curiae at 31 n.9, *District of Columbia v. Heller*, No. 07-290 (U.S. Jan. 11, 2008)*; Bruen*, 597 U.S. at 33 n.8. More recently, in a case presenting the same sort of questions under *Bruen* as this one, the Fourth Circuit held that review of sources of facts that are potentially relevant to deciding the constitutionality of a ban on certain types of arms is unrestricted. *See Bianchi v. Brown*, 111 F.4th 438, 461 n.2 (4th Cir. 2024); *see also Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023), *reh'g en banc granted, op. vacated*, 93 F.4th 1150 (2024) (Mem.). There is, therefore, no justification for this Court to ignore the myriad evidence of "common use" or of any of the other legislative facts on which the constitutionality of the Cook County ban depends.

4.    The County argues that Plaintiffs should not be permitted respond to the assertion that *United States v. Rahimi*, 144 S. Ct. 1889 (2024), supports the *Bevis* standard, because Plaintiffs did not argue that *Rahimi* undermined *Bevis* in their opening brief. *See* County Br. 23–24. It of course does not violate waiver principles to permit Plaintiffs to reply to an argument made in a response brief, and in any event, Plaintiffs *did* assert that "*Rahimi* … further undermin[ed] … *Bevis*." Pls.' Br. 23.

Plaintiffs did not discuss *Rahimi* at length in their opening brief simply because it does not change the analysis in this case. *Rahimi* reaffirmed that courts and litigants must determine whether a modern regulation "comport[s] with the principles underlying the Second Amendment." 144 S. Ct. at 1898. *Heller* and *Bruen* both already recognized the relevant historic principle, "common use," against which to compare the County Ban, and the County Ban comes up wanting.

## C. Plaintiffs Can and Should Prevail Under *Bevis*.

Surprisingly, given that it finds waiver and forfeiture everywhere it looks, the County responds to just two of Plaintiffs' arguments regarding how to apply *Bevis* in this case. First, it objects that Plaintiffs' evidence regarding the comparative rates of semiautomatic and automatic fire was before the *Bevis* panel. County Br. 21–22. But as Plaintiffs explained, *Bevis* did not address that any difference in rate of fire is of secondary importance to the (related) difference in accuracy between the two types of firearms. *See* Pls.' Br. 55–56 (citing *Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY (2008), https://bit.ly/3pvS3SW (D. Ct. Doc. 98-1, Ex. 7)). The County has no answer for this critical distinction between automatic and semiautomatic

fire. Second, the County responds to Plaintiffs' explanation that the banned "muzzle shroud" [sic] (the County presumably means to refer to a "barrel shroud") feature improves safety and accuracy by protecting a rifle-user's hand from being burned by a hot barrel on the bizarre ground that this is, itself, a problem necessitated only by "the extreme heat created by rapid fire, which explains why ordinary handguns not capable of such rapid fire are not equipped with similar 'ergonomic' features." County Br. 22 n.1. Both semiautomatic rifles and handguns fire once per pull of the trigger, and the absence of a barrel shroud on many handguns is easily explained by the fact that, unlike a rifle, many handguns are not held with a secondary grip on the barrel. The remainder of Plaintiffs' arguments under *Bevis* are ignored by the County.

## III. This Court Should Overrule *Bevis* As Inconsistent With *Bruen.*

*Bevis* is fundamentally inconsistent with *Heller*, *Bruen*, and *Rahimi*, and should be overruled. *Bruen* elaborated upon the mode of analysis employed by *Heller*, but did not change *Heller*. *See Bruen*, 597 U.S. at 17. And *Heller* definitively explained that *all* weapons, even "dangerous and unusual" ones, are "arms" within the meaning of the Second Amendment's plain text. 554 U.S. at 581–82. The "dangerous and

unusual" limitation is a *historical* principle that helps define the scope of the right, but by its own terms it does not apply to arms that are "in common use" among ordinary Americans today. *Id.* at 627. That the Seventh Circuit's *Bevis* analysis is inconsistent with binding Supreme Court precedent—since it narrows the text and purports to identify a different historical restriction that conflicts with the one identified in *Heller*—is a compelling reason to overrule circuit precedent pursuant to 7th Cir. R. 40(e). *See Saban v. U.S. Dep't of Lab.*, 509 F.3d 376, 379 (7th Cir. 2007) (overruling precedent as "contrary to Supreme Court decisions that have not been overruled" and predated the precedent in question).

The County argues that because these "exact argument[s] [were] made by the *Bevis* plaintiffs" they cannot show a compelling reason to overrule *Bevis*. But given that Plaintiffs' argument is that two binding cases that were 15 and 2 years old at the time *Bevis* was decided are directly contrary to *Bevis*, it would be surprising if the arguments Plaintiffs made in this case were *different* than those made to in *Bevis*. That the panel got the issues wrong for reasons that were clear at the time is not a reason to reject Plaintiffs' arguments.

## A. The Plain Text of the Second Amendment Includes Even "Dangerous and Unusual" Arms Within "Arms."

The *Bevis* panel erred in concluding that "arms" must have a narrower meaning than any "[w]eapons of offence, or armour of defence," *Heller*, 554 U.S. at 581 (quoting 1 DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed.) (reprinted 1978)), a definition that includes, at a minimum, "all firearms," *Heller*, 554 U.S. at 581. That conclusion was based on a fundamental misunderstanding of where "common use" and "dangerous and unusual" fit into the *Bruen* framework and of what *Heller* meant when it said that "arms" included, "then as now, … weapons that were not specifically designed for military use" (it was not limiting the term to the civilian context, but expanding it beyond *just* the military context), *see* Pls.' Br. 19–28; *Heller*, 554 U.S. at 581.

The County responds that *Heller*'s textual holding that "arms" includes all "bearable arms" was not an ultimate interpretation of the term but only a presumptive one, "absent more evidence," "[a]s indicated by the Court's inclusion of the term 'prima facie.'" County Br. 24. And it suggests that it now has evidence that shows the true textual meaning of the term is narrower than *Heller* thought.

This argument is foreclosed by *Heller*, which had to construe the term "arms" as a necessary part of its holding, in that case, that handguns are categorically protected by the Second Amendment. It is true that, at the conclusion of the Court's textual analysis, *Heller* summarized its findings by stating that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," 554 U.S. at 582, but that does not mean there was anything tentative about the Supreme Court's interpretation. As both *Heller* and *Bruen* make clear, the issue of whether it the Amendment protects an arm depends on both text *and* history, so any textual conclusion is necessarily preliminary, or prima facie, *Bruen*, 597 U.S. at 24, within the scope of the broader analysis. That is why there is no contradiction in holding, as *Heller* did, that the textual meaning of "arms" is broad enough to include items that have historically been banned, even if those historic bans are constitutional. But further analysis is not, as the County suggests, textual. Rather, as the Court made clear in *Bruen*, restrictions that implicate conduct within the plain-text meaning must be justified by history, and the County has the burden to prove that history supports its regulation. *Id.* at 27.

Because the County fundamentally misunderstands this point, its remaining "textual arguments"—which deal with the concepts of "dangerous and unusual" and "in common use" are all, actually, *historical* arguments. As such, Plaintiffs address them below.

### B. The County Has No Historical Support for Its Weapons Ban.

#### 1. The Banned Firearms Are "In Common Use."

Following its textual analysis, *Heller* thoroughly examined our history and determined there were just two historical traditions relevant to defining which firearms are, or are not, protected by the Second Amendment: (1) "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " and (2) that "at the time of the Second Amendment's ratification," citizens called on to participate in the militia "would bring the sorts of lawful weapons that they possessed at home to militia duty." 554 U.S. at 627. From these traditions, the Court derived a principle that is dispositive of this case: "the sorts of weapons protected [are] those 'in common use at the time' " for lawful purposes. *Id.* (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see* Pls.' Br. 24–28. As such, because the arms Cook County bans are in common

use by law-abiding citizens for lawful purposes, Cook County's ban is unconstitutional. *See* Pls.' Br. 48–53.

The County argues otherwise, claiming that "common use" should be understood, based on *State v. Huntly*, 25 N.C. 418 (1843), not to refer to firearms that are commonly *owned* but only those that are commonly carried or worn by a person, County Br. 25–26 (citing *Huntly*, 25 N.C. at 422). But *Huntly* merely confirmed that the common law crime of affray, carrying firearms in a manner intended to cause terror, was not inconsistent with the Second Amendment, and the North Carolina Supreme Court held, in that context, that "the carrying of a gun *per se* constitutes no offence" and that it is only carrying such an arm for a "wicked purpose … which essentially constitute[s] the crime." 25 N.C. at 422–23. Indeed, *Huntly* stressed that there was "scarcely a man in the community who [did] not own and occasionally use a gun of some sort." *Id.* at 422. As a result, it was the carrying of the weapon in a way calculated to cause harm and spread fear (Huntly had been publicly declaring that "he would kill James H. Ratcliff … [an]d that there were four or five men whom he meant to kill") that constituted the criminal act. The County cites other sources from the 16th and 17th century that

described the crime of affray in similar terms, *see* County Br. at 26, but they do not differ from *Huntly* or suggest that a firearm is unusual merely because it can be put to criminal ends.

The County next points to *Bailey v. United States*, 516 U.S. 137 (1995) for support of its narrow reading of "use," In that case, the Court construed the word "use" in a law prohibiting "use" of a firearm "during and in relation to any crime of violence or drug trafficking crime." *Id.* at 142 (quoting 18 U.S.C. § 924(c)(1)(A)); *see* County Br. 26. But *Bailey* provides no support to the County, as its reading of "use" was specific to the statutory context. Indeed, the Court initially noted how potentially broad the term "use" could be in connection with firearms: "Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.' 'Use' draws its meaning from its context," and it was that statutory context that drove the Court to hold a narrower meaning was intended, since Congress had made it a crime when a person either "uses" or "carries" a firearm and the broader meaning of "use," if adopted, would leave no room for "carry" to do any work. *Bailey*, 156 U.S. at 143; *see also id.* ("Had Congress intended possession alone to trigger liability … it easily could have so provided.").

18

Here, unlike in *Bailey*, *Heller* repeatedly equated "use" with possession. *Heller* explained, in support of the line it drew between "dangerous and unusual weapons" and protected arms, that citizens would "bring the sorts of lawful weapons that they *possessed* at home to militia duty," 554 U.S. at 627 (emphasis added), it said that the weapons that fell outside of protection were those "not typically *possessed* by law-abiding citizens for lawful purposes," *id.* at 625 (emphasis added), and its ultimate holding was based on the fact that handguns are "the most popular weapon chosen by Americans for self-defense *in the home*," *id.* at 629 (emphasis added).

The text of the Second Amendment itself rejects the County's position, as it protects both a right to keep (i.e., possess) and to bear (i.e., to carry) weapons. *See id.* at 592. Given this reality, it would be odd if possession were not a constitutionally relevant "use" of a firearm. *See Bruen*, 597 U.S. at 32 ("Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections.").

The County's narrow vision of "common use" is also refuted by the way that Justices of the Supreme Court have applied the test in other cases; they have *never* required a showing that the arm in question is commonly carried. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (The "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." (cleaned up)); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari) (explaining that "AR-style semiautomatic rifles" are "common semiautomatic firearms used for lawful purposes" because "[r]oughly five million Americans own" them); *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) ("*Heller II*") ("Semi-automatic rifles remain in common use today …. According to one source, about 40 percent of rifles sold in 2010 were semi-automatic.").

The County argues that "[f]ocus[ing] on the commonness of actual open, public use of a firearm, rather than mere ownership, best respects the common-use principle's origins in the law of affray." County Br. 27. Though this statement admirably admits to the *historical* origins of this

issue, it eliminates half of them. As Plaintiffs have explained, *Heller* also relied on the tradition of bringing "the sorts of lawful weapons that they possessed at home to militia duty." 554 U.S. at 627. There is no indication that such firearms were commonly carried in public for self-defense, rather than commonly owned and used publicly only for militia duty. It simply does not make any sense, given the stated purpose of the right was to enable collective self-defense through the militia, to require a firearm to be commonly *carried* for personal self-defense to merit constitutional protection. Such a rule not only permits the banning of the so-called "assault weapons" targeted by Cook County's rule, but of *any* rifle or shotgun, none of which are commonly carried for self-defense. And this argument entirely ignores the fact that, in this case, as in *Heller*, Plaintiffs simply claim a right to possess the banned firearms. Perhaps the analysis would be different in a suit about carrying AR-15s in public, but that is not this case. The County can offer no good reason, under governing precedent, the text of the Second Amendment, or even common sense, why the right to possess a given arm in the home should depend on how often it is carried publicly for self-defense.

The County's last line of defense for its limited view of "use" is to point to certain examples of allegedly unprotected firearms—e.g., machine guns and short-barreled shotguns—and to explain how those firearms can be banned under its interpretation. *See* County Br. 28. But the "common use" analysis for those firearms applies the same way regardless of whether this Court adopts the County's narrow understanding of "use" or not. Indeed, one of the County's examples, the short-barreled shotgun, was the specific example of a "weapon[] not typically *possessed* by law-abiding citizens for lawful purposes" that *Heller* discussed. 554 U.S. at 625 (emphasis added). The Thompson machine gun, on which the County also relies, was notable for selling poorly in the civilian marketplace. *See* Dave Campbell, *A Look Back at the Thompson Submachine Gun*, NRA (Apr. 17, 2019), https://bit.ly/3ZlZL5y. And the County's complaint that chainsaws are commonly owned but nevertheless, if "openly wield[ed] while strolling down Michigan Avenue," would cause terror, illustrates precisely why it makes no sense to look to common *carriage* as the benchmark for constitutional protection of arms plaintiffs seek to "keep" in their homes. While a chainsaw "wield[ed]" on Michigan Avenue could be terrifying

depending on the circumstances (not, for example, if wielded by a landscaper trimming trees), one stored in a garage or shed for use in yardwork would not raise any eyebrows, and this Court would surely look askance at an attempt to ban ownership of such a useful landscaping tool because the County fears its public misuse. Plaintiffs seek simply to possess semiautomatic rifles, including AR-15-stye rifles, in their homes to be ready "in case of confrontation." *Heller*, 554 U.S. at 592. That is constitutionally relevant "use," and the County's ban is therefore unconstitutional.

### 2. There Is No Tradition of Banning "Dangerous" Weapons Unless They Are Also Unusual.

The County argues both as a matter of "text" and history, that its Ban is constitutional because "dangerous" weapons are categorically excluded from the Second Amendment's coverage. County Br. 33–34, 46. As Plaintiffs explained at length in their opening brief, this argument fails as a textual matter. Pls.' Br. 24–25. And in any event, regardless of whether it is considered as part of the text or of history, there is no "dangerous" limitation that can deprive a firearm of constitutional protection without a corresponding finding that the firearm is "unusual" also. *See Heller*, 554 U.S. at 627.

The County objects that Plaintiffs are "read[ing] a Supreme Court decision like a statute, which is never appropriate," when Plaintiffs insist that, when *Heller* and *Bruen* used the conjunctive "dangerous and unusual" formulation to describe the relevant historical tradition, it was not misspeaking. County Br. 31. It counters that Blackstone used the disjunctive "dangerous or unusual" formulation and argues that Plaintiffs' "reading puts *Heller* in conflict … with the very passage of Blackstone it cited." *Id.* (emphasis omitted). The Supreme Court in *Heller* and again in *Bruen* has repeatedly used the conjunctive formulation, and this Court cannot ignore the carefully chosen language of the Supreme Court. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21, 47. What is more, the County's reading puts *Heller* at odds with itself. Handguns were determined to be protected in *Heller* even though all of the County's "dangerous" arguments could be made, and in fact were made, much more persuasively in favor of banning handguns. *See* Br. of Violence Pol'y Ctr. et al. as Amici Curiae in Supp. of Pet'rs at 15–28, *District of Columbia v. Heller*, No. 07-290, 2008 WL 136348 (U.S. Jan. 11, 2008) (arguing, e.g., that "Handguns Continue to be Responsible for a Disproportionately High Number of Homicides, Including Mass

Shootings" (emphasis omitted)); *Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States,* U.S. DEP'T OF JUST., FBI, https://bit.ly/3IF5A6M (last visited Oct. 16, 2024) (select the time frame "past 10 years") (averaging 368 rifle homicides per year, compared to 6,573 committed with handguns, 1,452 with knives, and 629 using personal weapons (i.e., hands and feet)); Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7 (D. Ct. Doc. 98-8, Ex. 76) (showing that all 20 of the top 20 firearms seized by Chicago police in 2014 were handguns); *see also* D. Ct. Doc. 98, ¶ 114; Daniel W. Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171, 188 (2020) (D. Ct. Doc. 98-5, Ex. 45); Benjamin M. Blau et al., *Guns, laws and public shootings in the United States*, 48 APPLIED ECON. 1, 1–15 (2016) (D. Ct. Doc. 98-6, Ex. 58) (finding that use of handguns, but not assault weapons, is associated with more victims in mass shootings). As then-judge Kavanaugh explained, "if we are constrained to use [the County's] rhetoric, we would have to say that *handguns* are the quintessential 'assault weapons' in today's society." *Heller II*, 670

F.3d at 1290 (Kavanaugh, J., dissenting). If there were a separate, free-floating "dangerous" principle that depended on the criminal misuse of the arm in question, then it would have been impossible for *Heller* to be decided as it was.

Of course, *Heller* is not at war with itself. *Heller* treated the terms "dangerous and unusual" as *conjunctive* and therefore, the fact that handguns are "in common use" was dispositive. Pls.' Br. 12; *see also id.* at 48–53 (reviewing overwhelming evidence of commonality). And even if the test were disjunctive, that ultimately would not make a difference. The question whether an arm was too dangerous would be "dangerous compared to what?" And the most apt comparator would be arms that are in common use, as it would make no sense to say that arms that are or are comparable to arms in common use are *unusually* dangerous. And of course the arms at issue here are in common use so they cannot be unusually dangerous.

The County also argues that Plaintiffs are "conspicuously unable to identify even a single statement in *Heller* or *Bruen* identifying ['dangerous and unusual'] as the *only* historical tradition that might be considered at *Bruen*'s second step." County Br. 54. But that is not true.

Both *Bruen* and *Heller* state that arms that are not unusual, but are in common use, are *categorically* protected and cannot be banned. *Bruen*, 597 U.S. at 21; *Heller*, 554 U.S. at 626–27. As such, a firearm not being unusual is conclusive proof of its protected status. The County has no response other than to tell this Court it should blind itself to this evidence, but as discussed above, doing so would be inappropriate.

### 3. The Banned Firearms Are Not "Dangerous" In Any Constitutionally Relevant Way.

The County argues that the banned firearms are "dangerous" for several invalid reasons.

First, the County claims that "the Framers understood 'dangerous' weapons to encompass 'militaristic' weapons—weapons fundamentally incompatible with longstanding principles of moderate, proportionate self-defense," and suggests that the banned firearms are such weapons. This is wrong twice over. The County cites no relevant law (ignoring, for instance, the irrelevant principles of Roman law, *see* County Br. 34–35) that banned *possessing* arms that are useful for military purposes, and in fact, at the Founding, civilians were legally *required* to own such firearms. *See* Militia Act of 1792, Act of May 8, 1792, ch. 33, 1 Stat. 271, § 1.

Nor is it true that the banned rifles are "militaristic" because they are more powerful than handguns. Indeed, handguns themselves are issued to servicemembers by militaries the world over, including in the United States. *See Bevis*, 85 F.4th at n.8 ("Obviously, many weapons are 'dual use[.]' … In this sense, there is a thumb on the scale in favor of Second Amendment protection.").

The County nevertheless claims that, because of they have power (but not automatic fire capability) similar to some firearms used by the military, the banned firearms are "fundamentally incompatible with the common-law right to moderate, proportional self-defense protected by the Second Amendment," County Br. 41, and it cites cases holding that excessive force may not be used in self-defense. This argument simply does not make sense. Of course, if lethal force is disproportionate to the needs of self-defense, using any firearm, including the banned firearms, would be "excessive." But in Illinois (as elsewhere), "[i]f a person is confronted with such means or force as to induce a reasonable belief that he is in danger of loss of life or of suffering great bodily harm, that is all the law requires to justify a killing as self-defense." *People v. White*, 409 N.E. 2d 73, 75 (Ill. App. Ct. 1980). And once lethal force is justified,

Plaintiffs are aware of no case—and the County has certainly supplied none—holding that certain force is *too lethal* to be justified.

The County suggests that historic prohibitions on trap or spring guns support this principle, but even in its own telling, those laws are disanalogous to the County Ban. The County admits they "were not based on spring guns' unusual lethality or other destructive potential," which "were largely similar to ordinary handguns and rifles, only modified to fire remotely." County Br. 42. This is fatal to any analogy under *Bruen* which requires relevant similarity, 597 U.S. at 28–29, given that "unusual lethality" is precisely the basis on which the County claims the banned firearms are unsuitable for self-defense, County Br. 42; *see id.* at 44. Spring or trap gun laws are readily understood as violating the principle that self-defense firing of a firearm must be justified by a lethal threat, because they were rigged to fire without a human deciding in the moment to pull the trigger—the lack of human control, an element completely absent from the banned firearms, meant that they were indiscriminate and posed an unacceptable risk of harm to innocent individuals. The banned semiautomatic firearms, on the other hand, are completely different. In fact, many of the very features that the County

targets with its ban—pistol grips, adjustable stocks, and barrel shrouds, all make it easier to fire the banned rifles comfortably and accurately and assist with controlling recoil. *See* Pls.' Br. 43–48; D. Ct. Doc. 98, ¶ 20. The County nevertheless claims, based on "use in terrorism, mass killing, and police murder," that the banned arms have a "recognized capacity for inflicting indiscriminate harm on innocents." County Br. 45. But this elides the critical difference between a trap gun harming an innocent person *truly indiscriminately*, as a function of the weapon configuration itself, and the horrific, intentional criminal *misuse* through which the banned firearms can be used to harm innocents. As explained above, if criminal misuse were enough to deprive law-abiding citizens of the right to possess a certain firearm, then *Heller* would have been decided differently.

There is, in any event, *nothing* in the County's brief that shows that the banned firearms are more "dangerous" than other common arms when wielded by a law-abiding citizen. The County repeats outlandish claims regarding the ability of 5.56 NATO ammunition (which is not banned by the County), to cause decapitation or to explode limbs, County Br. 44, but these claims are based on initial field reports about the M16

that the Army could never—despite trying—replicate, *see* David Kopel, *How powerful are AR rifles?*, REASON (Feb. 27, 2023) (D. Ct. Doc. 98-3, Ex. 26), and actual military experience with the round has showed it is often *underpowered* for military uses, rather than overpowered, *see* Anthony F. Milavic, *It's the Cartridge, Stupid—Not the Rifle*, U.S. NAVAL INST. (Aug. 2002) (D. Ct. Doc. 98-9, Ex. 84). The County also complains that the AR-15 has too great an effective range and can pierce body armor, County Br. 44, but these arguments sweep too broadly. "[V]irtually *all* rifle ammunition will penetrate soft body armor," an "AR-15 is no better at piercing soft body armor than any other rifle of the same caliber," STEPHEN HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 393 (2022) (D. Ct. Doc. 98-1, Ex. 3), and other semiautomatic centerfire rifles which are not banned are equal to or more powerful than the AR-15, *see* Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018) (D. Ct. Doc. 98-4, Ex. 39).

Second, the County argues the banned arms are "dangerous" because, it claims, they "have become indelibly linked to mass shootings in the popular consciousness." County Br. 29. Indeed, the County goes so

far as to (wrongly) claim that Plaintiffs "do[] not seriously dispute that such weapons are commonly—indeed, *repeatedly*—used for the unlawful purpose of massacring innocent civilians." *Id.* at 30; *but see id.* at 32 ("Viramontes argues that assault weapons are 'rarely' used for 'violent crime.' "). But as explained above, what matters under *Heller* is not criminal misuse, but lawful proper use.

Third, the County cannot show that AR-15-style rifles and similar firearms are "dangerous" based on historical laws "restricting access to weapons capable of inflicting rapid mass casualties, as demonstrated by historical regulations of gunpowder." *Id.* at 48. Pointing to these historical laws, the County claims that "[u]nlike cannons … gunpowder could be acquired and stored by average citizens," though states and localities enacted regulations regarding the method and quantity of their storage. *Id.* The County claims that these laws and the County's Ban have the same "why" because both gunpowder and the banned firearms "give a single individual the extraordinary ability to kill great numbers of people quickly," and the same "how" because both imposed a "minimal burden on armed self-defense" because the County has left some firearms (as-yet) unbanned. *Id.* at 51–53. These statements are wrong. First, the

County's claim that cannons, unlike gunpowder, were not available to private individuals, is typical of its historical analysis. It provides no citation for the claim, and in fact there is no law that prohibited private cannon ownership at any time in our country's history. *See* Louis Jacobson, *Fact-check: Could individuals own cannons during the Revolutionary War?*, Austin Am.-Statesman (June 30, 2020), https://bit.ly/3AdxCp8; Joseph E. Persico, *The Great Gun Merchant*, 25 Am. Heritage (Aug. 1974), https://bit.ly/48bDEmW. Second, the County's argument about the "how" and the "why" of these laws is flatly inconsistent with *Heller*, which correctly classed them not as prohibitions on mass-casualty weapons, but rather as "fire-safety laws," that "do not remotely burden the right of self-defense as much as an absolute ban on handguns." 554 U.S. at 632. And the burden is no less when the object of the ban is "assault weapons" as opposed to handguns, as the County suggests. *See* County Br. 53. "It is no answer" to the charge that the County has banned *one* means of self-defense, to say that *others* remain available. *Heller*, 554 U.S. at 629.

## CONCLUSION

The Court should reverse the judgment of the district court and remand with instructions to enter judgment in Plaintiffs' favor.

Dated: October 18, 2024

Respectfully Submitted,

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because it contains 6,940 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

October 18, 2024

/S/ David H. Thompson
David H. Thompson
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David H. Thompson
David H. Thompson
*Attorney for Plaintiffs-Appellants*